_____
                                        )
VICTOR VASQUEZ, et al.,                 )
                                        )
    Plaintiffs,                         )
                                        )
      v.                                )    Case No. 17-cv-00112 (APM)
                                        )
WHOLE FOODS MARKET, INC., et al.,       )
                                        )
    Defendants.                         )
_____ )

## MEMORANDUM OPINION AND ORDER

## I. INTRODUCTION

Plaintiffs Victor Vasquez, Nadeem Sheikh, Katia Sadoudi, Svetlana Bautista, Ibrahima Ba, Nicholas Miano, Pa M. Njie, Michael Amegnaglo, and David Berger (collectively, "Plaintiffs") are former Store Team Leaders for various Whole Foods grocery stores in the Washington, D.C., metropolitan area. They bring this action against Defendants Whole Foods Market, Inc. ("WFMI"), Whole Foods Market Group, Inc. ("WFM Group"), Whole Foods Market Services, Inc. ("WF Services"), and Whole Foods spokeswoman Brooke Buchanan (collectively, "Defendants" or "Whole Foods"), alleging that they were terminated in retaliation for blowing the whistle on the improper manner in which Whole Foods conducted its "Gainsharing" program, a bonus program designed to incentivize individual grocery store departments to operate under budget by sharing cost savings with employees. Plaintiffs also assert that, following their terminations, Defendants falsely accused them through published news stories of manipulating the Gainsharing program for their own benefit.

Before the court are the following motions: (1) Defendants' Motion to Dismiss Plaintiffs' Amended Complaint; (2) Plaintiffs' Motion for Leave to File Second Amended Complaint; and (3) Defendants' Motion to Stay. For the reasons herein, the court grants in part and denies in part

Defendants' Motion to Dismiss. The court dismisses all claims against all Defendants, except Plaintiffs' claims for defamation and false light invasion of privacy, which may proceed against WFM Group and WF Services only. Additionally, the court grants Plaintiffs' Motion to File a Second Amended Complaint and denies Defendants' Motion to Stay as moot.

## II.   BACKGROUND

### A.   Factual Background

Each of the nine Plaintiffs in this action worked as a Store Team Leader—the highest level of leadership at a store location—for a Whole Foods grocery store in the Washington, D.C., metropolitan area before his or her termination in December 2016. Am. Compl., ECF No. 11, ¶ 24. During Plaintiffs' employment, Whole Foods used a profit-sharing program—what Whole Foods referred to as its "Gainsharing" program—in its stores to incentivize department productivity and revenue. *Id*. ¶ 28. Under the program, Whole Foods awarded bonuses to employees whose departments performed under budget by distributing the surplus savings among the employees in that department. *Id*.

According to Plaintiffs, Whole Foods' corporate leadership undermined the Gainsharing program by imposing a nationwide scheme of "shifting" labor costs. *Id*. ¶ 29. Under this practice, if a department came in over budget, Whole Foods corporate leadership instructed store leadership—including Store Team Leaders—to "shift" the labor costs of that department to a department that had a budget surplus. *Id*. Payroll Specialists at each Whole Foods store then effectuated labor cost shifting by manually altering employee time records and submitting the manipulated records to corporate headquarters for payroll processing. *Id*. ¶ 33. As a result of this practice, the Gainsharing bonuses owed to employees of departments that performed under budget were reduced by the costs unlawfully "shifted" to those departments. *Id*. ¶ 29. Plaintiffs

allege that Whole Foods corporate leadership imposed this practice of "shifting" labor costs in every Whole Foods grocery store to steal bonuses earned by employees and pad company profits. *Id*. ¶ 30.

In October 2016, a Whole Foods employee from the Mid-Atlantic region submitted an anonymous complaint to Whole Foods' employee tip line, complaining that he or she did not receive the proper Gainsharing bonus because labor costs had been shifted from another department to the employee's department. *Id*. ¶ 34. Whole Foods thereafter launched an investigation into this complaint. According to Plaintiffs, however, the investigation was a sham. Its true goal was "to concoct support for Whole Foods' pre-determined outcome that the 'shifting of labor costs' was limited to the store complained about" in the anonymous tip. *Id.* ¶ 35.

In early November 2016, Whole Foods investigators interviewed each Plaintiff about the Gainsharing program implemented in his or her respective store. Each Plaintiff explained that shifting labor costs was a standard practice throughout Whole Foods stores and some Plaintiffs stated they received explicit instructions from corporate officials to do so. Am. Compl. ¶¶ 35–37. After these meetings, Plaintiffs were immediately placed on administrative leave. Am. Compl. ¶ 37.

Soon thereafter, Plaintiffs were fired. On November 30, 2016, Plaintiffs were instructed to meet at Whole Foods' regional office on the following day. Am. Compl. ¶ 38. Each Plaintiff met individually with Regional President Scott Allshouse, Regional Vice-President Nicole Wescoe, and Human Resources Executive Coordinator David Gearhart. Each Plaintiff was terminated, purportedly (according to Whole Foods) for shifting labor costs and falsifying documents in violation of company policy. *Id.*

The firings made the news. On December 13, 2016, the Associated Press reported in an article titled "Whole Foods Fires 9 Store Managers Over Bonus Manipulation" that nine store managers of Whole Foods stores in Maryland, Virginia, and the District of Columbia were dismissed after a company-wide investigation determined that the managers "engaged in a policy infraction that allowed the managers to benefit from a profit-sharing program at the expense of store employees." Defs.' Mot. to Dismiss, ECF No. 12 [hereinafter Defs.' Mot], Ex. C-2, ECF No. 12-7 [hereinafter AP Article]. The Associated Press article attributed Whole Foods' statements and details about the investigation to Defendant Brooke Buchanan, a spokeswoman for Whole Foods. Two days later, The Washington Post published a news article titled "Whole Foods Fires Managers in Md., Va., and D.C. for Manipulating Bonus System." Defs.' Mot., Ex. C-3, ECF No. 12-8 [hereinafter Washington Post Article]. In the article, Whole Foods confirmed that nine managers of Whole Foods stores in Maryland, Virginia, and the District were fired for manipulating a store bonus program. Washington Post Article, at 1. Whole Foods stated that the conduct was still under investigation but was isolated to a relatively small number of its 457 stores. Speaking on behalf of Whole Foods, Brooke Buchanan stated that "[Whole Foods] took swift action, but, relative to the rest of company, this manipulation only happened in nine of our locations." *Id.*

## B. Procedural Background

Plaintiffs filed this action in the Superior Court for the District of Columbia on December 20, 2016, and Defendants removed the case to this court on January 17, 2017. *See* Notice of Removal, ECF No. 1. Plaintiffs' Amended Complaint asserts the following claims: (1) wrongful termination and retaliation for whistleblowing against all Defendants except Buchanan (Count I); (2) wrongful termination and retaliation for whistleblowing as to Plaintiff Bautista only against all

4

Defendants except Buchanan (Count II); (3) breach of contract and breach of the duty of good faith and fair dealing against all Defendants except Buchanan (Count III); (4) defamation as to all Defendants (Count IV); and (5) false light invasion of privacy as to all Defendants (Count V). Am. Compl. ¶¶ 49–91.

Defendants moved to dismiss the Amended Complaint on April 3, 2017. Defs.' Mot. Defendants WFMI, WF Services, and Buchanan moved to dismiss pursuant to Rule 12(b)(2) of the Federal Rules of Civil Procedure for lack of personal jurisdiction, and, in the alternative, for failure to state a claim pursuant to Rule 12(b)(6). Defs.' Mot. at 1 n.1. WFM Group moved to dismiss the complaint solely under Rule 12(b)(6). *Id.* Plaintiffs opposed Defendants' Motion and simultaneously sought leave from the court to amend their Amended Complaint to add a whistleblower retaliation claim under the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010, 15 U.S.C. § 78u-6, against all Defendants except Buchanan. Pls.' Mem. in Opp'n. to Defs.' Mot., ECF No. 17 [hereinafter Pls.' Opp'n]; Pls.' Mot. for Leave to File a Second Am. Compl., ECF No. 16 [hereinafter Pls.' Mot. to Am.]. Defendants subsequently moved the court to stay consideration of Plaintiffs' Motion to Amend until the court ruled on the pending Motion to Dismiss. Defs.' Mot. to Stay Consideration of Pls.' Mot. to Am., ECF No. 21 [hereinafter Defs.' Mot. to Stay].

The parties' motions are now ripe for consideration.

## III.  LEGAL STANDARD

Upon a motion to dismiss under Rule 12(b)(2), the plaintiff bears the burden of establishing a factual basis for personal jurisdiction. *Crane v. N.Y. Zoological Soc.*, 894 F.2d 454, 456 (D.C. Cir. 1990)). A plaintiff can survive a motion to dismiss if she makes a "prima facie" showing of personal jurisdiction. *Edmond v. U.S. Postal Serv. General Counsel*, 949 F.2d 415, 424 (D.C.

Cir. 1991). "[T]o establish a prima facie case, plaintiffs are not limited to evidence that meets the standards of admissibility required by the district court. Rather, they may rest their argument on their pleadings, bolstered by such affidavits and other written materials as they can otherwise obtain." *Mwani v. bin Laden*, 417 F.3d 1, 7 (D.C. Cir. 2005). The court resolves all factual discrepancies in the record in favor of the plaintiff. *See Crane*, 894 F.2d at 456.

When evaluating a motion under Rule 12(b)(6), the court "construe[s] the complaint 'in favor of the plaintiff, who must be granted the benefit of all inferences that can be derived from the facts alleged.'" *Hettinga v. United States*, 677 F.3d 471, 476 (D.C. Cir. 2012) (quoting *Schuler v. United States*, 617 F.2d 605, 608 (D.C. Cir. 1979)). The court need not accept as true, however, "a legal conclusion couched as a factual allegation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). To survive a motion to dismiss, the complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Id.* (quoting *Twombly*, 550 U.S. at 570). A claim is plausible on its face "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

## IV. DISCUSSION

### A. Personal Jurisdiction

Before turning to the legal sufficiency of Plaintiffs' allegations, the court begins, as it must, by determining whether it can exercise personal jurisdiction over Defendants Brooke Buchanan, WFMI, and WF Services.[1] *E.g.*, *Forras v. Rauf*, 812 F.3d 1102, 1105 (D.C. Cir. 2016). Personal

---

[1] Defendant WFM Group, a Delaware corporation with its principal place of business in Texas, did not assert lack of personal jurisdiction when it moved to dismiss the Amended Complaint; it moved for dismissal only under Rule 12(b)(6). WFM Group therefore has waived lack of personal jurisdiction as a defense. *See* Fed. R. Civ. P. 12(h); *Gilmore v. Palestinian Interim Self-Gov't Auth.*, 8 F. Supp. 3d 9, 13 (D.D.C. 2014) (quoting *Candido v. District of Columbia*, 242 F.R.D. 151, 161 (D.D.C. 2007) ("[I]f a party files a Rule 12(b) motion to dismiss, it may not subsequently assert any Rule 12(b) defenses that were available when the first Rule 12(b) motion was filed.")). The court later asked the parties to brief the impact of a recent Supreme Court decision, *Bristol-Myers Squibb Co. v.*

jurisdiction takes two forms: (1) "general or all-purpose jurisdiction" or (2) "specific or case-linked jurisdiction." *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011). General jurisdiction exists where a defendant's contacts with the forum state are sufficiently "continuous and systematic," such that the defendant is "essentially at home" in the forum. *See id.* For individuals, "the paradigm forum for the exercise of general jurisdiction is the individual's domicile." *Id.* at 924. For corporations, "it is an equivalent place, one in which the corporation is fairly regarded as at home," *id.*, namely "the place of incorporation and principal place of business," *Daimler AG v. Bauman*, 134 S. Ct. 746, 760 (2014). In this case, Plaintiffs do not contend that the court has general jurisdiction over any of the corporate Defendants or Buchanan. *See* Pls.' Opp'n at 6 (conceding lack of general jurisdiction). Thus, the parties dispute whether exercising specific jurisdiction over these Defendants (except WFM Group, *see* n. 1, *supra*) is appropriate.

