IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

```
MICHAEL MOLOCK, ET AL.,          )
                                 )   CA No. 16-2483
          Plaintiffs,            )
                                 )
       vs.                       )
                                 )
WHOLE FOODS MARKET, INC., ET AL., )  Washington, D.C.
                                 )   October 1, 2018
          Defendants.            )   2:00 p.m.
---------------------------------)
                                 )
VICTOR VASQUEZ, ET AL.,          )
                                 )   CA No. 17-112
          Plaintiffs,            )
                                 )
WHOLE FOODS MARKET, INC., ET AL., )
_____)
```

TRANSCRIPT OF JOINT STATUS CONFERENCE PROCEEDINGS
BEFORE THE HONORABLE AMIT P. MEHTA
UNITED STATES DISTRICT JUDGE

APPEARANCES:

For Molock Plaintiffs:          Salvatore J. Zambri
                                REGAN ZAMBRI & LONG, PLLC
                                1919 M Street, NW
                                Suite 350
                                Washington, D.C. 20036
                                (202) 463-3030
                                szambri@reganfirm.com

For Vasquez Plaintiffs:         Brendan J. Klaproth
                                KLAPROTH LAW PLLC
                                406 Fifth Street, NW
                                Suite 350
                                Washington, D.C. 20001
                                (202) 618-2344
                                bklaproth@klaprothlaw.com

APPEARANCES CONTINUED

For the Defendants:             Gregory J. Casas
                                David E. Sellinger
                                GREENBERG TRAURIG, LLP
                                300 West Sixth Street
                                Suite 2050
                                Austin, TX 78701
                                (512) 320-7238
                                casasg@gtlaw.com
                                sellingerd@gtlaw.com


Court Reporter:                 William P. Zaremba
                                Registered Merit Reporter
                                Certified Realtime Reporter
                                Official Court Reporter
                                U.S. Courthouse
                                333 Constitution Avenue, NW
                                Room 6511
                                Washington, D.C. 20001
                                (202) 354-3249


Proceedings recorded by mechanical stenography; transcript
produced by computer-aided transcription

P R O C E E D I N G S

1
2          DEPUTY CLERK:  Your Honor, this is a Joint Status
3     Conference for Civil Action 17-112, Victor Vasquez, et al.,
4     versus Whole Foods Market Group, Inc., et al; and Civil
5     Action 16-2483, Michael Molock, et al., versus Whole Foods
6     Market, Inc., et al.
7          Brendan Klaproth representing the Vasquez
8     plaintiffs.
9          Salvatore Zambri representing the Molock
10    plaintiffs.
11         Gregory Casas and David Sellinger representing the
12    defendants in both cases.
13         THE COURT:  All right, Counsel.  Welcome back.
14    It's nice to see all of you.
15         All right.  So we're here for a status conference
16    on where things stand on discovery.  I've reviewed both
17    Joint Status Reports in each case.
18         The Vasquez case seems to flag a few more issues
19    than the Molock case.  Then the one issue that is in the
20    Molock issue also is identified in the Vasquez case.  So why
21    don't we talk through some of this.
22         I'm curious -- perhaps you all have talked since
23    these filings were made about some of these issues.  At
24    least some of them indicated that the parties were still in
25    the process of meeting and conferring on them.

1              So why don't we start with Mr. Klaproth.  And why

2    don't you tell me where some of these things stand.

3              My notes sort of indicate that you had flagged

4    four different issues:  Scope of discovery for the Vasquez

5    plaintiffs, the attorney-client privilege issue.

6              There was this objection about mustering.  And

7    then there's the Iron Mountain box issue.  So why don't we

8    sort of take those one at a time.

9              MR. KLAPROTH:  Of course, Your Honor.

10             So the major issue that's facing the Vasquez

11   plaintiffs is this phase of discovery, that just does not

12   exist in this case.

13             The defendants have brought this issue before the

14   Court as part of their 26(f) Joint Status Report filing.

15   The Court heard arguments and chose to not consolidate the

16   cases.  And quite frankly right now, we're being hamstrung

17   with discovery.

18             THE COURT:  Can you just tell me what it is that

19   you are seeking that they're saying is outside the scope of

20   the phase 1 discovery that's going forward in Molock?

21             MR. KLAPROTH:  Well, on a fundamental level, the

22   problem with this phase 1 discovery is, we need to prove

23   that this manipulation, so-called manipulation of the

24   gainsharing program, existed in stores other than where the

25   plaintiffs worked.

1          So we actually don't need any documents that's

2    being sought in the phase 1, other than communications,

3    perhaps, from corporate directing the shifting of labor.

4    So pretty much all the discovery we're seeking is outside

5    the phase 1 scope.

6          THE COURT:  But, I mean, give me an example of

7    what it is that you're looking for that's outside phase 1.

8          MR. KLAPROTH:  A perfect example, which I brought

9    with me, are those gainsharing reports.

10          Basically, it shows the stores that -- where labor

11    had shifted.

12          And I even have copies, if the Court would like to

13    take a look, at what exactly we're looking for.

14          These were documents that were easily accessible;

15    it took seconds to access off the Internet, and they exist

16    for every single store across the country.  And, from our

17    perspective, it's dispositive of the defamation claim.

18          THE COURT:  And how far back are you seeking these

19    gainsharing reports?

20          MR. KLAPROTH:  In our Joint Status Report, we

21    actually proposed a very limited three months for all the

22    stores.

23          Those are electronic --

24          THE COURT:  Every single store?

25          MR. KLAPROTH:  That's correct, Your Honor.

1          And these are Excel spreadsheets.  They're

2  roughly -- one printed out is about 30 pages per

3  spreadsheet.

4          And what it shows is when the actual labor was

5  shifted from -- for example, they would put two team leaders

6  in one department.

7          And so we would just look at the department, see

8  that there's two team leaders, or, in some cases, four or

9  five, in that department, which shows that labor had been

10  shifted.

11          THE COURT:  Why does that show a shift?

12          MR. KLAPROTH:  Because --

13          For example, I have --

14          THE COURT:  If you've got a sample, it would be

15  useful to always look at the records.

16          MR. KLAPROTH:  Just for the record, this is

17  Vasquez Plaintiff 699 through 731.

18          THE COURT:  Do you want us to make a copy of this?

19          RIGHT SPEAKER 2:  I won't have any basis to argue

20  about it or even know what it is.

21          MR. KLAPROTH:  I could also pull it up on an iPad

22  here.

23          THE COURT:  Actually, that makes far more sense.

24          If we've only got one more copy, why don't you use

25  the ELMO.  That way, everybody can look off the same thing.

1           Do we need to zoom out?

2           So are those monitors on where everybody can see

3    the document?