Specific jurisdiction is case specific. "In contrast to general, all-purpose jurisdiction, specific jurisdiction is confined to adjudication of issues deriving from, or connected with, the very controversy that establishes jurisdiction." *Goodyear*, 564 U.S. at 919 (citation omitted). Stated differently, specific jurisdiction exists if a claim is related to or arises out of the non-resident defendant's contacts with the forum. *See Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414 n.8 (1984).

A plaintiff seeking to establish specific jurisdiction over a non-resident defendant must make two showings. She must "establish that specific jurisdiction comports with the forum's

*Superior Court of Cal., San Francisco Cty.*, 137 S. Ct. 1773 (2017). *See* Order, ECF No. 25. In their response, WFM Group asserted for the first time that the court lacked personal jurisdiction as to it, as well, except as to one Plaintiff's claims. *See* Defs.' Suppl. Br. Regarding Personal Jurisdiction, ECF No. 26. The court, however, declines to consider WFM Group as having asserted a personal jurisdiction defense since the court raised the question of *Bristol-Myer*'s application sua sponte. *See Kapar v. Kuwait Airways Corp.*, 845 F.2d 1100, 1105 (D.C. Cir. 1988) (holding that district court committed error when it sua sponte dismissed claims against a defendant for lack of personal jurisdiction). Accordingly, only the sufficiency of Plaintiffs' pleading against WFM Group is at issue.

long-arm statute, D.C. Code § 13-423(a), and does not violate due process." *FC Inv. Group LC v. IFX Markets, Ltd.*, 529 F.3d 1087, 1094–95 (D.C. Cir. 2008). As pertinent to this case, the District of Columbia's long-arm statute provides that specific jurisdiction exists if the claim against the non-resident defendant arises from the defendant's:

> (1) transacting any business in the District of Columbia;
> (2) contracting to supply services in the District of Columbia;
> (3) causing tortious injury in the District of Columbia by an act or omission in the District of Columbia;
> (4) causing tortious injury in the District of Columbia by an act or omission outside the District of Columbia if the defendant regularly does or solicits business, engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed, or services rendered, in the District of Columbia; [or]
> (5) having an interest in, using, or possessing real property in the District of Columbia[.]

D.C. Code § 13-423(a)(1)–(5). Even if plaintiff satisfies one of these prongs, due process supplies a "constitutional check" and "sets the outer boundary" for the court's jurisdiction. *Crane*, 814 F.2d at 762. Whether due process is satisfied depends on weighing "the facts of each case . . . against notions of fairness, reasonableness and substantial justice." *Shoppers Food Warehouse v. Moreno*, 746 A.2d 320, 329 (D.C. 2000). Thus, the propriety of subjecting a defendant to a court's jurisdiction is a case-specific inquiry.

    *1.*    *The Impact of* Bristol-Myers Squibb Co. v. Superior Court of California, San Francisco County

The court starts the personal jurisdiction inquiry with the Supreme Court's recent decision in *Bristol-Myers Squibb Co. v. Superior Court of California, San Francisco County*, 137 S. Ct. 1773 (2017). The court ordered the parties to provide supplemental briefing addressing the impact of *Bristol-Myers* on this case. *See* Order, ECF No. 25. Specifically, the court asked "whether this court can, consistent with the requirements of due process as articulated in *Bristol-Myers Squibb*, exercise specific jurisdiction over Defendants with respect to any of the asserted

claims, except those by Vasquez." *Id.* at 2–3. The court singled out Vasquez because, as the only Plaintiff employed at a Whole Foods store in the District of Columbia at the time of his termination, Vasquez is the only Plaintiff to have clearly suffered injury in the District, thus satisfying the requirement of due process. *See id.* at 2. By comparison, the other Plaintiffs resided and worked in either Maryland or Virginia at the time of their terminations, thereby raising the question whether their claims have any connection to the District of Columbia that would enable the court to exercise personal jurisdiction over Buchanan, WFMI, or WF Services. *See id.* at 2–3.

In *Bristol-Myers*, "[a] group of plaintiffs—consisting of 86 California residents and 592 residents from 33 other States" brought a mass tort action in California state court arising from injuries allegedly caused by a drug manufactured by Bristol-Myers Squibb. 137 S. Ct. at 1777–78. Incorporated in Delaware and headquartered in New York, Bristol-Myers Squibb challenged the California state court's exercise of specific jurisdiction over the company as to the claims of the non-resident plaintiffs, none of whom asserted any injury from the drug in California or any other connection to the state. *Id.* at 1777–80, 1782. The Court agreed with Bristol-Myers Squibb that the California state court's exercise of personal jurisdiction over the company as to those claims brought by the non-resident plaintiffs violated the Due Process Clause of the Fourteenth Amendment. Applying "settled principles regarding specific jurisdiction," the Supreme Court explained that the California state court's exercise of specific jurisdiction as to the non-residents' claims was unconstitutional because there was no "connection between the forum and the [non-residents'] specific claims." *Id.* at 1781. For instance, the non-resident plaintiffs had not shown that they were prescribed or had purchased or had ingested the drug in California. *Id.* Nor were any of the non-resident plaintiffs injured by the drug in California. *Id.* In short, the Supreme

Court reasoned, the non-resident plaintiffs' claims did not comport with due process because none involved any activity or occurrence that took place in California. *Id.* The Court also rejected the argument that the similarity of the residents' and non-residents' claims obviated the due process infirmity. As the Court explained, "[t]he mere fact that other plaintiffs were prescribed, obtained, and ingested [the drug] in California—and allegedly sustained the same injuries as did the nonresidents—does not allow the State to assert specific jurisdiction over the nonresidents' claims." *Id.* Accordingly, the Court held that the non-resident plaintiffs' claims could not be heard in California state court.

In this case, *Bristol-Myers* does not pose a jurisdictional obstacle. All Plaintiffs have alleged some injury in the District of Columbia as a result of Defendants' alleged defamatory statements. Plaintiffs assert that, through Buchanan, Defendants made various defamatory statements that ran in the local press, including in The Washington Post. Am. Compl. ¶¶ 43, 73; *see* AP Article; Washington Post Article. They further allege that "Store Team Leaders, Assistant Store Team Leaders, and Team Members for Whole Foods in the Mid-Atlantic region knew and understood the defamatory statements published by Whole Foods referred to Plaintiffs." Am. Compl. ¶ 81. Viewing these alleged facts in the light most favorable to Plaintiffs, Plaintiffs have plausibly asserted that Defendants' defamatory statements reached residents of the District of Columbia. Such an allegation is sufficient to establish injury in the District of Columbia, even by a plaintiff who does not reside or work here. *See Charlton v. Mond*, 987 A.2d 436, 438 (D.C. 2010) (agreeing with a plaintiff asserting a defamation claim, who was a Maryland resident and whose business was registered in Maryland, that "the situs of the alleged injury was certainly in the District because the allegedly defamatory material reached some who were indisputably District residents"). This case, therefore, does not present the jurisdictional deficiency at issue in

*Bristol-Myers*—the lack of any connection between the claim and the forum.   Because Plaintiffs have alleged injury in the District of Columbia, there is no due process impediment to Defendants being held to account for their alleged actions in this court.[2]

Having concluded that *Bristol-Myers* does not preclude the exercise of personal jurisdiction over WFMI, WF Services, and Buchanan on constitutional grounds, the court turns to address whether dismissal of the Amended Complaint is warranted for lack of specific jurisdiction as to those Defendants under the D.C. long-arm statute.

2.    *Specific Jurisdiction over Brooke Buchanan*

The court starts its long-arm inquiry with Buchanan.   Buchanan is a Texas resident and is the Global Vice President of Communications for WF Services, which is headquartered in Austin, Texas.   *See* Defs.' Mot., Decl. of Brooke Buchanan, ECF No. 12-4 [hereinafter Buchanan Decl.] ¶¶ 3–4.   Plaintiffs allege that, shortly after their termination, Buchanan contacted reporters located in the District of Columbia and made false and defamatory statements about them and the circumstances of their termination.   Am. Compl. ¶¶ 22, 41–43.   Plaintiffs attribute an even more expansive role to Buchanan in their opposition memorandum.   *See* Pls.' Opp'n at 14–15; Pls.' Suppl. Br., ECF No. 27 [hereinafter Pls.' Suppl. Br.], at 3–4.   Plaintiffs contend that, because WF Services provided "legal services related to the investigation . . . within the District of Columbia," Pls.' Opp'n at 14 (citing Defs.' Mot., Decl. of Patricia Yost, ECF No. 12-3 [hereinafter Yost Decl.] ¶ 12), and because Buchanan was part of WF Services' investigative team, she engaged in a "persistent course of conduct" and received "substantial revenue" from the investigation of

---

[2] The court need not evaluate whether every claim advanced by Plaintiff satisfies the requirements of due process. So long as Plaintiffs obtain personal jurisdiction as to one claim—and here they have via their defamation cause of action—the doctrine of pendent personal jurisdiction permits the court to exercise personal jurisdiction over Defendants as to other "claims that arose out of the same core operative fact[s]."   *Oetiker v. Werke, G.m.b.H.*, 556 F.2d 1, 4 (D.C. Cir. 1977).   All of Plaintiffs' claims in this case concern their termination from Whole Foods for disclosures made about the Gainsharing program; therefore, the court has pendent personal jurisdiction with respect to Plaintiffs' non-defamation causes of action.

11

Plaintiffs in the District of Columbia, *see id.* at 14–15; Pls.' Suppl. Br. at 3–4. Plaintiffs maintain that these contacts are sufficient to establish specific jurisdiction over Buchanan under subsection (a)(4) of the long-arm statute. The court disagrees.