4           MR. CASAS:  Yes, Your Honor.

5           THE COURT:  Okay.

6           Why don't you continue, Mr. Klaproth.

7           MR. KLAPROTH:  Of course.

8           So what we're looking at is the gainsharing report

9    for 2015 in South Bend, Indiana, in the Midwest region.

10           And if you look under this grocery team towards

11   the bottom, it is -- an example here is the sixth entry is

12   Marcy Grabbert, who's a team leader that's been identified

13   here as being part of the grocery team.

14           So now we jump forward later on in this document,

15   we're looking at Plaintiff's 709, Ms. Grabbert here is also

16   listed in the bakery, which shows that she's been placed in

17   two teams.

18           And now, if we move again later on to the admin

19   team, she's the fifth individual down, she's now been listed

20   as working in the admin team as well.

21           So this is an example of a situation where this

22   one employee was a team leader -- what team, I don't know.

23   It's either the bakery, grocery, or admin -- has now been --

24   her labor has been attributed to three different teams.

25           So to us, this shows that labor was being shifted

1    in South Bend during this time period.

2           And I brought a couple more reports just as an

3    example as well, one from the northeast, in Milford,

4    Connecticut, and the southern region for Cary,

5    North Carolina.

6           THE COURT:  And you say you were able to more --

7    you can confine your response to however you deem it

8    appropriate -- but that these records were available on an

9    internal portal of some kind?

10          Or how would one -- what's your understanding of

11   how somebody would access this record?

12          MR. KLAPROTH:  So our understanding was all of

13   these records for all time periods for all stores were

14   available to all employees on the Intranet.  It's a

15   share-point system, and I think it's referred to actually as

16   called Grapevine.

17          Based on defendant's position, it appears that

18   that no longer exists since this lawsuit has been filed,

19   that those documents are no longer accessible, based on

20   the -- referring to the actual physical boxes of documents

21   being held at Iron Mountain.

22          THE COURT:  But what year is this from?

23          This is from 2015?

24          MR. KLAPROTH:  This was from 2015.

25          THE COURT:  All right.

1          But you're only asking for three months' worth

2     from what time?

3          MR. KLAPROTH:  I would say three months prior to

4     the actual initial report, which I believe was September

5     2016.  So September, August, July 2016.

6          THE COURT:  Okay.

7          And so -- I cut you off.

8          So you were explaining that this would be

9     available on something called Grapevine, that at least, once

10    upon a time, would have been available to -- at least that's

11    your understanding of what would have been available to any

12    employee?  Any employee could have gotten on and see --

13         MR. KLAPROTH:  Any employee, is my understanding.

14         THE COURT:  -- what the gainsharing program of a

15    store that was a thousand miles away?

16         MR. KLAPROTH:  That is correct.

17         So I believe there's dropdown filters, so to

18    speak, where you pick the region and the store at the time

19    period.

20         And that Excel spreadsheet -- they're all uniform

21    across the country, from the ones we've seen.  So it's a

22    nationwide practice of submitting these gainsharing reports

23    every payroll period.

24         THE COURT:  Okay.

25         Let me -- while you're up here, then, just in

1    terms of the other issues that had been flagged concerning

2    the attorney-client-privilege records and this objection

3    about mustering, are those still issues that you still have

4    concern about or have you all been able to talk to opposing

5    counsel about that and walk through it?

6           MR. KLAPROTH:  We've conferred with respect to the

7    mustering all the evidence.  We have not been able to make

8    any progress, though, on either of those objections.

9           With respect to the attorney-client privilege, in

10   this particular situation -- and, you know, we're dealing

11   with the 80 pages of objections, so this is just a small

12   slither of some of the issues we have.

13          But we're looking for the documents that

14   Brooke Buchanan relied upon before making those defamatory

15   statements, and there's certainly, certain attorney-client

16   privilege.

17          We don't have the logs; we can't fully assess the

18   prejudice.  But our position is that the privilege does not

19   protect facts that she was provided with, and it also

20   doesn't protect any sort of business advice that may have

21   been given by an attorney.

22          So I think the most -- if there's --

23          THE COURT:  Well, I guess the question is --

24   I understand all of that.

25          I think the question I have is, you all filed this

1  on September 26th, Whole Foods responded, saying, we're

2  still in the process, or at least I understood them to say

3  they were in the process of collecting these materials and

4  they would log them so that all of us could be working from

5  the same understanding of what they're, in fact, holding and

6  on what grounds, and so it wasn't clear to me whether the

7  issue had matured to the level of something I need to deal

8  with.

9         And part of that would involve also some sort of

10 meet and confer between you and opposing counsel, and

11 I don't know whether any of that has happened.

12        MR. KLAPROTH:  It has, to some extent.

13        But the position is -- Your Honor is correct,

14 perhaps it may be a bit premature, but our position is,

15 then, the privilege shouldn't be asserted, because if we are

16 going to have meaningful responses to our discovery

17 requests, how are we supposed to assess these objections?

18 Because we could be six months down the road, we now raise

19 this issue and it's been waived.

20        So we just wanted to put the issue before the

21 Court, because we do see it becoming an issue, perhaps,

22 requiring an in-camera review.

23        THE COURT:  All right.

24        Let's save the Iron Mountain issue to the last

25 since it's a common issue between the two cases.

1          So why don't I turn, then, to Mr. Casas and

2    Mr. Sellinger, who will be doing the honors for Whole Foods.

3          MR. CASAS:  Thank you, Your Honor.

4          We're going to split the responses up.  I'm going

5    to address the objection issues.  Mr. Sellinger will talk

6    about the gainsharing reports.

7          On the objection issue, we have not withheld any

8    documents at this point.

9          With regard to the attorney-client-privilege

10   argument, with regard to Ms. Buchanan, we are in the process

11   of going through her files right now so that we can make a

12   production in response to the three requests for production

13   at issue.

14          To the extent that we find any materials there

15   that we believe would be covered by the privilege, we'll put

16   them on a log and we'll get them to Mr. Klaproth right away

17   so that we can bring it up with the Court, if necessary.

18          But we're not in a position right now to say that

19   document X, Y, and Z are privileged, and so there's a

20   dispute; we haven't gotten to that point yet.

21          But we're not going to wait six months; we're

22   progressing through here, and so it will be timely.

23          THE COURT:  Okay.

24          In terms of -- I mean, just to be clear, so as

25   I understand it, it sounds like that your response has

1    listed a number of objections, but, at this point,

2    neither -- there's been no withholding of any document based

3    on any general objection or a specific objection that may

4    have been made with respect to any particular interrogatory

5    or document request?

6              MR. CASAS:  That's correct, Your Honor.

7              With regard to Ms. Buchanan specifically, we know

8    that she did speak with in-house counsel during that

9    process.  What we're trying to figure out is whether there

10   were any documents that were exchanged that have privileged

11   communications within them.