Section 13-423(a)(4) allows for the exercise of personal jurisdiction over a defendant that causes "tortious injury in the District of Columbia by an act or omission outside the District of Columbia if the defendant regularly does or solicits business, engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed, or services rendered, in the District of Columbia." D.C. Code § 13-423(a)(4). As the Circuit has observed, the drafters of the long-arm statute "apparently intended that the (a)(4) subsection would not occupy all of the constitutionally available space." *Crane*, 814 F.2d at 762. The subsection's required "plus" factors—regularly doing or soliciting business, engaging in persistent conduct, or deriving substantial revenue—are meant "to filter out cases in which the in-forum impact is an isolated event and the defendant has no, or scant, affiliations with the forum." *Id.* at 763. Consequently, subsection (a)(4) requires "something more" of plaintiffs than simply asserting that tortious conduct outside the District caused injury inside the District. *Id.*

Plaintiffs have failed to meet their burden of making a prima facie case of personal jurisdiction under subsection (a)(4) as to Buchanan. For starters, Plaintiffs offer no "specific facts" to support their contention that Buchanan was part of the WF Services' team that investigated Plaintiffs in the District of Columbia. *Lans v. Adduci Mastriani & Schaumberg, LLP*, 786 F. Supp. 2d 240, 263 (D.D.C. 2011) (citation omitted). The only fact that Plaintiffs offer to place Buchanan on the investigative team is that she *received* information about the investigation before making statements about Plaintiffs to the press. *See* Pls.' Opp'n at 14. But Buchanan's mere receipt of investigative findings does not plausibly make her a member of the investigative

team that supposedly engaged in a persistent course of conduct in the District. Moreover, even if she were part of the investigative team, Plaintiffs offer nothing to establish that Buchanan herself was involved in a "persistent course of conduct" in the District of Columbia. Plaintiff cannot "aggregate factual allegations concerning multiple defendants"—or, in this case, impute to Buchanan the acts of other WF Services employees or agents—"in order to demonstrate personal jurisdiction over" her. *Lans*, 768 F. Supp. 2d at 264 (internal quotation marks omitted); *accord Mouzon v. Radiancy, Inc.*, 85 F. Supp. 3d 361, 372–73 (D.D.C. 2015) (rejecting, for purposes of subsection (a)(4) jurisdiction, the plaintiffs' attempt to treat the employee's contacts with the forum state as the same as his employer's contacts). Finally, insofar as they claim that Buchanan received "substantial revenue" from the investigation, Plaintiffs concede that such revenue is "by virtue of her employment" with WF Services, and is not directly personal to her. Pls.' Opp'n at 15. Even if the court accepts that WF Services derived substantial revenue from the investigation, "it would not necessarily follow" that Buchanan did so as well. *Mouzon*, 85 F. Supp. 3d at 373. In sum, Plaintiffs' allegations about Buchanan's contacts with the District are insufficient to "make a prima facie showing of the pertinent jurisdictional facts to survive a motion to dismiss for lack of personal jurisdiction." *Livnat v. Palestinian Auth.*, 851 F.3d 45, 56–57 (D.C. Cir. 2017) (emphasis and internal quotation marks omitted). The court therefore dismisses without prejudice all claims against Buchanan for lack of personal jurisdiction.

### 3. Specific Jurisdiction over WFMI and WF Services

#### a. WFMI

Turning next to WFMI, WFMI is a Texas corporation with its principal place of business in Austin, Texas. Am. Compl. ¶ 18. According to a declaration submitted by Patricia Yost, an officer with WF Services, "WFMI is . . . a holding company that owns shares of other operating

companies, which in turn own and operate the individual Whole Foods market stores." Yost Decl. ¶ 5. Yost further attests that WFMI does not own or operate any stores in the District of Columbia; has no employees, office space, or telephones in the District; and has no bank accounts or other tangible personal or real property in the District. *See id.* ¶¶ 5, 9. WFMI also does not, according to Yost, set policies for Whole Foods stores and does not regulate or assure uniformity of policies in the stores. *See id.* ¶ 10.

To counter these assertions, Plaintiffs point to two pieces of evidence and one set of allegations. First, Plaintiffs offer WFMI's Form 10-K filing with the Securities and Exchange Commission for the fiscal year ending September 2016, which states that, "As of September 25, 2016, *we* operated 456 stores: 436 stores in 42 U.S. states and *the District of Columbia*," and identifies four such stores in the District. Pls.' Opp'n., Ex. 1, ECF No. 17-4 [hereinafter 10-K filing], at 14 (emphasis added). Second, Plaintiffs cite to the Complaint and Answer filed in *FTC v. Whole Foods Market, Inc.*, 07-cv-1021-PLF (D.D.C.), an antitrust enforcement action brought by the Federal Trade Commission ("FTC") to enjoin the merger of Whole Foods and another grocery chain. In the Complaint, the FTC defined "Whole Foods" to mean "Whole Foods Market, Inc." and alleged that "Whole Foods transacts business in the District of Columbia," an allegation WFMI admitted in its Answer. *See* Pls.' Opp'n. at 9–10. Plaintiffs also cite to another response in the Answer, in which WFMI admitted that it "operates approximately 190 stores in more than 30 states and the District of Columbia." Pls.' Opp'n, Ex. 3, ECF No. 17-6, at 2 ¶ 2. Third, Plaintiffs point to their allegations that the shifting of labor costs to undermine the Gainsharing program was a "nation-wide corporate practice" and Plaintiffs were instructed by "Whole Foods corporate leadership . . . to shift labor costs." Am. Compl. ¶¶ 29, 31. Plaintiffs argue this "nation-wide" practice only could have come from the "corporate parent," thereby

creating relevant contacts between WFMI and the District of Columbia. Based on the foregoing, Plaintiffs maintain that this court may exercise specific jurisdiction over WFMI because their claims in this case arise from WFMI's "transacting [ ] business in the District," D.C. Code § 13-423(a)(1); "contracting to supply services in the District," *id.* § 13-423(a)(2); and "having an interest in, using, [and] possessing real property in the District," *id.* § 13-423(a)(5). Pls.' Opp'n at 7–8. They further assert that personal jurisdiction also is available under subsections (a)(3) and (a)(4) by virtue of WFMI's agents terminating Plaintiff Vasquez, who was a Store Team Leader at a store in the District of Columbia,[3] and defaming all Plaintiffs in the District of Columbia. *Id.* at 8. Plaintiffs therefore insist that WFMI "qualifies under all five of the cited bases for this Court to exercise specific personal jurisdiction under the long-arm statute." *Id.*

The court disposes of two of the asserted bases quickly. Neither subsection (a)(2) nor subsection (a)(5) supports the exercise of long-arm jurisdiction. None of Plaintiffs' claims "aris[e] from," D.C. Code § 13-423(b), WFMI's "contracting to supply services in the District of Columbia," *id.* § 13-423(a)(2), or its "having an interest in, using, or possessing real property in the District of Columbia," *id.* § 13-423(a)(5). Accordingly, long-arm jurisdiction over WFMI, if it exists at all, must come under subsections (a)(1), (a)(3), or (a)(4).

Subsection (a)(1) does not, however, provide a basis to exercise jurisdiction over WFMI. Save an argument buried in a footnote, Plaintiffs do not argue that WFMI's subsidiaries' contacts with the District of Columbia should be imputed to WFMI.[4] Rather, Plaintiffs contend that WFMI

---

[3] Plaintiffs also maintain that Plaintiff Sheikh was employed in the District of Columbia when terminated. *See* Pls.' Opp'n at 8. But that assertion is contradicted by their Amended Complaint, which alleges that Sheikh was a Store Team Leader in Reston, Virginia, at the time of his termination. Am. Compl. ¶ 10. For that reason, the court only identifies Vasquez as having been employed in the District of Columbia when terminated.

[4] In that footnote, Plaintiffs argue that WFMI "exercises such active and substantial control over Whole Foods Group, it is merely an alter ego of its subsidiary and its individual stores." Pls.' Opp'n at 11 n.6. For that proposition, Plaintiffs point only to WMFI's statements in the Form 10-K. *See id.* The 10-K, on its own, however, cannot establish, even at the pleadings stage, that WFMI is the alter ego of its subsidiaries. *See Khatib v. Alliance Bankshares*

*directly* "transacts business" in the District of Columbia through its operation of stores and its setting of policies for stores. Pls.' Opp'n at 8–10. Plaintiffs' evidence and fact allegations do not support that proposition, let alone overcome Defendants' contrary evidence. WFMI's Form 10-K, on which Plaintiffs so heavily rely, does not establish WFMI's direct control of stores in the District. "[I]t is widely acknowledged that 'consolidating the activities of a subsidiary into the parent's reports is a common business practice.'" *Khatib v. Alliance Bankshares Corp.*, 846 F. Supp. 2d 18, 33 (D.D.C. 2012) (internal quotation marks omitted). That is precisely what WFMI did here. WFMI expressly noted that when the word "we" is used in the Form 10-K, unless otherwise specified, "we" includes "Whole Foods Market, Inc., *and* its consolidated subsidiaries." 10-K filing, at 1 (emphasis added). So, even though WFMI's Form 10-K says that "we" operate stores in the District of Columbia, *id.*, it cannot reasonably be read to mean that WFMI itself operates those stores. Likewise, WFMI's admission in its Answer in *FTC v. Whole Foods Market* that it "transacts business within the District of Columbia" does not advance Plaintiffs' cause. The court views that admission much like the Form 10-K—an acknowledgment that the corporate entity as a whole operates stores in the District of Columbia, and no more. After all, *FTC v. Whole Foods Market* involved a federal government enforcement action to block a $565 million merger between the country's two largest premium, natural, and organic supermarket chains. *See FTC v. Whole Foods Market, Inc.*, 548 F.3d 1028, 1032 (D.C. Cir. 2008). In such circumstances, the court finds it highly improbable that, by admitting to conducting business in the District of Columbia, WMFI intended to disavow its corporate structure and convey that it, in fact, transacts such business directly, instead of through a subsidiary. Finally, Plaintiffs' allegations that the cost-shifting practice was "nation-wide" and that "corporate leadership" instructed Plaintiffs to

---

*Corp.*, 846 F. Supp. 2d 18, 31–33 (D.D.C. 2012).

take such action, *see* Am. Compl. ¶¶ 29, 31, is simply too vague to ascribe jurisdictional contacts to WFMI in the District.   Plaintiffs do not allege specific facts supporting their assertion that labor cost-shifting occurred at stores outside the Mid-Atlantic region; nor do they identify the "corporate leadership" that directed Plaintiffs' conduct.   Absent such allegations, Plaintiffs cannot overcome Yost's sworn declaration that WFMI does not "set policies for any Whole Foods Market store, nor does WFMI regulate or assure the uniformity of policies in Whole Foods Market stores . . . . [, which] is set and regulated by other Whole Foods entities, not WFMI."   Yost Decl. ¶ 10.   Thus, having failed to provide specific facts to contradict Yost's testimony, Plaintiffs have not satisfied their burden of establishing specific jurisdiction as to WFMI under subsection (a)(1).

Next, subsection (a)(3) provides no refuge.   The only alleged tortious conduct occurring in the District of Columbia, as required under subsection (a)(3), is Vasquez's firing.[5]   Plaintiffs aver that "regional president Scott Allshouse, vice-president Nicole Newscoe, and executive coordinator of HR David Gearhart" terminated Plaintiffs "at the regional office on December 1, 2016."   Am. Compl. ¶ 16.   That allegation, however, is insufficient to attribute Vasquez's firing (or any other Plaintiff's firing for that matter) to WFMI because nowhere do Plaintiffs allege that Allshouse, Wescoe, or Gearhart are officers, employees, or agents of WFMI.   *Cf. Livnat*, 851 F.3d at 57 (observing that "bare allegations" of agency are insufficient to make out a prima facie case of personal jurisdiction).   In fact, the only record evidence suggests that they are not.   *See* Yost Decl. ¶ 7.   Nothing alleged in the Amended Complaint, therefore, establishes jurisdiction over WFMI under subsection (a)(3).