12             From what we can tell from the files we've seen,

13   that has not occurred -- that did not occur; that anything

14   that she was shown or she was relying upon was not

15   privileged, and we're in the process of gathering those and

16   producing them.

17             But if we find something in her files, we just

18   wanted to make sure we had that objection there in place.

19             THE COURT:  Okay.

20             Did you want to add anything about things that are

21   not related to these gainsharing files?

22             MR. CASAS:  There is also the issue about the

23   mustering-of-the-evidence objection.

24             THE COURT:  Right.

25             MR. CASAS:  Again, we haven't withheld any

 1  documents on it based on that objection, but we wanted to

 2  protect ourselves from this catch-all request for

 3  production.

 4          And we did email Mr. Klaproth, I believe it was

 5  Friday, with some cases we found from the

 6  District of Columbia that address this idea that catch-all

 7  requests for production are overly broad and that an

 8  objection that we have made --

 9          THE COURT:  Well, what was the request:  "Is there

10  anything that you haven't produced so far that's relevant?"

11  Is that the request?  I mean, that would be a catch-all.

12          MR. CASAS:  It's actually in the Status Report.

13          Hold on a second, please.

14          THE COURT:  Oh, I see.  You've quoted "All

15  documents relating to plaintiffs' claim."

16          MR. CASAS:  Right.

17          And so Mr. Sellinger counseled me on this.  We may

18  need to stop using the Texas vernacular on some of these

19  objections.  I apologize for that.

20          But when we see those kinds of catch-all requests,

21  the objection, in Texas is, you're trying to force us to

22  muster all of our evidence, and it's not proper.

23          We did find cases that, while they do not use that

24  phrase here in the District of Columbia, the concept is the

25  same, and so we forwarded those onto Ms. Klaproth.

1          But nothing has been withheld at this point on

2    those objections.  To the extent that we find anything that

3    we do withhold, because -- as a basis, this is an objection

4    that we'll raise with Mr. Klaproth as well.

5              THE COURT:  Okay.

6          Then let me hear from Mr. Sellinger about these

7    reports, and let's about the scope of discovery.

8              MR. SELLINGER:  Good afternoon, Your Honor.

9              THE COURT:  Good afternoon.

10             MR. SELLINGER:  Your Honor, in the prior order,

11   Your Honor ordered phase discovery in the Molock case.  So

12   we're not talking only about discovery of the nine stores,

13   we're talking about discovery, to some extent, about

14   40 stores.  And we think that -- is the nine stores, plus

15   any of the stores that any of the Vasquez plaintiffs worked

16   in at a prior point.

17         We think that, at least for phase 1 discovery,

18   that more than covers any issue that's likely to come up in

19   this case.

20         Mr. Klaproth raises the issue of the gainsharing

21   reports.  And as I understand it -- I had never seen that

22   document.  That document was offered to the Court as an

23   example of how the gainsharing -- there are labor transfers

24   occurring in other stores.

25         First, the mere fact that there's a shifting of

 1   hours does not represent anything unless it's improper

 2   shifting; that is, it's only a violation of the gainsharing

 3   practice if the hours are recorded improperly to another

 4   team, and the person whose hours were recorded did not, in

 5   fact, work on that other team.

 6          If that person was transferred to another

 7   department for an hour or a shift or a week or whatever it

 8   was, that's perfectly within Whole Foods' right, and that

 9   doesn't give rise to anything.

10          So the fact that these reports might exist doesn't

11   indicate anything.  We may get there.  But whatever the

12   issue is that we're going to get to, as his document shows,

13   we're going to get there based on the documents in the nine

14   stores and the 40 stores, and there's no need to go beyond

15   that.  That would be my point one.

16          Point two is really a response to Your Honor's

17   question about whether -- how they got these documents.

18          I understand that the Molock plaintiffs are

19   present and former employees and the Vasquez plaintiffs are

20   former employees who may have friends at the stores that

21   previously worked there.

22          But our position is that employees of Whole Foods

23   should not be accessing documents that they did not make use

24   of in the regular and ordinary course of their business,

25   that they're somehow able to access on the company's

1   database.

2          We need electronic systems and databases in order

3   to function as a company, but that doesn't mean that his

4   clients can go on the database or have their friends go on

5   the database and pull up relevant records from other

6   jurisdictions, where these people do not work and have no

7   need to see those records.  So I'm just stating that now.

8          It surprises me that they have these reports.  If

9   they continue to access the system, we're going to have a

10  problem, and we may have to come back to the Court and seek

11  appropriate relief.

12         Our systems should be protected from intrusion.

13  There are federal statutes that protect our systems from

14  intrusion by unauthorized access, and we don't think that

15  they should be using them for purposes of improper

16  discovery.

17         THE COURT:  Well, be that as it may, I guess the

18  way I look at that is, I'm not sure that's an issue for me.

19         MR. SELLINGER:  It isn't today.

20         THE COURT:  At least not today.

21         And it's not even clear to me it would be

22  tomorrow, in the following sense that:  It seems to me if

23  Whole Foods is making accessible to all of its employees

24  records from all stores, then that may be an issue for

25  Whole Foods in terms of the kind of access they're giving.

1  That's one.

2          And then, two, I don't know whether you all have

3  any kind of warnings to employees that these records only

4  ought to be used for certain purposes.  Separate issue.

5          In any event, the question that hasn't been

6  answered, however, is Mr. Klaproth's description of the

7  records and the ability to quickly access them

8  electronically.

9          I mean, is it the case that one could go online or

10 to some electronic repository and quickly obtain these

11 reports for the three-month period for each of the stores

12 that Mr. Klaproth is seeking?

13          MR. SELLINGER:  My understanding -- and Mr. Casas

14 will correct me if I am wrong.

15          My understanding is that the systems are able to

16 access the reports for a three-month period.  So we're

17 sitting here in September.  So October --

18          THE COURT:  You mean a three-month looking-back

19 period?

20          MR. CASAS:  Correct.  A three-month looking-back

21 period.

22          So that we would not be able to capture them for

23 the entire period at issue.

24          However, the systems do capture the underlying

25 data that goes into the gainsharing reports.

1          So they'll have the gainsharing reports.  And at

2     some point, there would be the capacity to generate

3     documents that show the data, the hours that are reflected

4     in those reports but not the physical copies of the reports.

5          THE COURT:  Okay.

6          But would the data, however it's preserved,

7     reflect -- and, again, I don't know what Mr. Klaproth has

8     just described is in violation of a gainsharing program or

9     not -- but say there is the kind of shifting that he

10    believes is a violation, would the data, as it exists, show

11    that John Jones, his hours were spread over three different

12    departments during a particular pay period?

13         MR. SELLINGER:  My understanding is that that

14    would be the data.  That may well be reflected

15    electronically.