Finally, subsection (a)(4) does not, as Plaintiffs maintain, confer jurisdiction over WFMI

---

[5] Any assertion that Buchanan's alleged defamatory statements—made in Texas—constitute tortious activity in the District of Columbia because they were published here is squarely foreclosed by precedent.   *See Forras*, 812 F.3d at 1107 (observing that "this court has twice held that publishing defamatory or otherwise tortious statements within the District that were made outside the District falls short of what subsection (a)(3) requires").

through Plaintiffs' defamation claim. That contention suffers from two defects. First, Buchanan, who uttered the alleged defamatory statement, is not alleged to be an officer, employee, or agent of WFMI. *Cf. Livnat*, 851 F.3d at 57. Indeed, the only evidence about her employment comes from Buchanan herself, who attests that she is the "Global Vice President of Communications" for *WF Services*. Buchanan Decl. ¶ 1. Second, Plaintiffs' argument that WFMI "derives substantial revenue" from the operation of Whole Foods stores in the District of Columbia is unpersuasive. As a holding company, to the extent WFMI earns any revenue from the District, it does so only indirectly through the shares it holds in the subsidiary that owns and operates the District's Whole Foods stores. To attribute such District-generated earnings to WFMI would run afoul of the rule that "it is generally improper to impute the contacts of a subsidiary to a corporate parent that is a holding company because the subsidiary is not performing a function that the parent would otherwise have to perform itself (the holding company could simply hold another type of subsidiary)." *Khatib*, 846 F. Supp. 2d at 33 (internal quotation marks and citation omitted). Plaintiffs offer no reason for the court to deviate from that general rule in this case.

In the end, Plaintiffs have not offered a sufficient factual basis upon which this court can exercise personal jurisdiction over WFMI. Accordingly, all claims against WFMI are dismissed without prejudice.

b.  WF Services

The final jurisdictional inquiry concerns WF Services. WF Services is a Delaware corporation with its principal place of business in Texas. Yost Decl. ¶ 3. Yost describes WF Services "as the administrative arm of the Whole Foods Market family of companies, providing accounting, legal, and other administrative services to the Whole Foods Market [regional]

operating entities," such as WFM Group. *Id.* ¶ 6; *see also id.* ¶ 11. WF Services charges WFM Group and other operating companies the cost of the services provided, "plus a nominal upcharge." *Id.* ¶ 11. The amounts charged by WF Services for its services "are not connected to any goods or services sold by WFM Group, including goods or services sold in the District of Columbia." *Id.* Moreover, WF Services has no permanent presence in the District of Columbia. It has no employees, office space, or telephones in the District; nor does it have any bank accounts or other tangible or real property in the District. *Id.* ¶ 13. It also does not render services directly to persons or entities operating within the District. *Id.* With regard to the events at issue in this case, according to Yost, WF Services provided "legal services related to the investigation and preparation for this and related pending legal matters." *Id.* ¶ 12. Additionally, it provided "non-legal services . . . in relation to the Gainsharing issues generally . . . at WFM Group's office in Rockville, Maryland." *Id.* Finally, Yost attests that WF Services does not derive revenue from any goods sold or services rendered in the District of Columbia. *Id.* ¶ 13.

Plaintiffs offer no facts of their own in opposition to Yost's affidavit. Instead, they assert that Yost makes their case for them. They contend that WF Services does not provide its services "in a vacuum," but instead provides administrative services "directly" to the four stores located in the District of Columbia. Pls.' Opp'n at 12. They also point to Yost's admission that WF Services provided legal services in connection with the investigation of Plaintiffs and other related pending matters. *Id.* at 13. And, finally, they rely on Buchanan's defamatory utterances, attributing those to her employer, WF Services. *Id.* Based on these specific facts, Plaintiffs assert that long-arm jurisdiction over WF Services is warranted under subsections (a)(1), (2), and (4).

The court views it as a close call, but ultimately concludes that Plaintiffs have satisfied their burden of making a prima facie showing of personal jurisdiction under subsection (a)(4). As previously discussed in connection with Buchanan, Plaintiffs have alleged tortious conduct outside the District of Columbia—Buchanan's alleged defamatory statements—as well as injury in the District of Columbia, because Buchanan's statements were received in the District. But, unlike with Buchanan, Plaintiffs have satisfied one of the "plus" factors required by subsection (a)(4) with regard to WF Services. Plaintiffs have pointed to facts connecting WF Services to the District of Columbia that render it plausible that WF Services either "regularly does . . . business" or "engages in any other persistent course of conduct" in the District. Yost's concession that WF Services provided legal services in connection with the investigation of Plaintiffs in the District of Columbia makes it "plausible" that WF Services has provided similar services in the past in this forum. *Cf. Forras*, 812 F.3d at 1105. It may be that WF Services' legal and investigative contacts in this case are an isolated instance of contacts with the District of Columbia, in which case they would not qualify as either "regular" or "persistent" conduct sufficient to satisfy subsection (a)(4). But the ultimate determination of whether the court can exercise personal jurisdiction over WF Services will have to wait until after the conclusion of discovery.

\*     \*     \*

Before moving on, the court recaps the results of the personal jurisdiction inquiry. Plaintiffs did not meet their burden of showing pertinent facts to make out a prima facie case of personal jurisdiction against WFMI and Buchanan; thus, the claims against them are dismissed without prejudice. Plaintiffs did meet their burden as to WF Services, and WFM Group did not contest jurisdiction. The court now turns to address the merits of Defendants' 12(b)(6) motion as to WF Services and WFM Group.

**B.     Merits**

*1.     Wrongful Termination in Violation of Public Policy (Count I)*

All Plaintiffs concede that they were at-will employees.   Nevertheless, in Count I of the Amended Complaint, they bring a claim for wrongful termination, asserting that the public policy exception to the at-will employment doctrine applies.   Plaintiffs assert that, because Whole Foods terminated them for blowing the whistle on the nationwide practice of shifting labor costs to undermine the Gainsharing program and steal bonuses from employees, they can maintain a claim for wrongful termination as a matter of public policy.   As Plaintiffs were terminated from employment in different jurisdictions, the law applicable to Count I varies.   District of Columbia law applies to Vasquez; Maryland law applies to Bautista and Njie; and Virginia law applies to Sheikh, Sadoudi, Ba, Miano, and Amegnaglo.   Regardless of the differences in law, none of Plaintiffs' wrongful termination claims survive, albeit for different reasons.

a.     Public-Policy Exception in District of Columbia

The District of Columbia recognizes a common law tort of wrongful discharge "as an exception to the traditional at-will doctrine governing termination of employment, where the discharge violates 'a clear mandate of public policy.'"   *District of Columbia v. Beretta, USA Corp.*, 872 A.2d 633, 645 (D.C. 2005) (en banc) (quoting *Carl v. Children's Hosp.*, 702 A.2d 159, 164 (D.C. 1997)).   When asked to apply the exception:

> A court should consider seriously only those arguments that reflect a clear mandate of public policy—i.e., those that make a clear showing, based on some identifiable policy that has been officially declared in a statute or municipal regulation, or in the Constitution, that a new exception is needed.   Furthermore, there must be a close fit between the policy thus declared and the conduct at issue in the allegedly wrongful termination.

*Rosell v. Long Rap, Inc.*, 121 A.3d 775, 778 (D.C. 2015) (quoting *Carl*, 702 A.2d at 163).   In view

21

of these strict requirements, District of Columbia courts have described the public policy exception as "narrow." *Id.*

Identifying a public policy and satisfying the "close fit" requirement does not, however, necessarily get a plaintiff across the finish line to stating a wrongful termination claim. Other public policies can foreclose the claim. "Even where there is a showing of a clearly identifiable policy, the D.C. Court of Appeals has refused to find new exceptions to the doctrine of at-will employment where the legislature has already 'creat[ed] a specific, statutory cause of action to enforce' the public policy at issue." *LeFande v. District of Columbia*, 864 F. Supp. 2d 44, 50 (D.D.C. 2012) (quoting *Carter v. District of Columbia*, 980 A.2d 1217, 1225–26 (D.C. 2009)). In *LeFande*, the court rejected a plaintiff's attempt to premise a claim for wrongful discharge in violation of public policy based on his belief that he was terminated for engaging in protected speech and criticizing his employer in a news article. *Id.* at 46–47, 49–51. Reasoning that the plaintiff could vindicate any perceived First Amendment violation pursuant to 42 U.S.C. § 1983— a specific statutory cause of action enacted to enforce exactly the kinds of deprivations the plaintiff complained of—the court declined "to recognize a novel, competing cause of action for wrongful discharge at common law." *Id.* (internal quotation marks omitted).

The same fate befalls Vasquez here. Vasquez invokes the District of Columbia's Wage Payment and Collection Law ("DCWPCL"), D.C. Code § 32-1301 *et seq.*, arguing that those provisions reflect a public policy that warrants departing from the general rule of at-will employment. Am. Compl. ¶ 49a–c. Employers in the District of Columbia must "pay all wages earned to his or her employees on regular paydays designated in advance by the employer and at least twice during each calendar month," *id.* § 32-1302, and pay a departing employee's wages within a statutorily-designated period of time, *id.* § 32-1303. The DCWPCL also imposes

criminal penalties upon employers who negligently or willfully fail to comply with its provisions. *Id.* § 32-1307. Thus, Plaintiffs argue, the DCWPCL reflects a public policy requiring an employer's timely payment of all employee wages, including bonuses. *See* Pls.' Opp'n at 18 (defining "wage" to include "bonus" under D.C. Code § 32-1301(3)(A)). The problem with that argument, however, is that the DCWPCL itself affords Vasquez a statutory remedy: It prohibits an employer from "discharg[ing], threaten[ing], penaliz[ing], or in any other manner discriminat[ing] or retaliat[ing]" against an employee who has "made a complaint to his or her employer . . . or to any other person that the employer has engaged in conduct that the employee, reasonably and in good faith, believes violates a provision" of the DCWPCL. D.C. Code § 32-1311(a)(1). An aggrieved employee has recourse under the DCWPCL: An employee "may bring a civil action in a court . . . against any employer" alleged to have violated the statute. *Id.* § 32-311(c). The availability of this private cause of action forecloses Vasquez's attempt to recover under the common law. Stated differently, "this is not a case where [the court has] any need to create a new exception to the at-will employment doctrine in order to vindicate an important public policy." *See Carter*, 980 A.2d at 1226. The court therefore dismisses Vasquez's wrongful termination claim.[6]

b.  Public Policy Exception in Maryland

Turning next to Plaintiffs Bautista and Njie, Maryland law also recognizes that "there is a public policy exception to the at-will employment rule for wrongful termination 'when the motivation for the discharge contravenes some clear mandate of public policy[.]'" *Yuan v. Johns Hopkins Univ.*, 157 A.3d 254, 262 (Md. 2017) (quoting *Adler v. Am. Standard Corp.*, 432 A.2d

---

[6] In their Opposition to Defendants' Motion to Dismiss, Plaintiffs raise for the first time a statutory claim for retaliation under the DCWPCL itself, D.C. Code § 32-1311. Pls.' Opp'n at 16, 20–21. However, "[i]t is axiomatic that a complaint may not be amended by the briefs in opposition to motion to dismiss," and the court therefore declines to consider this claim. *See Arbitraje Casa de Cambio v. US Postal Serv.*, 297 F. Supp. 2d 165, 170 (D.D.C. 2003).