16         The gainsharing reports, as I understand it -- and

17    I haven't seen the hard copy reports.

18         The gainsharing --

19         THE COURT:  When you said "gainsharing" -- so

20    we're on same page -- is what Mr. Klaproth showed us --

21    that's what you're referring to as the "gainsharing report"?

22         MR. KLAPROTH:  Yeah.  The official document is

23    called the "gainsharing report," and we have them going back

24    to 2006.

25         THE COURT:  Okay.

```
 1            MR. KLAPROTH:  So the suggestion that it's only a

 2   three-month period, maybe things have changed since this has

 3   been filed; but prior to that, we were able to have access

 4   to reports from 2006.

 5            MR. SELLINGER:  All right.  So all I know is what

 6   I was told.  So I don't know how far back they go.

 7            What I was about to say is what he just said to

 8   the Court was that the report shows that employee Jones,

 9   Mr. Jones, worked in three different departments.

10            THE COURT:  Right.

11            MR. CASAS:  Nothing about those facts would

12   suggest improper labor transfers.

13            THE COURT:  Well, that may be.

14            MR. CASAS:  Okay.

15            THE COURT:  And I'm not drawing any conclusions

16   one way or the other, understand that.

17            MR. SELLINGER:  Okay.

18            THE COURT:  I don't know whether that's a showing

19   of gainsharing violations or something perfectly innocuous.

20            My question is a different one, which is, again,

21   is Whole Foods able to -- for example, for the three-month

22   period that he's seeking these reports, able to go to any

23   kind of server or electronic repository that it may have and

24   obtain these records without much difficulty?

25            MR. CASAS:  Your Honor, I can answer that.
```

1          And Mr. Sellinger has indicated the data does

2     exist.

3          And so if you -- for a certain period of time.  It

4     doesn't go back for 20 years.

5          But the data is available to go back to 2000, my

6     understanding, is to go back to 2015, 2016.

7          And say you want data from a particular window of

8     time, we can download that data and provide that to the

9     plaintiffs, and that will show that Ms. Jones worked in

10    bakery for an hour and the butcher shop for an hour and

11    admin for two hours.

12         What we understand does not exist, and we'll go

13    back and check after Mr. Klaproth's representation, is that

14    the actual Pretty report itself --

15         THE COURT:  Okay.

16         MR. SELLINGER:  -- it may not actually exist on

17    our databases anymore.  But I will also verify that, because

18    what he's represented, I was not told that.  I was told

19    actually the complete opposite.  But we'll verify that.

20         THE COURT:  Okay.

21         MR. CASAS:  But as to the facts that he

22    represented, Your Honor, there's no dispute that employees,

23    on occasion, get transferred to different departments.

24         THE COURT:  Right.

25         MR. SELLINGER:  That just doesn't give rise to any

1  of the issues in the case.

2          THE COURT:  No.  I understand that.

3          I mean, look, it's going to be their burden of

4  proof to show that what he just pointed out and believes is

5  a gainsharing violation is, in fact, a gainsharing

6  violation, versus something else.

7          MR. SELLINGER:  Correct.

8          THE COURT:  And so that's for another day.

9          MR. SELLINGER:  Yes, Your Honor.

10         THE COURT:  So the bigger question is the one

11  about scope.

12         And I mean, it is true that the discovery is not

13  consolidated.  It's also true that there are obviously

14  different issues and different interests.

15         I guess, Mr. Klaproth, the question is -- I mean,

16  how is it that you think these records are going to

17  demonstrate that there is sort of a nationwide practice,

18  which is what you want to demonstrate to show the falsity of

19  the statement that the practice was only limited to the nine

20  stores?

21         MR. KLAPROTH:  It's a great question, Your Honor.

22         We actually have emails from corporate officials

23  directing the plaintiffs to do this practice, which, all --

24  and, by the way, all these documents have been produced in

25  discovery.

1          So we have an email from another corporate

2  official exactly telling us about the transfers of team

3  members from -- into admin, and that the nationwide -- the

4  national team is auditing these labor transfers and

5  reg-flagging these transfers.

6          So I mean, these are documents that exist and we

7  should have access to.

8          It's Plaintiff's 1521.

9          So I mean, national is red-flagging these

10  transfers.

11          These are audit reports we've asked for.  Why

12  don't we have them.

13          MR. SELLINGER:  Your Honor, we've already

14  agreed -- and I had a long discussion with Mr.Zambri about

15  it.

16          We've agreed that phase 1 discovery includes the

17  nine stores, the other stores where the Vasquez plaintiffs

18  worked prior to the three-year-limitations period, plus

19  applicable regional-office documents and other documents

20  that indicate nation -- or national leadership direction, to

21  the extent relating to any of these stores.

22          THE COURT:  No.  I understand that.

23          And I mean, there was a reason why we limited the

24  discovery in the way we did for Mr. Zambri, right?  Because

25  there's the hanging question mark over whether we can even

1  certify a nationwide class, consistent with the due-process

2  clause.

3          But that same limitation certainly is not put in

4  place on paper with respect to Mr. Klaproth's claim, and

5  what I'm trying to figure out is what kind of burden the

6  request that he's just described would really put on

7  Whole Foods.

8          And if all this is available electronically, it

9  doesn't seem to me that the burden would necessarily be all

10 that great.  But I think I need a little bit more

11 information to really make that determination.

12         But it's certainly the case that if Mr. Klaproth

13 wants to show that every store in the nation was

14 participating in that practice, that would certainly go to

15 support his contention that the statement that it was only

16 limited to the nine stores is false.  I mean, that, I think

17 you'd agree with that, right?

18         MR. SELLINGER:  No, I wouldn't at all, Your Honor.

19         His records may show that employees from the

20 bakery department are assigned to the seafood department.

21         THE COURT:  No.  I got all that.

22         My point is simply to you this:  You all can fight

23 what that means.

24         But his view is what that means is this is a

25 gainsharing violation.  And if he's seeing patterns of that

1   happening across the country, that very well may support his

2   position that, in fact, there have been gainsharing

3   violations across the country.

4          You all, of course, may have a different view that

5   all that is just an appropriate allocation of employee time

6   with no gainsharing consequences.  It's not for me to say at

7   this point right now.

8          My point is just simply, can we get him the

9   evidence that he thinks he needs and that would be

10  appropriate and relevant, without sort of breaking the bank

11  for Whole Foods?

12         MR. SELLINGER:  I understand that.

13         Let me respond this way, Your Honor.

14         Just as a matter of case management, I think we

15  have big enough issues trying to proceed in a logical,

16  efficient path down the road -- and I thought phase 1,

17  whether or not it applies primarily to the Molock case, was

18  a sensible approach.

19         We have all these nine stores we've produced to

20  them.

21         THE COURT:  Yeah, I got you.

22         I mean, I understand it was sensible, but it was

23  sensible for a reason.