363, 473 (Md. 1981)).  Whether the exception applies is decided on a case-by-case basis, and requires that "the employee must be discharged, the basis for the employee's discharge must violate some clear mandate of public policy, and there must be a nexus between the employee's conduct and the employer's decision to fire the employee."  *Id.* at 262–63 (internal quotations marks omitted).  But, like District of Columbia law, Maryland law will not recognize a wrongful discharge claim where an adequate statutory remedy exists.  As the Court of Appeals of Maryland has stated:  "[Wrongful] discharge is inherently limited to remedying only those discharges in violation of a clear mandate of public policy which otherwise would not be vindicated by a civil remedy."  *Makovi v. Sherwin-Williams Co.*, 561 A.2d 179, 180 (Md. 1989) (refusing to recognize wrongful discharge claim based on sex discrimination in light of remedies available under Title VII); *see also Wholey v. Sears Roebuck*, 803 A.2d 482, 490 (Md. 2002).  Thus, in Maryland, the availability of a statutory remedy forecloses recognition of a common law wrongful discharge claim.

Here, much like Vasquez, Bautista and Njie premise their claim on Maryland's Wage Payment and Collection Law, Md. Code Lab. & Empl. § 3-501 *et seq.* ("Maryland Wage Law"). Am. Compl. ¶ 49d–f.  That statute, however, provides injured employees a remedy.  If an employer fails to pay employee "wages"—a term that includes bonuses, Md. Code Lab. & Empl. § 3-501(c)(2)(i)—the employee may "bring an action against the employer to recover the unpaid wages."  *Id.* § 3–507.2(a).  And, if "a court finds that an employer withheld the wages of an employee in violation of [the Wage Law] . . . the court may award the employee an amount not exceeding 3 times the wage, and reasonable counsel fees and other costs."  *Id.* § 3–507.2(b).  As a District Court in Maryland has held, these statutory remedies foreclose a common law claim for wrongful discharge.  "[A]n at-will employee terminated for asserting her rights under [the Wage

Law] may not bring an action for [wrongful] discharge because the judicial exception to the at-will employment doctrine was created to generate a remedy only where none exists." *See Tarquini v. Superior Prods., Inc.*, No. 05-3292, 2007 WL 763186, at *6 & n.5 (D. Md. March 12, 2007) (dismissing wrongful discharge claim premised on argument that plaintiff was discharged in retaliation for asserting her rights under the Maryland Wage Payment and Collection Law because the Wage Law already "contain[ed] [its] own remed[y] for violation": "Md. Code Lab. & Empl. § 3-507.[2]").[7]  Accordingly, Plaintiffs Bautista's and Njie's wrongful termination claims are dismissed.

### c.  Public Policy Exception in Virginia

Plaintiffs Sheikh, Sadoudi, Ba, Miano, Amegnaglo, and Berger's claim for wrongful discharge arises under Virginia law.  Like the District of Columbia and Maryland, Virginia recognizes a narrow exception to the at-will employment doctrine, "known as the '*Bowman*' exception,'" which allows an employee to bring a common-law wrongful discharge claim "if the 'termination violates Virginia's public policy.'"  *Lester v. TMG, Inc.*, 896 F. Supp. 2d 482, 487 (E.D. Va. 2012) (citing *Bowman v. State Bank of Keysville*, 331 S.E.2d 797, 800–01 (Va. 1985)). Virginia courts have recognized a common law wrongful termination claim in "only three circumstances":

> (1) When an employer violated a policy enabling the exercise of an employee's statutorily created right . . . ;
> (2) When the public policy violated by the employer was explicitly expressed in the statute and the employee was clearly a member of that class of persons directly entitled to the protection enunciated by the public policy . . . ; [or]
> (3) When the discharge was based on the employee's refusal to

---

[7] Prior to October 2010, the cause of action provision in the Maryland Wage Payment and Collection Law was codified at Md. Code Lab. & Empl. § 3-507.1 (2010).

engage in a criminal act . . . .

*Francis v. Nat'l Accrediting Comm'n of Career Arts & Sciences, Inc.*, 796 S.E.2d 188, 190–91 (Va. 2017).   In this case, Plaintiffs do not assert that their discharges spring from a refusal to engage in a criminal act.   Nor do they cite to a statute that "explicitly state[s] that it expresses the public policy of the Commonwealth."   *Miller v. Wash. Workplace, Inc.*, 298 F. Supp. 2d 364, 379 (E.D. Va. 2004).   Instead, they assert they were wrongfully terminated for calling attention to Whole Foods' violation of Virginia's Wage Payment Act, Va. Code Ann. § 40.1-29, which requires employers to pay employees at regular intervals (at least once per month for salaried employees, and at least once every two weeks for hourly employees) and by certain enumerated methods.   Am. Compl. ¶ 49g–h.   Thus, the court must determine whether the Amended Complaint plausibly pleads that Defendants "violated a policy enabling the exercise of an employee's statutorily created right."   *Francis*, 796 S.E.2d at 190.

The narrowness of Virginia's public policy exception is demonstrated by the Virginia Supreme Court's recent decision in *Francis*.   There, an employee who was threatened and harassed at her workplace sought and obtained a preliminary protective order against her colleague.   *Id.* at 190.   Days later, the plaintiff's employer terminated her because she did not "fit the vision of the organization."   *Id.* (internal quotation marks omitted).   The plaintiff then filed a claim for wrongful discharge under *Bowman*, based on the theory that her termination violated the public policy embodied in the Virginia Protective Order Statutes, Va. Code Ann. §§ 19.2-152.7:1, *et seq*.   That law grants individuals the right to obtain a protective order and, according to the *Francis* court, states a clear public policy "to protect the health and safety of the petitioner or any family or household member of the petitioner."   *Francis*, 796 S.E.2d at 191 (quoting Va. Code Ann. § 19.2.-152.9(A)).   Notwithstanding this strong public policy designed to protect the health

and safety of Virginians, the court held that the public policy exception did not support a wrongful discharge claim. *Id.* at 191–92. The court noted that *Bowman* "does not recognize 'a generalized cause of action for the tort of 'retaliatory discharge.'" *Id.* (quoting *Miller v. SEVAMP, Inc.*, 362 S.E.2d 915, 918 (Va. 1987)). The court accordingly framed the question before it as whether "a viable *Bowman* claim in this context would require a showing that the termination of employment *itself* violated the stated public policy of protection of health and safety." *Id.* at 191. In holding the plaintiff had no viable *Bowman* claim, the court emphasized that the plaintiff "only alleges that she was terminated because she exercised her rights under the Protective Order Statutes." *Id.* at 192. The court contrasted this allegation to the one in *Bowman*, in which the court upheld a wrongful discharge claim where employee-shareholders were fired after failing to vote their shares in support of a proposed merger. *Id.* Ultimately, the court concluded that, "[u]nlike in *Bowman*, where the public policy existed to protect the exercise of the statutory right to vote one's shares," in the instant case "there exist[ed] no corresponding public policy in the Protective Order Statutes protecting the exercise of the right to seek a protective order." *Id.* Accordingly, the court held, "There is no public policy violated by the termination of [the plaintiff's] at-will employment." *Id.*

In light of the Supreme Court of Virginia's decision in *Francis*, the court concludes that Plaintiffs here do not have a viable claim for wrongful termination under Virginia law. "To analyze such a claim, it is important to discern what right was conferred on an employee by statute, and then whether the employer's termination of employment violated the public policy underlying that right." *Id.* at 191. As to the first inquiry, the Virginia Wage Payment Act does not itself confer a right on employees to receive pay. Rather, the sole state appellate court in Virginia to have interpreted the Wage Payment Act describes its purpose as "establish[ing] the public policy of the Commonwealth as *to the manner* in which employers pay wages to employees." *Mar v.*

27

*Malveaux*, 732 S.E.2d 733, 738 (Va. Ct. App. 2012) (emphasis added). The court in *Mar* emphasized that the Act is a "regulatory not a remedial statute" and, as a result, "we are not required to liberally construe this statute as a remedy for the benefit of employees." *Id.* The court further noted that the Act does not provide a private right of action, only an administrative one, and to the extent it creates an "underlying right to receive pay or wages," that right "derives *not from the Act*, but from the contract of employment, express or implied." *Id.* at 739 (emphasis added) (quoting *Pallone v. Marshall Legacy Inst.*, 97 F. Supp. 2d 742, 746 n.11 (E.D. Va. 2000)). Thus, the court observed, "a[n] aggrieved employee can pursue his private civil action based on claims of breach of contract or *quantum meruit*." *Id.* *Mar*, therefore, stands for the proposition that the Act itself confers no right on employees to receive wages; that right instead is rooted in contract law.

From that conclusion it naturally follows that each Plaintiff's termination *itself* did not violate public policy. At most, the Wage Payment Act establishes an employee's right regarding when and how to get paid. There is no correlative public policy in the Act that protects an employee's "exercise" of her right to receive wages. Indeed, if the statutory right to seek a protective order to safeguard one's health and safety does not reflect a public policy to protect the exercise of such a right, then surely the more passive right of receiving earned wage payments on a regular basis, to the extent it exists statutorily, cannot as a matter of public policy receive greater protection. The court therefore finds that Plaintiffs have failed to state a claim of wrongful discharge under Virginia law.

In so ruling, the court recognizes that numerous state and federal courts in Virginia have gone the other way. Those courts have concluded that the Wage Payment Act confers "an individual's right to compensation" and, as such, "implicates a property right that falls within the

*Bowman* exception." *Clark v. BayDocs, Inc.*, No. 3:12-cv-896, 2013 WL 1333520, at *5 (E.D. Va. March 9, 2013) (collecting cases); *see Blanchard v. Capital One Servs., LLC*, No. 2015-6937, 2015 WL 12591838, at *2–*4 (Va. Cir. Ct. Oct. 26, 2015) ("[A] plaintiff's grounds for wrongful termination does offend the public policy to protect an employee's property right in earned compensation, which can include bonuses, thereby falling within the *Bowman* exception and giving a plaintiff a cause of action."). This court's obligation, however, is to predict how the Supreme Court of Virginia would rule in the present case. *Cf. Earle v. District of Columbia*, 707 F.3d 299, 310 (D.C. Cir. 2012) (stating that in the absence of a case directly on point from the D.C. Court of Appeals, the court is to predict how that court would decide the case). None of the state or federal cases that have found in favor of a wrongful termination claim have had the benefit of the Supreme Court of Virginia's reasoning in *Francis*, which was decided in 2017. And the two cases that have come after *Mar v. Malveaux* did not cite that important decision. *See, e.g.*, *Clark*, 2013 WL 1333520; *Blanchard*, 2015 WL 12591838. In this court's view, *Francis* and *Mar* dictate a result different than the one reached by prior courts.