24         And so I mean, I'm not hearing you tell me that

25  three-month production for each store during the year of

1   2016 is going to be that burdensome.

2          I mean, it would be one thing if you told me that

3   you'd have to search boxes in Iron Mountain for these

4   reports, and send legions of people in there to start

5   digging around for these reports and expending thousands and

6   thousands of lawyer hours to do that.  That might be a

7   different case.

8          But that's not what you're telling me.  You're

9   telling me this stuff is available on your electronic

10  databases, and that somebody with, presumably, some number

11  of key strokes, can obtain this material, put it on a flash

12  drive, and send it on over.

13         And if you want to limit it to just Mr. Klaproth's

14  case, then that's fine; I can put that kind of order in

15  place so that -- because, presumably, Mr. Zambri would be

16  interested in that information too, but I've ruled so far

17  that he's not entitled to it.

18         MR. SELLINGER:  If I can jump in with one

19  clarification.

20         While the data is available for those gainsharing

21  reports -- so we'll know that Ms. Jones was transferred

22  around.  The reason why she was transferred is not reflected

23  on those reports or within that data.

24         To find out why Ms. Jones was transferred, you

25  actually need to go and look at the TTF, the time transfer

1    forms.  These are only available in hard copy.

2             And if you want to find out, was Ms. Jones

3    improperly transferred to bakery for whatever reason, you

4    actually have to look and see whether the time transfer form

5    was manipulated in any way, was not signed, was altered.

6             So looking at the gainsharing data that

7    Mr. Klaproth is talking about, looking at it in a vacuum is

8    not going to show you anything.

9             In order to actually show -- or in order to

10   actually see whether there was improper gainsharing --

11   shifting, you have to look at both sets of documents

12   together.

13            And the TTFs only exist in hard copy.  And that's

14   where the Iron Mountain issue came up, where we tried to

15   figure out if we need to go back -- for even just phase 1,

16   to go back and get the TTFs for these 40 stores across the

17   country, that's where the Iron Mountain issue came up.

18            So I want to make sure Your Honor understands that

19   while pushing a few buttons to get the data is fine, it has

20   to include the TTFs or else it's just a waste of time.

21            THE COURT:  And that's a helpful clarification.

22            And maybe the answer is that we put some

23   limitations, in terms of the TTFs, because that is the kind

24   of burdensome discovery that I just talked about that may

25   warrant narrowing the scope of that search at this point.

1          But let me just ask Mr. Klaproth:  What's your

2   reaction to the need for the TTFs to explain what your

3   reports show?

4          MR. KLAPROTH:  Well, with respect to the TTFs

5   themselves, that's the first time I've heard this.

6          But that being said, I think where we start is we

7   start with the electronic data.  It takes seconds to

8   download that data.

9          Once we see who's been transferred, then we can

10  follow up maybe with a limited scope of, let's start with

11  these individuals and these different regions to show,

12  produce the TTFs, because we have an email from corporate

13  saying an internal audit team at national --

14          THE COURT:  Hang on.

15          Can you put that up?

16          MR. KLAPROTH:  The first one we have --

17          THE COURT:  And just for the record, tell me what

18  the Bates number is on that.

19          MR. KLAPROTH:  It's Vasquez Plaintiffs 1519.

20          This first email is from a regionwide official

21  saying, "Hi, Nick.  Are you --"

22          THE COURT:  Hang on.

23          Can you sort of zoom out so we can all see it?

24          If this thing goes to trial, you're going to have

25  to learn how to use that.

1          MR. KLAPROTH:  So what we have here is an email

2    from a regionwide level official saying, "Hi, Nick.  Are you

3    okay to spread the grocery prep foods and WD deficits to the

4    other teams that may have labor?  We're doing this with a

5    few stores so teams don't get too far behind."

6          He responds, "Yes, I'm okay with this.  Thanks."

7          THE COURT:  And who's Nick Miano?

8          MR. KLAPROTH:  So he's one of the plaintiffs.

9    He's being instructed by a corporate-level person to do

10   this.

11         THE COURT:  Okay.  That's Ms. Mueller?

12         MR. KLAPROTH:  Yep.

13         THE COURT:  She was -- what's her title again?

14         MR. KLAPROTH:  Executive Coordinator of

15   Operations.

16         MR. SELLINGER:  She was, Your Honor.  Her title

17   has changed.

18         THE COURT:  But she was at headquarters in Dallas?

19         MR. SELLINGER:  No.

20         MR. CASAS:  She's at the regional office in --

21         THE COURT:  Oh, the regional office.  Right.

22   Okay.

23         MR. SELLINGER:  This is a local, at-issue store

24   that he's talking about.

25         THE COURT:  Okay.

1          MR. SELLINGER:  So I don't know how that goes to

2   the need to go beyond the scope of phase 1 discovery,

3   Your Honor.

4          MR. KLAPROTH:  Here, we have an email from

5   Dave Gearhart.

6          THE COURT:  And, remind me again, Mr. Gearhart?

7          MR. SELLINGER:  Mr. Gearheart is essentially the

8   head of HR for the Mid-Atlantic region of the northeast

9   region, which is located in Rockville, which is the relevant

10  regional office for this region, Judge.

11         THE COURT:  Okay.

12         What's it say?

13         MR. KLAPROTH:  So what he's telling here is the

14  situations where it's permissible to transfer labor, which

15  is news to us that it was permissible at all.

16         But then he says in the second paragraph here,

17  "There is now in place an internal audit team at national

18  that is auditing labor transfers or red-flagging any

19  transfers that seem to be out of the ordinary and requesting

20  specifics and justifications of the transfers when it's

21  flagged.

22         So one of the requests we're also seeking is these

23  audits that occurred.  We understand them to be called --

24  identified as fraud-buster reports.  We were told in

25  discovery that these are not actual documents, but these are

1    the documents we're looking for, or these actual audits.

2        MR. SELLINGER:  So this document, as I'm reading

3    it for the first time, Your Honor, would support the

4    company's position that if somebody was improperly

5    transferring labor that was contrary to Whole Foods'

6    practice -- and that's why they're looking.

7        I've never seen this document before.

8        MR. KLAPROTH:  Again, it was produced.

9        MR. SELLINGER:  Could you identify the Bates

10   number on that, please.

11       MR. KLAPROTH:  I'm sorry, it's Vasquez Plaintiffs

12   1521.

13       MR. CASAS:  Thank you.

14       MR. SELLINGER:  Again, Your Honor, this document

15   would provide no support for plaintiffs' claim, nor would it

16   provide any reason for Your Honor to expand discovery

17   beyond --

18       THE COURT:  Well, it might.

19       I mean, here's the problem.  It might.  And

20   I don't know.

21       Here, you have folks from the Mid-Atlantic.  Your

22   client spokesperson, I think it was her, but maybe it was

23   just a general statement from the company, said, this

24   practice was only limited to nine stores, right?