\*       \*       \*

In summary, because Plaintiffs have not succeeded in meeting the narrow public policy exception to the at-will employment doctrine under any applicable law, the court dismisses Count I with prejudice.

### 2.    *Wrongful Termination of Plaintiff Bautista (Count II)*

In Count II, Plaintiff Svetlana Bautista asserts a separate claim of retaliatory wrongful termination in violation of the public policy exception to the at-will employment doctrine in Maryland. Bautista alleges that, on two separate occasions, she reported to Whole Foods corporate leadership that for eight months, compost collected in Whole Foods stores from

29

customers had been illegally dumped into landfills rather than a compost facility. Am. Compl. ¶¶ 56–57. Bautista asserts that corporate leadership never followed up on her reports and instead terminated her in retaliation for blowing the whistle on Whole Foods' violation of the Maryland Consumer Protection Act, Md. Com. Law Code Ann. § 13–301 *et seq.* Am. Compl. ¶¶ 55, 58–59.

The court agrees with Defendants that Bautista's common law wrongful termination claim is foreclosed by *Parks v. Alpharma, Inc.*, 25 A.3d 200 (Md. 2000), and accordingly dismisses Count II. In *Parks*, the Court of Appeals of Maryland rejected the plaintiff's claim that she was wrongfully discharged for reporting her employer's violations of the Maryland Consumer Protection Act, concluding that the Act "does not provide the specificity of public policy that we have required to support a wrongful discharge claim." 25 A.3d at 214. Perhaps recognizing that reliance on the Act is misplaced, Plaintiffs cite to statements of Maryland's Department of the Environment concerning the importance of composting to reduce waste in an effort to identify some public policy to support Bautista's wrongful termination claim. *See* Pls.' Opp'n at 23–24. These efforts, however, fall far short of identifying "the unmistakably clear mandate of public policy" required by Maryland courts to sustain the tort of wrongful termination. *See Parks*, 25 A.3d at 214. Thus, because Bautista fails to state a claim of wrongful termination under Maryland law, the court dismisses Count II with prejudice.[8]

### 3. Breach of Contract and Breach of the Duty of Good Faith and Fair Dealing (Count III)

The court turns now to Plaintiffs' breach of contract and breach of the implied duty of good faith and fair dealing claims contained in Count III of the Amended Complaint. In support of

---

[8] Because the court dismisses Counts I and II in their entirety, it need not reach Defendants' request to dismiss Plaintiffs' claims for punitive damages and attorneys' fees. *See* Defs.' Mot. at 24.

these claims, Plaintiffs assert that their employment with Whole Foods was governed by the Whole Foods General Information Guide ("GIG"), which applies to all Whole Foods stores within the District of Columbia, Virginia, and Maryland. *See* Defs.' Mot., Ex. C-4, ECF No. 24 [hereinafter 2016 GIG].[9] In Plaintiffs' view, the GIG creates an implied contract under District of Columbia, Maryland, and Virginia common law, and Defendants' failure to strictly adhere to the "corrective action process" set forth in the GIG before terminating Plaintiffs constitutes a breach of contract and breach of the duty of good faith and fair dealing. Am. Compl. ¶¶ 62–71. The court disagrees.

As already discussed, in the District of Columbia, Maryland, and Virginia, employment is presumed to be terminable at-will, that is, at any time and without cause. *See Turner v. Fed. Express Corp.*, 539 F. Supp. 2d 404, 410 (D.D.C. 2008); *Towson Univ. v. Conte*, 862 A.2d 941, 947 (Md. 2004); *Cty. of Giles v. Wines*, 546 S.E.2d 721, 723 (Va. 2001). Each jurisdiction, however, recognizes that an employee may overcome the at-will employment presumption. In the District, an employee may overcome the presumption by showing that "the parties clearly state an intention to place limits on the employer's right to terminate." *Turner*, 539 F. Supp. 2d at 410. In Maryland, "the presumption of at-will employment can be defeated through the inclusion of a just-cause requirement, or by specifying a duration of employment." *Spacesaver Sys., Inc. v. Adam*, 98 A.3d 264, 272 (Md. 2014). And, in Virginia, the presumption can be rebutted if sufficient evidence is produced to show that the employment is for a definite term, including that the employment can be terminated only for cause. *Cty. of Giles*, 546 S.E.2d at 724.

---

[9] In evaluating the 12(b)(6) motion, the court may consider the portions of the GIG filed by Defendants because Plaintiffs have incorporated relevant portions of the GIG by reference in their Amended Complaint. *See Rand v. Sec'y of the Treasury*, 816 F. Supp. 2d 70, 72–73 (D.D.C. 2011).

Plaintiffs' allegations fail to rebut the presumption of at-will employment under the law of all three jurisdictions for two reasons. First, Plaintiffs have not identified any language in the GIG to support their assertion that Whole Foods intended to limit its ability to terminate plaintiffs without cause. Second, the GIG expressly disclaims that it is a contract and affirms the at-will nature of the employment relationship.

With respect to the first reason, Plaintiffs maintain that Whole Foods limited its ability to terminate employees at-will by committing to a "corrective action process," as set forth in the GIG. Plaintiffs characterize that process as a promise by Whole Foods to its employees that it would terminate an employee for misconduct only after subjecting her to a series of incremental disciplinary actions over a 12-month period, except in the case of a severe offense. *See* Pls.' Opp'n at 33–35. By agreeing to adhere to such a process, Plaintiffs assert, Whole Foods "voluntarily and explicitly mandated dismissal only for cause." *Id.* at 35. Plaintiffs' argument is unpersuasive, however, because it relies on a selective reading of the GIG. It is true that the GIG generally prescribes a corrective action process for behavioral or performance deficiencies that moves from counseling statements to written warnings to a final written warning, instituted over a "rolling 12-month period," before Whole Foods discharges an employee. *See* 2016 GIG at 46–49. It also, however, vests substantial discretion in Whole Foods to carry out that process. For instance, when describing the policy, the GIG states at the outset that, "[*w*]*hen practical*, Team Members will be warned and counseled for unsatisfactory performance prior to discharge." *Id.* at 46 (emphasis added). The very next sentence states that, "[d]epending on the nature and severity of the offense . . . , the company reserves the right to discharge any Team Member without warning." *Id.*; *see id.* ("The process may vary based on the severity of the situation."). The GIG also contrasts "[e]xamples of conduct that may lead to corrective action" and "major infractions,"

suggesting that the latter category of offenses is more likely to lead to immediate discharge. *See id.* at 47–48. The GIG's use of permissive language makes clear that Whole Foods did not intend to precondition termination of its employees on participation in the corrective action process, or to create a "just cause" requirement for termination. *Cf. Strass v. Kaiser Found. Health Plan of Mid-Atl.*, 744 A.2d 1000, 1013 (D.C. 2000) (construing "mandatory term 'shall,' rather than the permissive 'may'" contained in personnel policy manual to support employee's assertion that the employer intended the manual to "govern the rights and responsibilities" of it and its employees); *Cty. of Giles*, 546 S.E.2d at 723 (holding that language providing that an "employee *may* be discharged for inefficiency, insubordination, misconduct, or other just cause," unlike language providing that an employee "*shall only* be discharged . . . ," was insufficient to rebut Virginia's strong presumption in favor of the at-will employment relationship).

This reading is confirmed by the series of disclaimers contained in the GIG warning employees that the manual does not create any contractual rights. It is well-established that employers may "effectively disclaim any implied contractual obligations arising from" provisions in employment manuals. *Boulton v. Inst. of Int'l Educ.*, 808 A.2d 499, 505 (D.C. 2002). "The legal effect of such a disclaimer is, in the first instance, a question for the court to decide." *Id.* (internal quotation marks omitted). In this case, the GIG contains two disclaimers, informing employees first that:

> YOUR EMPLOYMENT IS AT-WILL. THIS MEANS THAT YOUR EMPLOYMENT IS FOR NO DEFINITE PERIOD OF TIME, AND EITHER YOU OR WHOLE FOODS MAY

TERMINATE YOUR EMPLOYMENT AT ANY TIME, WITH
OR WITHOUT CAUSE OR NOTICE.

2016 GIG at 3.   The GIG continues immediately to its second disclaimer, advising Whole Foods

employees:

> This *GIG* is not an employment contract with you or any other
> person, nor is it a promise regarding the terms or conditions of your
> employment. Neither this *GIG*, nor any other Company policy or
> representation, is intended to promise or guarantee any right to you
> or any other person, including employment for any period of time
> [.]

*Id*.   These disclaimers could not be any clearer that the GIG creates no judicially enforceable

contractual rights.   As such, the court cannot find that Whole Foods has disavowed the general

rule of at-will employment when the GIG plainly states otherwise.   *See Grove v. Loomis Sayles*

*& Co.*, 810 F. Supp. 2d 146, 149 (D.D.C. 2011) ("Even if the employer has provided its employees

with an employee handbook, the handbook is not enforceable as an employment contract if it

disclaims the establishment of contractual obligations and explicitly provides that employment

may be terminated at-will."); *Smith v. Union Labor Life Ins. Co.*, 620 A.2d 265, 269 (D.C. 1993)

(dismissing implied contract theory based on employment manual that disclaimed it was a contract

and stated that employment was terminable at-will as "to no avail because of the express

disavowals that [the manual] created any contractual rights for employees"); *see also Spacesaver*

*Sys., Inc. v. Adam* 69 A.3d 494, 503 n. 15 (Md. Ct. Spec. App. 2013) *aff'd by Spacesaver Sys.,*

*Inc.*, 98 A.3d at 264) (Maryland courts have "refused to find the provisions of a handbook

enforceable where a clear and unequivocal disclaimer is included therein, such as a disclaimer

stating that [:] 'this handbook does not constitute an express or implied contract[.]'") (internal

citation and quotation marks omitted)).

Relying on the D.C. Court of Appeals' decision in *Strass v. Kaiser Foundation Health Plan of Mid-Atlantic*, Plaintiffs assert that Whole Foods' disclaimers should not control the outcome. According to Plaintiffs, *Strass* requires that disclaimers in an employment manual be "considered with reference to the entire document" before a court can rule on an implied employment contract claim. Pls.' Mot. at 35 (quoting *Strass*, 744 A.2d at 1014). The court does not quibble with that principle; it just does not help Plaintiffs. The manual in *Strass* contained only a single disclaimer stating that it was not a contract. The court contrasted that language with other aspects of the manual that contained language of a mandatory nature. The manual provided that certain disciplinary steps "will occur" before termination and elsewhere contained the word "shall" to define the rights and responsibilities of the employee and the employer. *See Strass*, 744 A.2d at 1013. The court ultimately concluded that, while the disclaimer in the personnel manual suggests "that it is not a contract," "this qualifier is rationally at odds with other language in the document," such that "a jury could conclude reasonably that the employer intended to be bound by its terms." *Id.* at 1013–14. In this case, by sharp contrast, the GIG disclaims that it is a contract *and* affirmatively asserts that employment at Whole Foods remains at-will. Moreover, as discussed, the GIG uses permissive, rather than mandatory, terms. With respect to the correction action process, the GIG contains a bevy of permissive words and phrases, such as "when practical," "where possible," "may be used," "typically," and "generally." 2016 GIG at 46. No reasonable employee could read the GIG's disclaimers and the permissive language prevalent in the GIG and conclude that Whole Foods has agreed not to terminate employees without first resorting to the correction action process. Plaintiffs' breach of implied contract claim and their breach of duty of good faith and fair dealing claim thus fail.[10]

Accordingly, Count III is dismissed without prejudice.