25       MR. SELLINGER:  Yes.

1          THE COURT:  And they're claiming that's a false

2    statement.

3          These are Mid-Atlantic region officers, and

4    there's a heck of a lot more than nine stores in the

5    Mid-Atlantic region.

6          MR. SELLINGER:  Correct.

7          THE COURT:  So, at a minimum, it does -- if,

8    in fact, this practice is more widespread than the nine

9    stores, it certainly would support their view, if he's

10   reading the documents correctly; again, I don't know whether

11   that's the case or not.

12         So look.  I think here's where I'm going to come

13   out on this.  I'm not hearing from you all that it's going

14   to be hard to get this data, okay?

15         MR. SELLINGER:  Before Your Honor rules, can I

16   just make a suggestion, if I may?

17         THE COURT:  Sure.

18         MR. SELLINGER:  We are on the verge of producing

19   to them the relevant electronic records and the TTFs for the

20   stores that are subject to your order; that is, the nine

21   stores, plus the other stores where these plaintiffs worked.

22         I don't know how many of the other stores that

23   those plaintiffs worked at are included in this stack, but

24   this information will include the hours reports and the

25   TTFs.

1          And I think it would be more meaningful to look at

2   that set of data that relates to a specific number of stores

3   that are at issue and understand how these reports, of the

4   data that says Ms. Jones was transferred to a different

5   department, in and of itself doesn't suggest anything

6   untoward.

7          MR. KLAPROTH:  And if I may, my clients,

8   I presume, will testify that labor was transferred in those

9   40 stores.  So I don't need those reports.  I need every

10  other store.

11         So that's really the rub you're trying to box us

12  into phase 1 discovery.

13         THE COURT:  All right.  So here's what we're going

14  to do:

15         Whole Foods is going to be ordered to produce

16  these reports or the data, I should say, not the reports,

17  but the data, for the three-month period that Mr. Klaproth

18  is asking for for the stores, for all the stores nationwide.

19         Again, I'm not hearing that this is a major lift

20  for Whole Foods.

21         And certainly, given what the allegations are in

22  this case and the proof that's needed to prove up the

23  falsity of the statement, then those documents are relevant

24  to demonstrate that there was a nationwide practice when

25  Whole Foods said just the opposite.

1          Now, that said, that discovery is going to be just

2    with respect to Mr. Klaproth and his case, because I think

3    it's the kind of thing that would go beyond the phase 1

4    discovery that we've ordered for Mr. Zambri's case.

5          If, in fact, what we then need to do is get the

6    TTFs to inform the data.  Then we can talk about whether

7    it's proper to limit it and how we limit it, because, as I

8    hear Whole Foods' counsel representing that the TTFs --

9    that's a harder pull.

10          I mean, those are hard-copy documents, presumably,

11   that aren't readily accessible; and instead of chasing --

12   requiring him to go through thousands of manhours' worth of

13   digging around in boxes for this material, then we can do

14   that in a way that makes a little bit more sense, if we get

15   to that point.

16          MR. SELLINGER:  May I please, Your Honor, suggest

17   a limitation of what the Court just said?

18          As you know, the only entity that's before the

19   Court is Whole Foods Market Group, which operates in

20   20-something states.

21          I think it would amply --

22          MR. KLAPROTH:  Just to clarify.  We also have

23   Whole Foods Markets Services, Inc., that's a defendant.

24          THE COURT:  Right.  But they don't hold any

25   stores, is my understanding, right?

1          MR. SELLINGER:  They what?

2          THE COURT:  They don't operate stores.

3          MR. SELLINGER:  Correct.

4          THE COURT:  They're sort of an --

5          MR. SELLINGER:  Yeah.  It's an administrative.

6          THE COURT:  That's the back-office portion of the

7     company.

8          MR. SELLINGER:  Correct.

9          But the relevant claim is against Whole Foods

10    Market Group for doing this.

11         THE COURT:  Right.

12         MR. SELLINGER:  So my suggestion would be --

13    I just heard the Court in its order --

14         Since the other operating entities are not subject

15    to the Court's jurisdiction -- and I'm not fighting you

16    about what Whole Foods, as a bigger entity, will or won't

17    do -- I'm just asking -- since the only entities that are

18    here before for you are Whole Foods Market Services and

19    Whole Foods Market Group, that you limit your order to those

20    stores within Whole Foods Market Group, which will get you,

21    I think, all the way to Florida and parts of the Midwest.

22         MR. KLAPROTH:  Are you suggesting Whole Foods

23    Market Services, Inc., does not have access to these

24    documents?  Because that's discovery; it's what's within

25    control.

1          MR. SELLINGER:  No.  I'm saying that the employer

2     of these defendants is Whole Foods Market Group.

3          THE COURT:  Who issued the press release?

4          It's in a press release.

5          MR. KLAPROTH:  It was Whole Foods Market Services,

6     Inc., employee Brooke Buchanan, who made the statements, the

7     defamatory statements.  So they're technically the entity at

8     issue here for the defamation claim, which is based in

9     Austin.

10         THE COURT:  Right.

11         And Whole Foods Market, Inc., is the parent

12     company that holds all of the food, the grocery stores,

13     correct?

14         MR. SELLINGER:  It's the parent company.

15         THE COURT:  Right.  But -- it's the parent

16     company, okay.

17         Just point me where in your complaint,

18     Mr. Klaproth, the statement's made.

19         MR. KLAPROTH:  Just one moment, Your Honor.

20         So paragraphs 41 through 43 of the amended

21     complaint, second amended complaint, which is Docket

22     Entry 16.2, contains the defamatory statements.

23         And then in Your Honor's decision, you also

24     identify those statements.

25         THE COURT:  Okay.

1          I mean, look.  This answers the question, which is

2    that, in paragraph 43, the allegation is, "On or about

3    December 15th, 2016, Whole Foods published additional

4    defamatory statements to *The Washington Post* with respect to

5    plaintiffs' involvement in the gainsharing program.  In

6    *The Post* article, Whole Foods states that 'manipulation of

7    the gainsharing program was isolated to a relatively small

8    number of its 457 stores.'"

9          So I think that answers the question.

10         MR. SELLINGER:  But Ms. Buchanan is involved in

11   the case, and Whole Foods Market Services is involved in the

12   case with respect to her statement, not with respect to the

13   practices.  They're not the ones who run the stores.

14         MR. KLAPROTH:  We need to disprove the statement.

15         THE COURT:  Yeah.  Right.  That's the point.

16         So the reports for the three-month period --

17   Mr. Zambri, I'm not done, so -- will be -- those need to be

18   produced for the three-month period that Mr. Klaproth is

19   seeking for each of the 457 stores that are controlled by

20   Whole Foods Market, Inc.

21         And then we'll sort of cross the next bridge, if

22   you're going to seek more information than that, on a

23   nationwide basis.