### 4. Defamation and False Light (Counts IV & V)

The court at last reaches Counts IV and V, Plaintiffs' claims for defamation and false light, respectively. These claims are sufficiently pleaded and survive the motion to dismiss.

To state a claim for defamation under District of Columbia law,[11] Plaintiffs must allege sufficient facts showing:

> (1) that the defendant made a false and defamatory statement concerning the plaintiff; (2) that the defendant published the statement without privilege to a third party; (3) that the defendant's fault in publishing the statement amounted to at least negligence; and (4) either that the statement is actionable as a matter of law irrespective of special harm, or that its publication caused the plaintiff special harm.

*Marsh v. Hollander*, 339 F. Supp. 2d 1, 5 (D.D.C. 2004) (quoting *Crowley v. N. Am. Telecomm. Ass'n*, 691 A.2d 1169, 1172 n.2 (D.C. 1997)). Relatedly, to state a claim for false light invasion of privacy under District of Columbia law, a plaintiff must show: "(1) publicity; (2) about a false statement, representation or imputation; (3) understood to be of and concerning the plaintiff; and (4) which places the plaintiff in a false light that would be offensive to a reasonable person." *Doe v. Bernabei & Wachtel, PLLC*, 116 A.3d 1262, 1267 (D.C. 2015) (internal quotation marks omitted). The torts of defamation and false light are "often analyzed in the same manner, at least where the plaintiff rests both his defamation and false light claims on the same allegations."

---

[10] In light of the foregoing conclusion that Plaintiffs had no implied employment contract with Defendants, Plaintiffs' breach of duty of good faith and fair dealing claim necessarily fails under District of Columbia and Maryland law. *E.g.*, *Paul v. Howard Univ.*, 754 A.2d 297, 310 n.28 (D.C. 2000) ("[S]uch a claim [for breach of covenant of good faith and fair dealing] cannot be made by an at-will employee because there is no contract to provide a basis for the covenant."); *Suburban Hosp., Inc. v. Dwiggins*, 596 A.2d 1069, 1076–77 (Md. 1991) ("[T]here is no implied covenant of fair dealing with regard to termination by either side in an employment-at-will."). Furthermore, the Commonwealth of Virginia "does not recognize a cause of action for breach of an implied covenant of good faith and fair dealing in employment contracts, and in at-will employment contracts in particular." *Devnew v. Brown & Brown, Inc.*, 396 F. Supp. 2d 665, 671 (E.D. Va. 2005) (collecting cases).

[11] Because both parties apply District of Columbia law to these claims, this court does the same. *See Abbas v. Foreign Policy Grp.*, 783 F.3d 1328, 1338 n.6 (D.C. Cir. 2015) (concluding that District of Columbia defamation law governed dispute in part because the "parties relied on D.C. defamation law in briefing this appeal").

*Zimmerman v. Al Jazeera Am., LLC*, 246 F. Supp. 3d 257, 273 (D.D.C. 2017) (internal quotation

marks omitted). "Nevertheless, they are two different claims, as the D.C. Circuit has recognized."

*Id.* (citing *Weyrich v. New Republic, Inc.*, 235 F.3d 617, 628 (D.C. Cir. 2001)). What is remedied

by each tort is "conceptually distinct": "a defamation tort redresses damage to *reputation*," while

"a false light privacy tort redresses *mental distress* from having been exposed to public view." *Id.*

at 274–75 (internal quotation marks omitted). Given that Plaintiffs rely on the same allegations

to sustain their defamation and false light claims in this case, the court analyzes the claims jointly.

Plaintiffs assert that Whole Foods defamed Plaintiffs and placed them in a false light in an

effort to scapegoat them and cover up corporate labor-shifting practices. Am. Compl. ¶¶ 72–82;

83–91. The Amended Complaint identifies the following purportedly defamatory statements to

substantiate their claims:

a) "[Whole Foods] fired nine store managers in the mid-Atlantic region for manipulating a bonus program to their benefit."

b) "[N]ine managers at stores in Maryland, Virginia, and the District of Columbia engaged in a policy infraction that allowed the managers to benefit from a profit-sharing program at the expense of store employees."

c) "[Whole Foods] is still investigating exactly how much money is involved and plans to ensure that employees at the affected stores are compensated properly. The amounts involved, though, will not be material to the company's quarterly earnings."

d) "Whole Foods Fires 9 Store Managers Who Were Stealing Money From Employees."

e) "Whole Foods has fired nine store managers who were using a bonus program to their benefit…the managers were benefiting from a profit sharing program at the expense of employees…."

f) Whole Foods stated that the "manipulation" of the "Gainsharing" program was "isolated to a relatively small number of its 457 stores."

g) "[Whole Foods] took swift action, but, relative to the rest of the company, this manipulation only happened in nine of our locations."

h) "We are still in the process of investigating…..once our investigation is complete, we will take all necessary steps to correct any errors we identify."

Am. Compl. ¶¶ 73a–h; 74a–b.    Plaintiffs attribute to Buchanan statements (a), (b), and (c) above, which appeared in the Associated Press Article, as well as the statement that "Nine managers at Whole Foods stores in Maryland, Virginia and the District have been fired for manipulating a store bonus program," which appeared in The Washington Post.[12]   Pls.' Opp'n at 36.

Defendants contend that Plaintiffs have failed to state defamation and false light claims for three reasons: (1) none of the alleged statements identify Plaintiffs; (2) the statements are neither capable of bearing a defamatory meaning nor highly offensive to a reasonable person; and (3) many of the statements Plaintiffs identify are not attributable to the Defendants.   Defs.' Mot. at 40.   The court considers each argument in turn.

a.        "Of and Concerning" Plaintiffs

Defendants first contend that Plaintiffs' claims must be dismissed because "the statements enumerated in the Amended Complaint do not identify Plaintiffs by name or disclose any personal information sufficient to specifically identify them."   Defs.' Mot. at 34.   More specifically, Defendants assert that Plaintiffs cannot rely on the "of and concerning" theory to establish the first element of defamation; under that theory, a defamation claim can be sustained if the facts alleged "lead the listener to conclude that the speaker is referring to the plaintiff by description, even if the plaintiff is never named or is misnamed."   Defs.' Mot. at 34 (quoting *Croixland Prop. Ltd. P'ship v. Corcoran*, 174 F.3d 213, 216 (D.C. Cir. 1999)).   Defendants here observe that there are at least

---

[12] WFM Group has not argued that Buchanan is not its employee or agent.   The court therefore assumes that she is for present purposes.

20 different Whole Foods stores in the Mid-Atlantic region, and the alleged defamatory statements do not specify the store locations. Moreover, they point out that Whole Foods has many different types of "store managers," and the statements do not specify Plaintiffs' positions as "Team Leaders." *See id.* at 34–35. Consequently, Defendants insist, no defamation or false light claim can lie against them because Plaintiffs are not the sufficiently identifiable subjects of the statements. The court disagrees.

In *Croixland*, the D.C. Circuit explained that the first element of defamation—that the defendant made a false and defamatory statement of and concerning the plaintiff—can be satisfied without specifically identifying the plaintiff by name. "[I]t suffices that the statements at issue lead the listener to conclude that the speaker is referring to the plaintiff by description." 174 F.3d at 216. *Croixland* involved only one plaintiff, but the principle applies all the same when, as here, the defamatory statement is directed towards a group. "When a statement refers to a group, a member of that group may claim defamation if the group's size or other circumstances are such that a reasonable listener could conclude the statement referred to each member or 'solely or especially' to the plaintiff." *Browning v. Clinton*, 292 F.3d 235, 247 (D.C. Cir. 2002) (citing Restatement (Second) of Torts § 564A (1977)). Importantly, whether a plaintiff within a group is identifiable need not rest on the face of the statement alone. A plaintiff can rely upon extrinsic evidence to show that listeners understood the statements to pertain to the plaintiff. "If the applicability of the defamatory matter to the plaintiff depends upon extrinsic circumstances, it must appear that some person who saw or read it was familiar with the circumstances and reasonably believed that it referred to the plaintiff." Restatement (Second) Torts § 564 cmt. b. Thus, to establish that the defamatory statement pertains to a plaintiff within a group, the plaintiff can prove

"the circumstances of publication reasonably give rise to the conclusion that there is a particular reference to the [plaintiff]." *Id.* § 564A(b).

Applying the foregoing principles here, the court concludes that Plaintiffs have sufficiently pleaded facts that Buchanan made defamatory statements "of and concerning" them, even though none of the Plaintiffs are specifically named. Plaintiffs have averred that both prospective employers and their Whole Foods colleagues in the Mid-Atlantic region knew and understood that Buchanan's statements referred to them. Am. Compl. ¶¶ 80–81. Not only must the court treat those allegations as true at this stage, but the complaint when read as a whole renders the allegations plausible. It is true, as Defendants point out, that Buchanan's statements do not specify any particular store within the Mid-Atlantic region or any particular type of manager; however, it does not require a large inferential leap to think it plausible that, at a minimum, Plaintiffs' colleagues at Whole Foods stores would have known about their terminations and, if they had heard Buchanan's statements, reasonably believed that they referred to Plaintiffs. After all, as here, when the termination and its publication coincide, it should come as no surprise to the employer that the terminated employee's co-workers would attribute the public statement and the stated reason for firing to their departed colleague. *Cf. Elias v. Rolling Stone LLC*, 872 F.3d 97, 106 n.6 (2d Cir. 2017) (in defamation action alleging false accusation of rape during a fraternity rush process, holding that "[g]iven the prominence of his role in the process and the temporal proximity of his involvement to the purported rape, it is plausible that some readers of the Article concluded that he was involved"). Thus, placing Buchanan's identified statements into "context," the court concludes that both the temporal proximity between the Plaintiffs' termination and the publication of these statements and their identification as "store managers" in the District of Columbia, Maryland, and Virginia, all lead to the plausible inference that "a listener could perceive

40

that the [Plaintiffs] [are] connected to [wage theft and bonus manipulation]." *Croixland*, 174 F.3d at 217.

Defendants' reliance on *Stovell v. James* is inapposite. *See* Defs.' Mot. at 34 (citing *Stovell*, 810 F. Supp. 2d 237 (D.D.C. 2011)). There, Stovell brought a defamation claim against NBA basketball star Lebron James and his mother, Gloria, alleging that their purportedly defamatory statements about "Lebron James's father" were "of and concerning" him because he believed himself to be James's biological father, despite a negative paternity test. *Id.* at 241–45. The court concluded that Stovell failed to establish that the statements were made about him because "no one other than Stovell or Gloria James could have known that Stovell might be LeBron James's father." *Id.* at 249. Here, distinct from *Stovell*, knowledge of the circumstances of Plaintiffs' termination was not limited to the speaker and defamed; instead, Plaintiffs have sufficiently alleged that a number of readers would have recognized them to be the subject of the statements. *Cf.* Restatement (Second) of Torts § 564 cmt. b ("However, the fact that only one person believes that the plaintiff was referred to is an important factor in determining the reasonableness of the belief.").