24         MR. KLAPROTH:  Understood, Your Honor.  Thank you.

25         MR. ZAMBRI:  Could I just have a clarification on

1    the record as far as what the three-month period is?

2    I don't see it in the Status Report.

3            THE COURT:  He told me, but he'll correct me if

4    I'm wrong, July, August and September of 2016.

5            MR. KLAPROTH:  That's correct, Your Honor.

6            MR. SELLINGER:  Thank you, Your Honor.

7            THE COURT:  Okay.

8            Mr. Zambri.

9            MR. ZAMBRI:  Your Honor, I thought it would be

10   okay if I could be heard on the Court's order about it being

11   a blind discovery to my clients.

12           THE COURT:  Uh-huh.  Sure.

13           MR. KLAPROTH:  Just very briefly.

14           It's my understanding that the purpose behind

15   doing this in phases in my case was not to burden the time

16   and energy and expense of the defendant.  Not for some sort

17   of tactical thing.

18           What I worry about is that if I'm blind to it --

19           THE COURT:  Here's the thing.

20           I want to interrupt you, because here's the

21   problem.

22           It may be that the stores with respect to which

23   some of these records -- frankly, first of all, some of

24   these records aren't going to be relevant to your class

25   members, even if you get certified nationwide, because only

1   the Whole Foods Market Group stores are the defendant in

2   this case, right?

3          MR. ZAMBRI:  Correct.

4          THE COURT:  So already, if I were to give you

5   access to records concerning 457 stores, that's

6   overinclusive.

7          MR. ZAMBRI:  Understood.

8          THE COURT:  So for that reason alone, you

9   shouldn't have access to those.

10         And, secondarily, the reason we limited it in this

11   way is because it may never become relevant, depending on

12   what the Circuit holds, that you're going to get access to

13   anything other than the stores in the Mid-Atlantic and the

14   phase 1 stores that we've allowed discovery to go forward

15   with.

16         And so I hear what you're saying and I should

17   allow you to continue to make your record, but it does seem

18   to me to be a reasonable limitation, in light of what the

19   scope of your case is at the present stage.

20         MR. ZAMBRI:  The problem that I see, Your Honor,

21   is actually during the discovery when we do depositions, at

22   the request of defendant, we have agreed to coordinate

23   discovery.

24         One of the things that we agreed to do was to

25   participate at the same time for these depositions.  Am I

1  supposed to walk out of the room when counsel is asking

2  questions about documents?

3          I don't know how it's going to work in practice.

4          I'm going to be -- apparently, if I ask a single

5  question, I'm going to be using up one of my depositions

6  that I'm allowed to under the Rules.

7          I don't see, respectfully, the harm in having me

8  see it, at least the stuff related to my -- our stores.

9          I'm not going to make arguments --

10          THE COURT:  But you're going to get that.

11          MR. ZAMBRI:  I'm not going to get it now.

12  I'm going to get it --

13          THE COURT:  No.

14          You're getting these reports with respect to the

15  phase 1 stores, and that is all of your stores, right?

16          MR. ZAMBRI:  Right.  But what happens during the

17  deposition, Your Honor, which --

18          THE COURT:  Well, that's a different issue.

19          But in terms of the documents, that's what we're

20  sticking to right now, you're getting all that.

21          MR. ZAMBRI:  I am getting phase 1.

22          THE COURT:  Right.  And that's the subset of

23  material that pertains to your clients' stores.

24          MR. ZAMBRI:  But, for instance, if I may, if I'm

25  taking the deposition, which I will, of the Vasquez

1    plaintiffs, and I'm asking them where the practice took

2    place outside of their nine stores, if they're aware of it,

3    and they start talking about stores that go beyond the

4    phase 1 stores, I would imagine that to be reasonable,

5    discoverable information.  I shouldn't have to stop them

6    from answering that question.

7              And they may get into documents --

8              THE COURT:  So here's the thing.

9              Mr. Zambri, I can't game this out.

10             And I mean, I appreciate the bind that you think

11   you'll find yourself in.

12             But, you know, look.  I'm going to assume that

13   everybody is going to be reasonable here.  And if the

14   question of your physical presence during certain

15   questioning -- why don't you all talk about that first

16   before I have to start calling balls and strikes on it,

17   because it does seem to me that --

18             My interest here was to ensure sort of the most

19   efficient discovery possible.  I don't want to make this

20   overly burdensome just to try and do that.

21             So I think the better -- the more sensible

22   approach is to figure out, talk to counsel, what you all

23   think makes sense.

24             And I'm not sure it would require you to walk out

25   of the room.  Maybe it would.  Maybe it wouldn't.  But I'm

1  just not sure I can game that out right now.

2          MR. ZAMBRI:  Okay.

3          Your Honor, I just wanted to make the point that I

4  don't see any prejudice to them, since they're putting the

5  testimony and energy in it, for me.

6          THE COURT:  Look, the prejudice is this:  You're

7  now in possession of documents that you may not be entitled

8  to it.  That's it.  I mean, that's the prejudice.

9          And I'm confident they don't want to disclose

10  those to you until you're entitled to them.  And right now,

11  you're not, and so I think that's where we are.

12          I mean, I don't mean to be difficult, but that's

13  where we are.

14          MR. ZAMBRI:  Thank you, Your Honor.  I have no

15  further questions.

16          THE COURT:  Okay.  Does that leave us with

17  anything other than the Iron Mountain material to talk

18  about?

19          MR. KLAPROTH:  That's everything for the Vasquez

20  plaintiffs, Your Honor.

21          THE COURT:  Okay.

22          Mr. Zambri, do you have anything you wanted to

23  raise other than the Iron Mountain material?

24          MR. ZAMBRI:  No, Your Honor.

25          We have been talking about some other things, but

1    there's no dispute for us to bring to your attention.

2              THE COURT:  There's no dispute.  Okay.

3              MR. ZAMBRI:  There's no dispute.

4              THE COURT:  All right.

5              Well, then let's talk about the Iron Mountain

6    material.  And I don't know whether -- if we've reached a

7    point where there's something to really talk about, other

8    than you all are sort of wrestling with what it is exactly

9    you're going to do with it and how you're going to produce

10   responsive materials.

11             So, Mr. Sellinger, Mr. Casas, do you want to just

12   bring me up to date on where things stand with that?

13             MR. SELLINGER:  We haven't done anything with the

14   Iron Mountain material yet, Your Honor.

15             I would suggest that we proceed with what we have

16   that sort of indicates some relevance to this issue.

17             So we know we have a limited number of boxes where

18   we have indices from Iron Mountain that seem to include the

19   types of records that would include the gainsharing

20   documents.

21             So we understand that those are available --

22   whether it's reasonably accessible.  We understand that

23   those are within the scope of retrievable documents, and

24   we're going to get those.