Likewise, the court is unpersuaded by Defendants' reliance on *Lines v. Cablevision Sys. Corp.*, No. 04-CV-2517, 2005 WL 2305010 (E.D.N.Y. Sept. 21, 2005). *See* Defs.' Mot. at 35. In *Lines*, the plaintiff's employer fired him, along with 13 other officers and employees, following an internal investigation that determined the plaintiff and the others had engaged in accounting fraud. The employer then announced in a press release the group's termination for that conduct. *Lines*, 2005 WL 2305010, at *1. Treating the plaintiff's claim as one for defamation, the court held that the plaintiff's claim could not be sustained under the "group libel doctrine" under New York law. The court explained: "Plaintiff cannot demonstrate that [the employer's] citation to

'14 AMC employees' reasonably gives rise to the conclusion that it particularly referenced Plaintiff." *Id.* at *5.

Admittedly, the facts of *Lines* are analogous to those presented here. The court, however, doubts that *Lines*, a 2005 case, would come out the same way today, after the Second Circuit's 2017 decision in *Elias v. Rolling Stone*. *See* 872 F.3d at 97. *Elias* involves the infamous Rolling Stone article that falsely reported that members of the Phi Kappa Psi fraternity at the University of Virginia had gang raped a female student named "Jackie." *Id.* at 102–03. After Jackie's story was determined to be fabricated, three fraternity brothers sued Rolling Stone for defamation, even though the Rolling Stone article identified no brother of the 53-member fraternity by name. *Id.* at 104, 108. The district court rejected the plaintiffs' claims, concluding that the plaintiffs had not shown that the alleged defamatory statements were "of and concerning" them.[13] *Id.* at 101.

The Second Circuit reversed except as to one claim. *Id.* The court explained that, under New York law, the question whether an alleged defamatory statement is "of and concerning" the plaintiffs turns on whether "'[t]he reading public acquainted with the parties and the subject would recognize the plaintiff as the person to whom the statement refers. . . . It is not necessary that the world should understand the libel; it is sufficient that those who know the plaintiff can make out that she is the person meant." *Id.* at 104–05 (internal citations and quotation marks omitted). Viewing the plaintiffs' complaint through that lens, the Second Circuit held that two of the three plaintiffs had pleaded sufficient facts "to make it plausible . . . that a reader familiar with each Plaintiff would identify him as the subject of the statements at issue." *Id.* at 105. In reaching that conclusion, the court emphasized not only the commonality between the article's allegations

---

[13] Defendants cited and relied upon the district court decision in *Elias*. *See* Defs.' Mot. at 35–36. The Second Circuit decided *Elias* after the close of the original round of summary judgment briefing, but before the court ordered briefing on the impact of *Bristol-Myers*. Defendants did not, however, at any time notify the court that the Second Circuit had reversed the district court's decision in *Elias*. They should have done so.

and the plaintiffs' attributes, but also that each plaintiff had alleged that his family, friends and others had identified him as one of the alleged attackers. *Id.* at 105–06. Additionally, the court held that all three plaintiffs could proceed under a "small group defamation" theory. *Id.* at 108–10. The court observed that, under New York law, "where a statement defames all members of a small group, the reference to the individual plaintiff reasonably follows from the statement. . . . Accordingly, an individual belonging to a small group may maintain an action for individual injury resulting from a defamatory comment about the group, by showing that he is a member of the group." *Id.* at 108 (citation and internal quotation marks omitted). The court concluded that, given the Rolling Stone article's broad condemnation of all members of Phi Kappa Psi as either having participated in the gang rape or having turned a blind eye to it and other alleged sexual assaults at the fraternity house, "Plaintiffs sufficiently alleged that they were defamed because they were members of the fraternity at the relevant time." *Id.* at 110. Critically, the court's reasoning rested in part on the size of the university community and the fraternity's prominence. *Id.* Noting that "a plaintiff is more likely to succeed under a theory of small group defamation in small communities where individual members are readily associated with the defamed group," the court observed that university campuses are "intimate communities" "'where people know each other,'" and the plaintiffs had alleged that members of the university community had identified and harassed them because of their membership in Psi Kappa Psi. *Id.* (citation omitted). The court, therefore, concluded that all three plaintiffs had plausibly alleged that the Rolling Stone article was "of and concerning" them "under a theory of small group defamation." *Id.*

This extended discussion of *Elias* makes two things clear. First, the court in *Lines* surely would have reached a different conclusion with the benefit of *Elias*. After all, if three plaintiffs

of a 53-member fraternity could advance a small-group theory of defamation, then surely one plaintiff of a 14-person group of terminated employees could do so, too; a workplace is at least as intimate as a university community, if not more so, and there can be little doubt that the plaintiff's co-workers in *Lines* would have recognized the plaintiff as among the 14 employees referenced in the company's press release announcing their firings. Second, *Elias* supports the court's conclusion here. Like the plaintiffs in *Elias*, Plaintiffs here have plausibly alleged that those acquainted with them and the circumstances would have recognized them as the subjects of Buchanan's statements accusing them of wrongdoing. Indeed, like the plaintiffs in *Elias*, Plaintiffs here have pleaded that, in fact, prospective employers and their former Whole Foods colleagues were able to make out that Buchanan was referring to them in her statements. Thus, consistent with *Elias*, Plaintiffs in this case have pleaded sufficient facts to support a small-group theory of defamation.

Finally, Defendants reliance on a line of cases that "refus[e], as a matter of law, to find defamatory meaning where the claim of defamation is based on the interpretation third parties place upon termination of an at-will employee" is misplaced. Defs.' Mot. (quoting *Lefande*, 864 F. Supp. 2d at 52 (citing *Clampitt v. Am. Univ.*, 957 A.2d 23, 40–41 (D.C. 2008))). Unlike those cases, Plaintiffs' defamation claim does not rest on the interpretation of a third party as to why they were fired. Rather, Buchanan's alleged defamatory statements expressly state why Plaintiffs were terminated: because they manipulated the Gainsharing program for their own benefit. No third-party interpretation is needed to make such statements have a defamatory meaning.

In sum, the court concludes that Plaintiffs have pleaded sufficient factual matter to make it plausible that persons acquainted with them would recognize Buchanan's alleged defamatory statements as "of and concerning" them.

b. "Capable of Bearing a Defamatory Meaning" and "Highly Offensive to a Reasonable Person"

The court next addresses Defendants' contention that the alleged defamatory statements are not capable of bearing a defamatory meaning nor would be highly offensive to a reasonable person. Defs.' Mot. at 40. Under District of Columbia law, "a statement is 'defamatory' if it tends to injure the plaintiff in his trade, profession or community standing, or lower him in the estimation of the community." *Jankovic v. Int'l Crisis Grp.*, 494 F.3d 1080, 1091 (D.C. Cir. 2007). Similarly, to sustain a false light claim under District of Columbia law, Plaintiffs must show that the statements "would be offensive to a reasonable person" or that they were "given unreasonable and highly objectionable publicity that attributes to [them] characteristics, conduct or beliefs that are false, and so [are] placed before the public in a false position." *Zimmerman*, 246 F. Supp. 3d at 275 (quoting Restatement (Second) of Torts § 652E cmt. b (2016)). "[C]ontext is key to determining whether, as a matter of law, a statement is capable of bearing a defamatory meaning." *Marsh*, 339 F. Supp. 2d at 10.

Plaintiffs' allegations easily satisfy these standards. In context, Buchanan's statements to the Associated Press and The Washington Post paint Plaintiffs as cheats and thieves. True, one of the statements communicates that Whole Foods fired Plaintiffs for merely committing a "policy infraction," but other statements are more specific, asserting that Plaintiffs "manipulated a bonus program to their benefit" and that their misconduct "allowed [them] to benefit from a profit-sharing program at the expense of store employees." It is hardly a stretch to say that such statements, if false, would injure Plaintiffs in their profession and community and "would be offensive to a reasonable person." *Zimmerman*, 246 F. Supp. 3d at 278. The statements identified by Plaintiffs therefore are capable of bearing a defamatory meaning and would be highly offensive to the reasonable person.

c.    The statements are attributable to Defendants

Finally, the court turns to Defendants' argument that the court should dismiss Plaintiffs' claims with regard to the remaining statements identified in the Amended Complaint because, of the eight allegedly defamatory statements in the Amended Complaint, only four are quotes directly attributed to Buchanan in the Associated Press and Washington Post articles.   Defs.' Mot. at 36. The court declines to do so.   At this stage, what matters is that Plaintiffs have successfully pleaded at least some actionable statements.   Discovery will bear out whether the remaining statements are attributable to Defendants or not.

**C.    Plaintiffs' Motion for Leave to File a Second Amended Complaint and Defendants' Motion to Stay**

Finally, the court addresses Plaintiffs' Motion for Leave to File a Second Amended Complaint to add a claim under the whistleblower provision of the Dodd-Frank Wall Street Reform and Consumer Protection Act, 15 U.S.C. § 78u-6.   Federal Rule of Civil Procedure 15(a) instructs courts to "freely give leave" to a party seeking to amend its pleadings.   Denying leave to amend is "inconsistent with the spirit of the Federal Rules" and an abuse of discretion, *Foman v. Davis*, 371 U.S. 178, 182 (1962), unless the court provides a sufficient reason for so doing, such as "futility of amendment, undue delay, bad faith, dilatory motive, undue prejudice, or repeated failure to cure deficiencies by previous amendments," *Boyd v. District of Columbia*, 465 F. Supp. 2d 1, 3 (D.D.C. 2006).

Consistent with these principles, the court grants Plaintiffs' motion to amend. Defendants' Motion to Stay is therefore denied as moot.   The Second Amended Complaint shall now be the operative pleading in this matter.   Defendants may move to dismiss the new claim within 14 days, unless additional time is requested.

## V. CONCLUSION AND ORDER

For the foregoing reasons, Defendants' Motion to Dismiss Plaintiffs' Amended Complaint is granted in part and denied in part, as follows:

1. All claims against WFMI are dismissed without prejudice for lack of personal jurisdiction.

2. All claims against Buchanan are dismissed without prejudice for lack of personal jurisdiction.

3. Plaintiffs' claim for wrongful termination against WFM Group and WF Services (Count I) is dismissed with prejudice for failure to state a claim.

4. Plaintiff Bautista's claim for wrongful termination against WFM Group and WF Services (Count II) is dismissed with prejudice for failure to state a claim.

5. Plaintiffs' claim for breach of contract and breach of implied duty of good faith and failure dealing against WFM Group and WF Services (Count III) is dismissed without prejudice for failure to state a claim.

6. Plaintiffs may proceed with their claims for defamation and false light against WFM Group and WF Services (Counts IV and V).

Plaintiffs' Motion for Leave to File a Second Amended Complaint is granted, and Defendants' Motion to Stay is denied as moot.


Dated:   February 9, 2018

Amit P. Mehta
United States District Judge