25             THE COURT:  And that's about 300, right?

1          MR. SELLINGER:  Yeah.

2          THE COURT:  Okay.

3          MR. SELLINGER:  And whatever we have to do, we're

4   going to do, and we'll get those documents and identify if

5   there are any relevant documents.

6          With respect to these other 60,000 boxes, I think

7   at this point we should -- it's just so disproportionate to

8   any issue in the case.

9          And there's so little reason to believe that the

10  yield would be fruitful in relation to the value that we go

11  through all this other discovery that we have, where we know

12  there are documents that are responsive and witnesses and

13  all those things.  And then if we need to, we'll address --

14  we'll meet and confer so we're not bringing you an issue

15  that we're discussing for the first time, and we'll see if

16  we can resolve how we're going to do it together.

17          I mean, from our perspective, if we have to go to

18  Iron Mountain facilities around the country, they can get on

19  an airplane and we can get on an airplane, and they can look

20  and we can look.

21          But I would hope that we don't get there, but

22  I think it's way -- it's not necessary today.

23          THE COURT:  Okay.

24          I mean, you all devoted a number of pages to it,

25  so I wanted to make sure we talked about it.

1          MR. KLAPROTH:  From our perspective, it just

2     wasn't the electronic files.  So we don't need to go

3     through -- I don't think it's as burdensome as they portray

4     it to be.

5          I think we just need the electronic gainsharing

6     reports.  And if the TTFs are in paper form, we've already

7     addressed how we would go about that.

8          THE COURT:  Okay.

9          Mr. Zambri, did you want to add anything to the

10    mix here in terms of the Iron Mountain material?

11         MR. ZAMBRI:  No.  My statement in my Status Report

12    speaks for itself.

13         We find it bizarre and unusual that they would

14    have these unlabeled boxes that have no way of being tagged

15    electronically to figure out what's in it, but it sounds

16    like we're going to get TTFs.

17         And I presume I'm going to be getting the

18    gainsharing reports for at least the 34 stores or so or 40

19    stores.  That's going to be important, because there's been

20    an admission that you need to look at them contemporaneously

21    to make much sense of them, or at least to get any value out

22    of them.

23         So assuming that's the case --

24         MR. CASAS:  Of course.

25         MR. ZAMBRI:  -- we understand phase 1.

1          THE COURT:  All right.

2          Well, look.  Let me just -- I'll just give you my

3    general impressions, Mr. Sellinger and Mr. Casas, that

4    I think what you've described is sensible.

5          You know, if we ever do get to a point where the

6    other tens of thousands of boxes become relevant, we'll

7    cross that bridge when we get to it, but it certainly sort

8    of screams out for some sort of proportionality, if we get

9    to that point.

10          I will just -- it's not the least bit unusual that

11    large corporations send their documents off to Iron Mountain

12    or like storage facilities and we run into this from time to

13    time and just have to figure out what to do with them.

14          Okay.  Anything else before we just talk

15    scheduling?

16          MR. ZAMBRI:  No, Your Honor.

17          MR. KLAPROTH:  Nothing for the Vasquez plaintiffs.

18          MR. SELLINGER:  No, Your Honor.

19          THE COURT:  All right.

20          I think we had discussed every 90 days.  And maybe

21    as you all are moving forward, you'll have something that

22    requires my attention sooner.

23          But, at a minimum, let's set something down in

24    another 90 days.  I think that if we stick to 90 days, it

25    puts us right in the middle of the holidays.  So let's --

1   why don't we do it after the first of the year.  How

2   about --

3          MR. ZAMBRI:  Your Honor, may I approach?

4          THE COURT:  Yeah.  Of course.

5          MR. ZAMBRI:  The only thing that I'm worried

6   about -- and maybe it's not a concern -- is that I have a

7   deadline, if I were to amend the pleadings, I believe it's

8   before then, sometime in the middle of December.

9          I mean, I suppose we could just bring it to the

10  Court's attention beforehand, but...

11        THE COURT:  I mean, look.

12        Let me just be clear about one thing, and this

13  isn't just directed at you, Mr. Zambri.  But my view of

14  these deadlines is unless you move before the deadline

15  passes, you're out of time --

16        MR. ZAMBRI:  Understood.

17        THE COURT:  -- unless there's a good reason for

18  it.  And I think -- I find too often lawyers don't

19  understand that.  I know all of you are sophisticated and

20  probably do, but let me just make sure everybody is aware of

21  that.

22        Look, I'm happy to meet in the middle of December

23  if that works for everybody too.  I'm not -- whether it's

24  middle of December, middle of January, it's cold either way.

25        MR. KLAPROTH:  Could we have a moment, Your Honor?

1          (Counsel conferred off the record.)

2          MR. ZAMBRI:  Your Honor, we've chatted, and

3   I don't have any objection to meeting in the beginning of

4   the year.

5          Obviously, I have my deadlines, and if there's

6   something that pops up and we run into a dispute, we'll

7   bring it to the Court's attention.

8          THE COURT:  Look, Mr.Zambri.  If you're running up

9   against a deadline and you need me, you know how to get

10  ahold of me --

11         MR. ZAMBRI:  Yes.

12         THE COURT:  -- and you know how to file a motion.

13  So I'm not concerned that we're going to run into any

14  problems.

15         And if we need to convene here for something in

16  person sooner than that, then we'll do that as necessary.

17         So why don't we just set January 9th at -- is this

18  a good time for you all since you're coming in from out of

19  town?  I don't know whether it can help you avoid staying

20  the night if you don't want to stay the night.

21         MR. SELLINGER:  I have an out-of-town hearing.

22  Just bear with me.

23         That's fine, Your Honor.  Thank you.

24         THE COURT:  So January 9th at 2:00 p.m. works for

25  everyone?

1          MR. KLAPROTH:  Yes, Your Honor.

2          THE COURT:  Works for you, Mr. Zambri?

3          MR. ZAMBRI:  Very good, Your Honor.

4          THE COURT:  All right.

5          So we've got January 9th, 2:00 p.m., as a control

6    date.

7          I know you all are barreling toward the end of the

8    year, and I suspect things will come up.  If they do,

9    obviously, let me know, we can either get on a telephonic

10   hearing; or if it's a big enough deal, we can reconvene in

11   person.

12         But I suspect other issues will come up, and just

13   let me know if you need me.

14         Thanks, everyone.

15         DEPUTY CLERK:  All rise.

16         (Proceedings concluded at 2:55 p.m.)

17

18

19

20

21

22

23

24

25

C E R T I F I C A T E

        I, William P. Zaremba, RMR, CRR, certify that the foregoing is a correct transcript from the record of proceedings in the above-titled matter.


Date: October 3, 2018_____    /S/__William P. Zaremba_____

                                      William P. Zaremba, RMR, CRR