# UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

VICTOR VASQUEZ, et al.,

               Plaintiffs,

     v.

WHOLE FOODS MARKET SERVICES, INC., WHOLE FOODS MARKET GROUP, INC.,

               Defendants.

Case No. 1:17-cv-00112-APM

## DEFENDANTS WHOLE FOODS MARKET SERVICES, INC. AND WHOLE FOODS MARKET GROUP INC.'S MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

**GREENBERG TRAURIG, LLP**
300 West 6th Street, Suite 2050
Austin, Texas 78701
*Attorneys for Defendant*

## ORAL ARGUMENT REQUESTED

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ................................................................................................................ 1

SUMMARY OF ARGUMENT ........................................................................................... 1

STATEMENT OF FACTS .................................................................................................. 3

      A.    The Parties. ............................................................................................ 3
      B.    The Gainsharing Program and EVA Bonuses. ..................................... 4

            1.    The Gainsharing Program. .............................................. 4
            2.    The EVA Bonuses for STLs. ............................................ 5

      C.    Tip-line call and internal investigation in the Mid-Atlantic Region. .......... 6
      D.    Whole Foods' nationwide investigation. ............................................. 9

            1.    Mike Grady's initial data-based review and creation of
                 Heat Map. ...................................................................... 10
            2.    Follow-up investigation by Regional Presidents. ......... 12
            3.    Ongoing investigation. .................................................. 13

      E.    Following Plaintiffs' termination and social media commentary on
          the controversy, Whole Foods is contacted by Associated Press and
          Washington Post for comment. ............................................................. 14
      F.    Procedural History. ............................................................................ 18
      G.    There is no evidence that Whole Foods' statements were actual or
          proximate causes of any injury to Plaintiffs. ..................................... 20

SUMMARY JUDGMENT STANDARD ........................................................................... 22

CHOICE OF LAW ........................................................................................................... 22

ARGUMENT ..................................................................................................................... 23

    I.    Ms. Buchanan's Statements to the Press Were Substantially True. ................... 23

      A.    Ms. Buchanan's statement regarding the investigation and Whole
          Foods' ongoing efforts to pay potentially affected employees are
          substantially true. .............................................................................. 25
      B.    Ms. Buchanan's statement regarding Plaintiffs' motivation is an
          opinion that cannot constitute defamation. ........................................ 27

    II.    Whole Foods did not act with actual malice regarding the truthfulness of
      its statements. ..................................................................................................... 29

      A.    The "actual malice" standard applies to the statements at issue in
          this case ............................................................................................. 29

1. Plaintiffs have only alleged that Whole Foods acted with knowledge or reckless disregard to the truth, and therefore have not alleged negligence in this case. ...................................... 29

2. Alternatively, Plaintiffs are limited-purpose public figures, and therefore are required to prove actual malice......................... 30

B. Plaintiffs cannot satisfy the heightened actual malice standard............... 33

III. Whole Foods' statements did not identify Plaintiffs or their stores, and therefore do not have a defamatory meaning as to Plaintiffs................................ 37

IV. Whole Foods' statements are subject to the qualified self-defense privilege. .................................................................................................. 39

A. Whole Foods is entitled to rely on the qualified self-defense privilege. ......................................................................... 40

B. Plaintiffs cannot establish common-law malice sufficient to overcome the self-defense privilege. ........................................ 41

V. Plaintiffs' false light claims must be dismissed.................................................. 42

VI. There is no evidence of causation to support special damages............................ 43

CONCLUSION.................................................................................................... 44

*ACTIVE 64281300v18*

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Askew v. Collins*,
    722 S.E.2d 249 (Va. 2012)..................................................................................43

*Austin v. Howard Univ.*,
    267 F. Supp. 2d 22 (D.D.C. 2003) ....................................................................39

*Barrett v. Covington & Burling LLP*,
    979 A.2d 1239 (D.C. 2009) ...............................................................................22

*Bodgett v. Univ. Club*,
    930 A.2d 210 (D.C. 2007) .................................................................................42

*Bose Corp. v. Consumers Un. of U.S.*,
    466 U.S. 484 (1984).........................................................................................36

*Brooks v. Kerry*,
    37 F. Supp. 3d 187 (D.D.C. 2014) ....................................................................22

*Brown v. Prince George's Hosp.*,
    No. 09CV295, 2011 WL 2413344 (D. Md. June 9, 2011) .........................34, 37, 44

*Brummett v. Taylor*,
    569 F.3d 890 (8th Cir. 2009) ............................................................................38

*Clyburn v. News World Commc'n, Inc.*,
    705 F. Supp. 635 (D.D.C 1989) ........................................................................32

*Dyun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*,
    472 U.S. 749 (1985)..........................................................................................30

*Fields v. Office of Johnson*,
    520 F. Supp. 2d 101 (D.D.C. 2007) ..................................................................22

*Garfield v. Shutterfly, Inc.*,
    857 Fed. App'x 71 (4th Cir. 2021) ....................................................................29

*Gazette, Inc. v. Harris*,
    325 S.E.2d 713 (Va. 1985)................................................................................37

*Gertz v. Robert Welch, Inc.*,
    418 U.S. 323 (1974).....................................................................................32, 33

*Glocoms Group, Inc. v Center for Public Integrity*,
    No. 17-cv-6854, 2018 WL 2689434 (N.D. Ill. June 5, 2018).............................29

*Gov. of Micro Res. Inc. v. Jackson*,
    624 S.E.2d 63 (Va. 2006).............................................................................34, 37

*Greer v. Paulson*,
    505 F.3d 1306 (D.C. Cir. 2007) ........................................................................22

iii

*Hall v. Dist. of Columbia*,
   867 F.3d 138 (D.C. Cir. 2017) ..............................................................................43

*Harmon v. Liss*,
   116 A.2d 693 (D.C. 1955) ...........................................................................37, 38

*Haycox v. Dunn*,
   104 S.E.2d 800 (Va. 1958).....................................................................................40

*Haynes v. Alfred A. Knopf, Inc.*,
   8 F.3d 1222 (7th Cir. 1993) ..................................................................................28

*Jacron Sales Co. v. Sindorf*,
   350 A.2d 688 (Md. 1976) ......................................................................................23

*Jankovic v. Int'l Crisis Grp.*,
   822 F.3d 576 (D.C. Cir. 2016) ........................................................................35, 37

*Jordan v. Kollman*,
   612 S.E.2d 203 (Va. 2005).............................................................................23, 24

*Lewis v. Elliot*,
   628 F. Supp. 512 (D.D.C. 1986) ...........................................................................30

*Lohrenz v. Donnelly*,
   350 F.3d 1272 (D.D.C. 2003) .........................................................................35, 36

*\*Mastro v. Potomac Elec. Power Co.*,
   447 F.3d 843 (D.C. Cir. 2006) ..............................................................................22

*McFarlane v. Sheridan Square Press, Inc.*,
   91 F.3d 1501 (D.C. Cir. 1996) ..............................................................................35

*Mejia v. Telemundo Mid-Atlantic LLC*,
   440 F. Supp. 3d 495 (D. Md. 2020) ......................................................................29

*\*Montgomery v. Risen*,
   197 F. Supp. 3d 219 (D.D.C. 2016) ......................................................................28

*Moss v. Stockard*,
   580 A.2d 1011 (D.C. 1990) .......................................................................30, 31, 32

*New York Times Co. v. Sullivan*,
   376 U.S. 2540 (1964)............................................................................................33

*Novecon Ltd. v. Bulgarian–Am. Enter. Fund*,
   190 F.3d 556 (D.C. Cir. 1999) ........................................................................39, 40

*Parker v. Amtrak*,
   214 F. Supp. 3d 19 (D.D.C. 2016) ........................................................................37

*Piscatelli v. Van Smith*,
   35 A.3d 1140 (Md. 2012) ......................................................................................42

*Poullard v. Smithkline Beecham Corp.*,
   No. Civ. A. 02-1590, 2005 WL 3244192 (D.D.C. Nov. 30, 2005) ............27, 43, 44

iv

*Publish Am., LLP v. Stern*,
    84 A.3d 237 (Md. 2014) ................................................................37

*Sigal Const. Corp. v. Stanbury*,
    586 A.2d 1204 (D.C. 1990) ...........................................................24

*Spiegel v. Leavitt*,
    No. 1-2195, 2005 WL 2402322 (D.D.C. Sept. 22, 2005) ................22

*St. Amant v. Thompson*,
    390 U.S. 727 (1968)...........................................................34, 35, 37

*Stovall v. James*,
    810 F. Supp. 2d 237 (D.D.C. 2011) ...............................................38

*Tavoulareas v. Piro*,
    817 F.2d 762 (D.C. Cir. 1987) .............................................33, 34, 35

*Telnikoff v. Matusevitch*,
    702 A.2d 230 (Md. 1997) ..............................................................40

*\*Underwager v. Channel 9 Australia*,
    69 F.3d 361 (9th Cir. 1995) ...........................................................28

*\*Waldbaum v. Fairchild Pub., Inc.*,
    627 F.2d 1287 (D.C. Cir. 1980) ...........................30, 31, 32, 33

*Washburn v. Lavoie*,
    437 F.3d 84 (D.C. Cir. 2006) ..............................................40, 41, 42

*Weyrich v. New Rep., Inc.*,
    235 F.3d 617 (D.C. Cir. 2001) .................................................23, 37

*WJLA-TC v. M. Levin, M.D.*,
    564 S.E.2d 383 394 n.5 (Va. 2002)................................................42

**Statutes**

Va. Code § 8.01-40 ...................................................................................42

**Other Authorities**

D.C. Civ. Jury Inst. § 17.06 .................................................................23, 24

D.C. Civ. Jury Instr. § 17.13 ...............................................................34, 37

D.C. P. J. Inst. 17-1 .................................................................................43

Fed. R. Civ. P. 56...................................................................................1

Fed. R. Civ. P. 56(a) ...............................................................................22

Md. P. J. Inst. Cv 12:1 ...........................................................................23

Md. P. J. Inst. Cv 12:4 .......................................................................23, 24

Md. P. J. Inst. CV 12:6...........................................................................43

v

Md. P. J. Inst. CV 12:8..................................................................................................34, 37

Restatement (Second) of Torts § 564..........................................................................37

Va. Instruction No. 37.020............................................................................................23

Va. Instruction No. 37.090............................................................................................23

Va. P. J. Inst. 37.097....................................................................................................43

Va. P. J. Inst. 37.105...............................................................................................32, 44

*ACTIVE 64281300v18*

## INTRODUCTION

Defendants Whole Foods Market Services, Inc. ("WFMS"), and Whole Foods Market Group, Inc. ("WFMG) (collectively, "Defendants" or "Whole Foods") submit this Memorandum of Law in Support of their Motion for Summary Judgment on "Plaintiffs"[1] claims against Whole Foods, pursuant to Federal Rule of Civil Procedure 56. Whole Foods would respectfully show the Court as follows.

## SUMMARY OF ARGUMENT

Plaintiffs are suing Whole Foods for defamation stemming from statements that its spokesperson, Brooke Buchanan, made to two news reporters in mid-December 2016. These statements summarized Whole Foods' internal investigation regarding "manipulation" of the Gainsharing program that had been ongoing for nearly two months. Importantly, these statements confirmed prior information already obtained by these reporters that nine store managers in the Mid-Atlantic Region had been terminated for this policy infraction and that Whole Foods was investigating how much money might be owed to employees in those nine stores.

In their operative complaint, Plaintiffs assert that Whole Foods made these statements in an attempt to cover up a vast, nationwide, corporate-led conspiracy to deprive employees of their Gainsharing bonuses. *See* Second Am. Compl. [Dkt. 16-2] ¶¶ 1–6. Indeed, Plaintiffs claimed they themselves were "whistleblowers" who tried to bring this practice to light but were retaliated against for their candor. *Id.*

---

[1] Plaintiffs refers collectively to Victor Vasquez ("Vasquez"); Nadeem Sheikh ("Sheikh"); Katia Sadoudi ("Sadoudi"); Svetlana Bautista ("Bautista"); Ibrahim Ba ("Ba"); Nicholas Miano ("Miano"); Pa M. Njie ("Njie"); Michael Amegnaglo ("Amegnaglo"); and David Berger ("Berger").

*ACTIVE 64281300v18*

Unfortunately for Plaintiffs, after receiving over one-hundred thousand documents and a dozen depositions covering every aspect of Whole Foods' investigation and the Gainsharing program, there is no evidence of any such nefarious corporate practice. Instead, the evidence directly refutes Plaintiffs' claim that they were whistleblowers, as the majority of the Plaintiffs lied about their manipulation of the program when confronted by Whole Foods' investigators. Finally, the evidence confirms that Whole Foods' statements to the reporters accurately reflected the state of Whole Foods' investigation. Plaintiffs have had ample opportunity to prove their far-fetched claims. Because they cannot produce evidence—other than their own self-serving statements—to support their claims, summary judgment is proper.

Thus, the Court should dismiss Plaintiffs' defamation and false-light-invasion-of-privacy claims on five principal grounds:

1. The evidence established that Ms. Buchanan's statements regarding the status of Whole Foods' investigation were substantially true, which is a complete bar to defamation.

2. Under the relevant standard here, there is no clear and convincing evidence to support the contention that Whole Foods spoke with knowledge or reckless disregard regarding the alleged falsity of their statements.

3. There is no evidence—other than Plaintiffs' speculation—that anyone was able to identify them as the "nine store managers" vaguely referenced in the news articles.

4. When Whole Foods made these statements, it was acting in self-defense to protect its own reputation from false public allegations. Thus, Whole Foods' statements are protected by the qualified self-defense privilege, which Plaintiffs cannot overcome.

5. Plaintiffs have provided no evidence—again, other than their own self-serving speculation—that their reputation was harmed by these news articles specifically. Given that Plaintiffs cannot recover for presumed damages under applicable state law, Plaintiffs' have failed to show actual injury from Whole Foods' alleged conduct.

Put simply, Plaintiffs have failed to introduce evidence to support each and every essential element of their defamation and false light claims. Therefore, Whole Foods respectfully requests

*ACTIVE 64281300v18*

the Court grant this Motion, render judgment in favor of Whole Foods on all of Plaintiffs' claims, and allow the case to proceed on Whole Foods' counterclaims.

## STATEMENT OF FACTS

Pursuant to Local Rule LCvR 7(h)(1), Whole Foods provides the following statement of material facts for which there is no genuine dispute.

### A.     The Parties.

WFMG is a Delaware corporation with its principal place of business in Austin, Texas. WFMG is "an operating company which operates the individual Whole Foods Market Stores in" various states in the Northeast, Midwest, and South—including, as relevant here, stores in Virginia, Maryland, and the District of Columbia. SOF ¶¶ 1–2 (P. Yost Decl. [Dkt. 12-3] ¶ 7). WFMS "works as the administrative arm of the Whole Foods Market family of companies, providing accounting, legal, and other administrating services to" operating entities such as WFMG. SOF ¶ (*Id.* ¶¶ 6, 11). At all times relevant to this case, Brooke Buchanan ("Buchanan") was the Global Vice President of Communications for WFMS. SOF ¶ 5 (B. Buchanan Decl. [Dkt. 12-4] ¶ 1).

Plaintiffs are nine former WFMG Store Team Leaders ("STL") who were terminated on December 1, 2016. SOF ¶ 6 (Second Am. Compl. [Dkt. 16-2] ¶ 38). An STL is Whole Foods' equivalent of a store manager. SOF ¶ 7 (*Id.* ¶ 24). At the time of their termination, Mr. Vasquez worked at a Whole Foods store in the District of Columbia (the "D.C. Plaintiff"); Ms. Sheikh, Ms. Sadoudi, Mr. Ba, Mr. Amegnaglo, and Mr. Berger worked at stores in Virginia (the "Virginia

Plaintiffs"); and Ms. Bautista, Mr. Miano, and Mr. Njie worked at stores in Maryland (the "Maryland Plaintiffs").[2] *See* SOF ¶¶ 8–10 (*id.* ¶¶ 9–17).

**B.      The Gainsharing Program and EVA Bonuses.**

1.      The Gainsharing Program.

At all times relevant to this suit, Whole Foods maintained a "Gainsharing" program that "incentivizes employees to increase department productivity." SOF ¶ 11 (Second Am. Compl. [Dkt. 16-2] ¶ 28). The policies for the Gainsharing program, as it existed at the time the Plaintiffs were terminated, are set forth in "Gainsharing Guide." SOF ¶ 12 (*see* Ex. 3; *see also* Allshouse Dec. 9, 2021 Dep. (Ex. 5) at 79:17-81:6). To summarize:

> Gainsharing is a program that enables Team Members to earn monthly dividends (i.e., Labor Surplus payouts) from the excess Labor Budget of their individual teams. The program directly rewards teams for driving sales (because labor comes directly from team sales), reducing unnecessary overtime (a waste of labor dollars), and working cooperatively and efficiently.

Ex. 3 at 2.

Gainsharing is calculated every four weeks for each team in a store. *See* SOF ¶ 14 (*id.* at 5). As relevant here,[3] to calculate Gainsharing, a team's Labor Budget is multiplied by the team's actual sales, and then the actual labor spent is deducted from this product.  SOF ¶ 15 (*id.* at 2). The "Labor Budget," itself is "set as a percentage of the individual team sales." *Id.* If the resulting difference is a positive number, the team has a "Labor Surplus," making the team members eligible

---

[2] As discussed below, for choice-of-law purposes in defamation cases, the relevant jurisdiction is where the individual plaintiff worked, rather than where the plaintiff lived or where the statement was received.  *See infra* at 22–23.

[3] There are other mechanics to the Gainsharing program—including how certain teams' gainsharing depends on store wide sales, how teams can share their gainsharing with the entire store, and how teams can have a Gainsharing "savings pool"—that are not germane to this Motion.

for a Gainsharing payment. If the balance is negative, the team has a "Labor Deficit" and may not receive Gainsharing for that period. *See* SOF ¶¶ 16–17 (*id.* at 2–4).

The Gainsharing Guide states, in three separate locations that it is a "major infraction" to manipulate the Gainsharing program by charging a team member's hours to a team where he or she did not work. SOF ¶¶ 18–21 (*id.* at 3, 8, 12). This major infraction, which Whole Foods will refer to as "Improper Labor Shifting," is central to this case. The Gainsharing Guide is unequivocal:

> 1. "No one may manipulate Labor Surplus Payouts by charging hours worked by Team Members on one team to other teams." SOF ¶ 19 (*id.* at 3).

> 2. It "is considered a major infraction to pull funds from successful teams to aid those in deficit." SOF ¶ 20 (*id.* at 8).

> 3. "No one may manipulate Labor Surplus payouts/pools by charging hours worked by Team Members to anywhere but the team where the hours were worked." SOF ¶ 21 (*id.* at 12).

Despite these clear mandates, all nine Plaintiffs admittedly engaged in Improper Labor Shifting, resulting in their termination.

### 2. The EVA Bonuses for STLs.

STLs, including Plaintiffs, were not eligible to participate in Gainsharing. SOF ¶ 22 (*id.* at 7). Instead, STLs were eligible for a quarterly bonus payment called an "Economic Value Added (EVA™)" Incentive Compensation Plan (the "EVA Plan"). SOF ¶ 23 (*see* Ex. 4). These "EVA Payouts" could be significant, with Plaintiffs themselves sometimes earning over $10,000 in a given quarter. *See, e.g.*, SOF ¶¶ 24–25 (Ex. 6 (Sheikh's $12,989,49 EVA Payout for Q3 2015); Ex. 7 (Ba's $17,505.55 EVA Payout for Q1 2014)).

The specific mechanics of how EVA Payouts are calculated is complex and not germane to this case. However, broadly speaking, as is clearly stated in the EVA Plan, an STL's EVA Payout could be reduced if any of the teams in the STL's store had a Labor Deficit when the EVA

Payout was calculated. *See* SOF ¶ 26 (Ex. 4 at 3–4). Specifically, "[i]f any team at the store has a

Negative Savings Pool[4] balance, the STL will receive an adjustment of 50% of the increase in the

negative balance between the beginning and the end of the quarter." SOF ¶ 27 (*id.*). Similarly, a

"charge of 50% of negative admin labor budget variances (admin labor dollars spent in excess of

the budget for the quarter) within a store is used when calculating [EVA] payouts for the STL."

SOF ¶ 29 (*id.*). Thus, if either individual teams or the Admin team are in Labor Deficit at the end

of a quarter, an STL's potential EVA Payout would be reduced by 50% of those deficits because

"it is part of the responsibility of an STL to keep the teams at his/her store at our under budget."

*See* SOF ¶¶ 27–30 (*id.*).

### C.      Tip-line call and internal investigation in the Mid-Atlantic Region.

On October 24, 2016, Whole Foods received an anonymous tip-line call. SOF ¶ 31 (*see*

Ex. 8). The caller alleged that Plaintiff Njie[5] "instructs the team leads to transfer hours from one

team to another team so that all teams make labor." SOF ¶ 32 (*id.*).

That same day, Whole Foods' outside consultant, Tommy Sautter emailed Mr. Njie a copy

of the tip-line complaint and asked for a "written rebuttal to these allegations." SOF ¶ 33 (*see* Ex.

9 at 2). Less than twelve hours later, Mr. Njie responded and unequivocally denied the allegations,

insisting that he only transferred team member hours when the team member actually worked for

a different team. SOF ¶ 34 (*id.* at 1). Based on this denial, Whole Foods initially closed the

investigation. SOF ¶ 35 (*id.*). However, over the next five days, Whole Foods received an

additional three anonymous calls, all alleging that Mr. Njie improperly billed team member hours

---

[4] A "Negative Savings Pool" balance is defined in the Gainsharing Guide as "Teams in deficit
[who] will not participate in Storewide Gainsharing because they do not have Labor Surplus to
share"—i.e., the team is in Labor Deficit.  SOF ¶ 28 (Gainsharing Guide (Ex. 3) at 7).

[5] *See* SOF ¶ 32 (discussing scrivener's error that misspelled Njie's first name).

6

to teams where the team member did not work—i.e., Improper Labor Shifting.[6]  SOF ¶¶ 36–38 (Ex. 10; Ex. 11; Ex. 12).

Based on these repeated accusations, Whole Foods began its investigation of Mr. Njie's store. SOF ¶ 39 (*see* Gearhart Jan. 7, 2020 Depo. (Ex. 13) at 35:19-45:16). On November 1, 2016— just seven days after the initial anonymous call—David Gearhart (WFMG's Director of Human Resources for the Mid-Atlantic Region); Rose Smith (the notetaker); and Joe Faul (an outside consultant) interviewed Mr. Njie. SOF ¶ 40 (*id.* at 18:4–8, 39:20–41:10, 42:16–22, 95:9–96:8; Ex. 14). During that interview, Mr. Njie retracted his initial denial and admitted to Improper Labor Shifting. SOF ¶ 41 (*see* Ex. 14 at 3–4).  Following this interview and the interview of Mr. Njie's Assistant Store Team Leader ("ASTL"), Mr. Njie was placed on administrative leave. SOF ¶ 42 (Gearhart Jan. 7, 2020 Depo. (Ex. 13) at 44:20-45:16).

As a result of the investigation of Mr. Njie's store, Mr. Gearhart; WFMG's President for the Mid-Atlantic Region, Scott Allshouse; and the Vice President for the Mid-Atlantic Region, Nicole Wescoe, all agreed "that a broader look outside of the Kentlands store" was appropriate. SOF ¶ 43 (*see id.* at 33:16–22, 45:17–46:14). First, WFMG gathered documents "to determine what stores we should look at based on questions" regarding labor transfers. SOF ¶ 44 (*id.* at 45:18–47:1). If questions existed, Mr. Gearhart's team would "approach those stores to get the" answers to those questions. SOF ¶ 45 (*id.*). Mr. Gearhart's team ultimately conducted on-site interviews at nine additional stores—including eight stores where the other eight Plaintiffs worked. *See* SOF ¶¶ 46–78 (*see id.* at 46:15-47:1, 48:15-51:10; Exs. 15–23; Ex. 76; Ex. 78).[7]

---

[6]  *See* SOF ¶¶ 36, 38 (discussing scrivener's error that misspelled Njie's first name).

[7] Mr. Gearhart's team's detailed notes of the interviews, documents, and corresponding emails with the employees at these 10 stores have been produced. *See* SOF ¶¶ 46–78 (Exs. 14–22). Furthermore, Whole Foods produced its investigation file for an October 29, 2015 "Ops Meeting"—the meeting where Plaintiff Sheikh falsely claimed Kristen May, then Director of

During these interviews, Plaintiffs Vasquez, Ba, Amegnaglo, Bautista, and Miano admitted that they knew it was improper to transfer labor hours to teams where team members did not work, and each unequivocally denied ever doing so.[8] It was not until their subordinates revealed that each of these Plaintiffs directed them to engage in this improper labor transfer that Mr. Gearhart's team was able to confirm Plaintiffs Vasquez, Ba, Amegnaglo, Bautista, and Miano breached the Gainsharing policy. SOF ¶ 80 (Allshouse Mar. 6, 2020 Dep. (Ex. 25) at 220:1-227:19, 229:14-230:21, 247:6-14). Plaintiffs Vasquez, Ba, Amegnaglo, Bautista, and Miano have all since admitted to lying during their interviews and admitted to directly moving labor hours in violation of the Gainsharing Guide or, at a minimum, instructing their subordinates to do so.[9]

Furthermore, although Ms. Sheikh, Ms. Sadoudi, and Mr. Berger each admitted to engaging in Improper Labor Shifting during these onsite interviews, none of them had the same explanation for her or his behavior. Mr. Berger, for example, admitted that Ms. Wescoe specifically told him not to move hours for a Team Member to a team where they did not actually work. *See* SOF ¶ 56 (Ex. 17 at 3, 15).  Similarly, Ms. Sadoudi admitted that she did not get approval from Ms. Wescoe to engage in Improper Labor Shifting, but claimed it was the practice at "P Street" and "Arlington"—stores in which she worked as ASTL under Mr. Vasquez and Mr. Ba as

---

Finance for WFMG's Mid-Atlantic Region, directed STLs to transfer labor hours to bring teams out of deficit. *See* SOF ¶¶ 50, 75–76 (Ex. 15 at 8–11; K. May Depo. (Ex. 24) at 12:19–13:2; Ex. 23 (investigation file with emails and signed statements from witnesses confirming what was said at Ops Meeting)).

[8]  *See* SOF ¶¶ 57–71 (Ex. 18 at 6–7, 9–10; Ex. 20 at 3–4, 11; Ex. 19 at 3, 6–7; Ex. 21 at 2–3, 12, 14–15; *See* Ex. 22 at 3, 8–9).

[9]  *See* SOF ¶¶ 165–73 (Vasquez Depo. (Ex. 54) at 32:23–33:4, 46:1–11; Amegnaglo Depo. (Ex. 55) at 53:17–58:22; Ba Depo. (Ex. 56) at 52:11–54:11, 55:4–56:4; Miano Depo. (Ex. 57) at 82:7–84:24; Njie Depo. (Ex. 58) at 50:20–54:1; Sheikh Depo. (Ex. 59) at 43:3–46:13; Berger Depo. (Ex. 60) at 70:12–71:14; Bautista Depo. (Ex. 61) at 27:9–29:12; Sadoudi Depo. (Ex. 62) at 49:7–53:3, 118:5–124:24).

*ACTIVE 64281300v18*

STLs. SOF ¶ 53 (Ex. 16 at 6–7). In fact, of all the nine Plaintiffs, only Shiekh alleged during his interview that he had been directed to engage in Improper Labor Shifting by Kristen May at the above described Ops Meeting. *See* SOF ¶ 49–50 (Ex. 15 at 5–6); *see also supra* n. 7.

Whole Foods' investigation of a regional operating meeting which has figured prominently in Plaintiffs' evidence revealed that the only discussions were (1) moving Team Members to other teams or other stores for structural changes and (2) how to allocate Team Member hours when they work on the "Holiday Table." SOF ¶¶ 75–77 (Ex. 23 at 3–5; *see also* Gainsharing Guide (Ex. 3) at 6 (discussing how "seasonal teams" get Gainsharing)).

These onsite investigations lasted from November 1, 2016 through November 18, 2016. *See* SOF ¶¶ 40, 78 (Ex. 14; Ex. 23 at 38).[10] Mr. Gearhart's investigation of these stores in the Mid-Atlantic region was concluded, and he provided his investigation files to Martin Tracey, Global Vice President of Human Resources for WFMS. *See* SOF 78–79 (Gearhart Jan. 1, 2020 Depo. (Ex. 3) at 56:12–59:18; Ex. 79). The Plaintiffs were each terminated on December 1, 2016. SOF ¶ 80 (Second Am. Compl. [Dkt. 16-2] ¶ 30).

### D. Whole Foods' nationwide investigation.

Concurrently with the above investigation in the Mid-Atlantic Region, Whole Foods undertook a nationwide investigation of all regions. SOF ¶ 82. This investigation had three phases. First, Whole Foods used the available computerized data to determine which stores had patterns in labor transfers that would warrant further investigation. *See* SOF ¶¶ 82–107. Second, once those stores were identified, Whole Foods' Regional Presidents our their designees would proceed by region to specifically investigate those stores. *See* SOF ¶¶ 108–21. After each region completed

---

[10] Each investigation was the result of the review of documents and data for a number of stores in the Mid-Atlantic.  *See* SOF ¶¶ 31–81.

its investigation, the regions reported back to the investigation team. *See* SOF ¶¶ 122–27. Importantly, each region cleared each store on the list it was provided. *See* SOF ¶ 127. Third, Whole Foods had a continuing investigation, including investigating payments to store team members. *See* SOF ¶¶ 128–34. The following is a timeline of those investigations.

        1.     <u>Mike Grady's initial data-based review and creation of Heat Map.</u>

James Michael ("Mike") Grady, WFMS's former Senior Business Analyst, was responsible for overseeing the initial collection and analysis of labor data for Whole Foods' nationwide investigation. *See* SOF ¶¶ 85–86 (Grady Depo. (Ex. 26) at 13:13–16:16, 122:6–12, 124:18–2016:16, 126:13–22, 127:6–22, 129:9–21). Although data collection began a few days earlier, by November 18, 2016, Whole Foods circulated the initial "timeline, investigation triggers, and a calendar with major milestones" for conducting this nationwide investigation. SOF ¶ 87 (Ex. 27).

The following day, Christ Yost (Whole Foods' head of internal auditing) emailed Joe Faul, outlining the computer triggers used to identify which additional stores nationwide should be investigated further for potential Improper Labor Shifting. *See* SOF ¶ 89 (Ex. 27; Ex. 28; Gearhart Jan. 7, 2021 Dep. (Ex. 13) at 95:9–96:8; Allshouse Dec. 9, 2021 Depo. (Ex. 5) at 21:10–17). As Mr. Grady explained, the percentages reflected in these "Investigation Triggers" were not tied to any actual statistical analysis.[11] SOF ¶¶ 88–96 (Grady Dep. (Ex. 26) at 137:2–139:2). Instead, these "confidence levels" were provided by Golda Sahayam, WFMS's then Senior Coordinator of Enterprise Business Systems (i.e., the IT department). SOF ¶¶ 98–101 (G. Sahayam Decl. (Ex. 31)

---

[11] As detailed in the Heat Map, Mr. Grady's team developed three triggers. *See* Ex. 28 at 3. The first trigger asked whether a team member's labor was moved from his or her home team to another team in the same store. *Id.* The second trigger asked if the team member's home team "barely made/not made labor budget," which was defined as being between $200 in deficit to $900 in surplus. *Id.* The third trigger asked if the movement of labor hours followed specific patters. *Id.*

¶¶ 2, 6–9).  Ms. Sayam did not base these percentages on any actual findings or analysis by her IT team or Mr. Grady's team that was handling the actual investigation. SOF ¶ 100 (*id.* ¶ 7; Grady Depo. (Ex. 26) at 137:2–139:2).  Rather, Ms. Sahayam ascribed these percentages because she wanted to include numerical values (even if not tied to any analysis) rather than using the color-coding Mr. Grady insisted upon.  SOF ¶¶ 98–101 (Grady Dep. (Ex. 26) at 137:2–139:2; G. Sahayam Decl. at (Ex. 31) ¶¶ 7–9).

Mr. Grady used these investigation triggers to analyze the "Kronos data, Workday data and the gainsharing data" for all Whole Foods stores nationwide. SOF ¶ 90 (Grady Dep. (Ex. 26) at 129:9–21). Based on these triggers, on November 23, 2016 Mr. Grady created and circulated an initial list of 119 stores that were flagged for additional investigation. SOF ¶ 91–95 (*see* Ex. 28; Grady Dep. (Ex. 26) at 147:19–22). This document, referred to herein as the "Heat Map," specifically stated 62 stores qualified as "red"—i.e., meaning all three investigation triggers utilized by Mr. Grady's team were met. SOF ¶ 93 (*see* Ex. 28 at 6); *see also supra* n. 11 (discussing triggers). The Heat Map further identified 57 stores as "orange," meaning the first two triggers in Mr. Grady's analysis were met, but not the third. SOF ¶ 94 (Ex. 28 at 6); *see also* n. 11 (discussing triggers).

Ms. Sayaham circulated Mr. Grady's Heat Map to various participants in this nationwide investigation. *See* SOF ¶ 102 (Ex. 29, Ex. 30). Though Ms. Sahayam stated in her email that that the stores identified in red "almost certainly moved labor across product teams to increase gainsharing," she had conducted no inquiry at any of the stores, which would have been required in order to actually determine if any Improper Labor Shifting had occurred.  SOF ¶¶ 103–06 (*see* Ex. 29; G. Sahayam Decl. (Ex. 31) ¶¶ 10).  At this point in the investigation, the Heat Map was only "looking for patterns that could be indicative of, you know, hours being moved with the intent

of altering gainsharing," but Mr. Grady's team was in no way able to say this "equate[d] to a statement such [as] almost certainly move labor." SOF ¶¶ 95–96 (Grady Dep. (Ex. 26) at 149:5–11).[12]

After his creation of the Heat Map, Mr. Grady "handed off" the investigation to the Regional Presidents ("RPs"). SOF ¶ 107 (*see* Grady Dep. (Ex. 26) at 130:6–9, 221:14–224:12).

2.  Follow-up investigation by Regional Presidents.

On November 25, 2016, Sharon Espinoza sent a series of emails to each Regional President, providing each with a copy of the Heat Map and a more detailed spreadsheet regarding their specific regions. *See* SOF ¶¶ 108–17 (Exs. 32–41). That same day, Martin Tracey, David Lannon, and Golda Sahayam scheduled a call with each of the above Regional Presidents to discuss the "Gainsharing – Labor Transfer Analysis." SOF ¶ 118 (Ex. 42).

From there, Ken Meyer and David Lannon, each of whom are Executive Vice President of Operations, "immediately communicated to the regional presidents that we needed to look into this" with the "goal . . . to find out who the bad actors were." SOF ¶ 119 (Allshouse Dec. 9, 2021 Depo. (Ex. 5) at 43:17–45:8). These Regional Presidents—along with "an executive quarter [sic] of" Team Member Services and "operations folks"—conducted an individualized review of more than just 119 stores identified in the Heat Map as red or orange. SOF ¶ 120 (*see* Allshouse Dec. 8, 2021 Depo. (Ex. 43) 87:5–93:4; Allshouse Dec. 9, 2021 Depo. (Ex. 5) at 70:14–79:11). As part of these investigations, the Regional Presidents' teams "talk[ed] to somebody at the store, whether it be the PBS, the store team leader, the team leader of the team that received the transfer" to determine if Improper Labor Shifting was occurring at the store. *See* SOF ¶ 120 (Allshouse Dec.

---

[12] Thus, Ms. Sahayam's summary regarding what could be inferred from the Heat Map was purely speculation.

12

9, 2021 Depo. (Ex. 5) at 72:7–73:11).  Some of these Regional Presidents went beyond the red and

orange stores identified and spoke to every store in their region.  SOF ¶ 121 (*see id.* at 72:7–21).

Following their investigations, the Regional Presidents reported back confirming that their

investigations did not reveal Improper Labor Shifting.  SOF ¶¶ 122–25 (*see* Allshouse Dec. 8, 2021

Depo. (Ex. 43) 91:2–92:20; Allshouse Dec. 9, 2021 Depo. (Ex. 5) at 101:16–103:11).   By

November 28, 2016, Whole Foods had collected results from many of the Regional Presidents'

reports for individual stores.  SOF ¶ 123 (*see* Ex. 77).  On November 28, 2016, Ms. Sahayam sent

an email to the internal investigation team stating:

> I have received status updates from all regions other than RM [Rocky Mountain]
> and FL [Florida].  No additional stores were identified as 'red' today.  Based on
> what we are seeing, the issue seems to be isolated to the 9 stores in MA, and
> possibly the WSL [Westlake] store in [the Pacific Northwest].

SOF ¶ 123 (Ex. 77 at 2). The next day, Ms. Sahayam confirmed that she had spoken to the Rocky

Mountain region, and updated their information.  *See* SOF ¶ 128 (Ex. 77 at 1).

On December 1, 2016, WFMS's "Global" executives had a call to discuss the status of the

investigation and next steps.  *See* SOF ¶ 126 (Ex. 75).  This call included a discussion of the

"Region status update (based on what we've collected so far); "Next steps to review other periods

and regions (Canada and UK)"; and "Back pay process & timing," among other things.  *Id.*

### 3.  Ongoing investigation.

On December 14, 2016, Whole Foods' retained Deloitte Financial Advisory Services, LLP

("Deloitte") to assist Whole Foods in its investigation.  SOF ¶¶ 128–29 (*see* Ex. 46). Deloitte's

work was led by Anthony Campanelli, a partner at Deloitte Financial Advisory Services.  *See* SOF

128 (Campanelli June 21, 2021 Dep. (Ex. 47) at 8:4–7, 12:7–14:5).

Deloitte's scope of work included assessing manual transfers from 2014 through 2016 for

the nine stores where Plaintiffs were terminated.  *See* SOF ¶ 129 (Campanelli June 21, 2021 Dep.

13

(Ex. 47) at 35:11–37:1; 103:16–104:10, 171:19–173:21).  Mr. Campanelli "was not engaged to perform an assessment on whether the transfers were appropriate, valid.  I was looking for support for those manual transfers."  *See* SOF ¶ 130 (Campanelli Dep. (Ex. 47) at 12:7–11).  Rather, as Mr. Campanelli explained, Whole Foods "made a business decision that to the extent that transfers were unsupportable, [meaning] there were no documents, based upon their business decision, they were going to make a payment to team members that may have been impacted."  SOF ¶ 130 (Campanelli Dep. (Ex. 47) at 20:17-21:8).

Mr. Campanelli's work regarding payment to team members at the nine stores was completed in early March of 2017.  SOF ¶¶ 131–32 (Campanelli Dep. (Ex. 47) at 155:3–18).  Based on Deloitte's calculations, Whole Foods paid those team members for potential additional Gainsharing payments for those transfers that were not supportable with documentation.  SOF ¶ 132 (*see* Campanelli Dep. (Ex. 47) at 203:4–204:8; Allshouse Dec. 9, 2021 (Ex. 5) at 81:7–84:1).

In addition to their work to help calculate these payments, in late December 2016, Mr. Campanelli was contacted by Whole Foods' general counsel, Susan Anderson, regarding Whole Foods' ongoing nationwide investigation.  SOF ¶¶ 133–34 (*see* Campanelli Dep. (Ex. 47) at 160:5–161:5, 167:19–168:7).  Ms. Anderson asked Mr. Campanelli "how Deloitte would execute a review of the manual transfers recorded in Kronos if [Deloitte] got asked to perform a review at a hundred stores."  *See* SOF ¶ 134 (Campanelli Dep. (Ex. 47) at 160:16–161:1).  In response, Deloitte agreed to consider of "how [Deloitte] may be able to execute such an assessment."  SOF ¶ 134 (Campanelli Dep. (Ex. 47) at 161:2–5).

    **E.**    **Following Plaintiffs' termination and social media commentary on the controversy, Whole Foods is contacted by Associated Press and Washington Post for comment.**

Within 2 days of Plaintiffs' termination, social media platforms including "Layoff.com," had online message threads asking, "Why no statement from regional about the fired/suspended

14

store team leaders in the mid Atlantic." SOF ¶ 136 (*see* Ex. 48). These message boards already included allegations that "Regional has been complicit from the beginning" and "labor shuffling has been going on since the 90s when gainsharing began," reflecting that people knew that Plaintiffs' termination related to Improper Labor Shifting effecting the Gainsharing program. SOF ¶¶ 137–38 (*see id.* at 3).

WFMS's marketing team, including Ms. Buchanan, WFMS's former Senior Vice President of Communications, monitored these threads on Layoff.com. *See* SOF ¶ 139 (Ex. 49). By December 4, 2016, there were additional threads titled "Major labor fraud in the Mid Atlantic region" and "suspended Store team leaders." SOF ¶¶ 140 (*id.* at 1). These posts suggested that "team members file a class action so it is investigated and they get back pay" and alleging this same "scam" was occurring in other Whole Foods' regions. SOF ¶ 141 (*id.* at 2, 5). Furthermore, these anonymous internet posts identified the relevant stores as "Arlington VA STL (who used to be at friendship heights) Friendship Heights ASTL, Kentlands STL, Reston, Vienna and Columbia also were part of this." SOF ¶ 142 (*id.*).

Thus**, before Whole Foods made any statements to the press, anonymous information about Plaintiffs' termination—including the specific identities of the store in which they worked—was already circulating publicly in social media.** Whole Foods was aware of these messages and the potential for litigation. *See* SOF ¶ 143 (Ex. 49 at 5; *see also* Buchanan Dep. (Ex. 50) at 180:22–16).

On December 12, 2016, Associated Press reporter Matthew Barakat emailed Whole Foods stating that:

> I am checking out some allegations that about 18 Whole Foods stores in the mid-Atlantic area have fired managers, and that *lawsuits may be forthcoming*, over improper actions by managers to manipulate a program at the company in a way that regular store employees were cheated out of shares that they have deserved.

15

*See* SOF ¶ 144 (Ex. 51; *see also* Buchanan Dep. (Ex. 50) at 71:4–72:7). Mr. Barakat asked for clarification regarding the "situation." Ex. 51.

Mr. Barakat's email establishes several key facts. First, before reaching out to Whole Foods, Mr. Barakat had already received allegations that STLs had manipulated Gainsharing in a way that hurt Team Members. Second, Mr. Barakat reported to Whole Foods that lawsuits may be forthcoming. And third, Whole Foods was not the original source of or impetus to Mr. Barakat's story. Rather, Mr. Barakat merely sought to confirm details regarding the story.  After receiving Mr. Barakat's request for comment, Ms. Buchanan called Mr. Barakat back to ask where he got his information.  SOF ¶ 145 (Buchanan Dep. (Ex. 50) at 46:9–48:15).  She then told Mr. Barakat that she would call him back with a comment for Whole Foods.  SOF ¶ 145 (Buchanan Dep. (Ex. 50) at 46:9–48:15).

At this time, Ms. Buchanan was aware "of the ongoing investigation and the investigation that had occurred."  SOF ¶ 146 (Buchanan Dep. (Ex. 50) at 48:16–49:5).  Ms. Buchanan conferred with Whole Foods' in-house counsel, Roberta Lang and Susan Anderson, as well as Mr. Tracy, Mr. Meyer, and Mr. Lannon.  SOF ¶ 146 (Buchanan Dep. (Ex. 50) at 48:16–49:18). Ms. Lang and Ms. Anderson provided Ms. Buchanan with factual information about the status of the investigation as it stood.  SOF ¶ 147 (Buchanan Dep. (Ex. 50) at 50:16–52:8).  They confirmed to Ms. Buchanan that there had been nine STLs who were terminated for a major policy infraction involving the Gainsharing program.  SOF ¶ 147 (Buchanan Dep. (Ex. 50) at 50:16–52:8).

Following this information gathering, Ms. Buchanan responded to Mr. Barakat via phone to discuss the story. SOF ¶ 148.  The following four statements were attributed to Ms. Buchanan in Mr. Barakat's December 13, 2016 story (the "AP Story"):

*ACTIVE 64281300v18*

1. Whole Foods supermarkets says it has fired nine store managers in the mid-Atlantic region for manipulating[13] a bonus program to their benefit.

2. Plaintiffs "were dismissed in recent weeks after a company-wide investigation."

3. "The [company][14] found that nine managers in the stores in Maryland, Virginia and the District of Columbia engaged in a policy infraction that allowed the managers to benefit from a profit-sharing program at the expense of store members."

4. "Whole Foods is still investigating exactly how much money is involved and plans to ensure that employees at the affected stores are compensated properly. The amounts involved, though, will not be material to the company's quarterly earnings."

SOF ¶ 150 (AP Story (Ex. 1)). During her deposition, Ms. Buchanan confirmed that other than the two corrections noted in footnotes 13 and 14, these attributions accurately summarize the information she provided to Mr. Barakat. SOF ¶ 153 (*see* Buchanan Depo. (Ex. 50) at 76:18–77:21).  After the Associated Press Story was published, Whole Foods continued to monitor news, blogs, and other media sources regarding the story. SOF ¶ 154 (*see* Ex. 52).

On December 14, 2016—four days after the Associated Press story ran—Justin Moyer,  a Washington Post reporter, emailed Whole Foods "to get any information you guys had about these 'bonus firings.'" SOF ¶ 155 (Ex. 53 at 5). Unlike with Mr. Barakat, Ms. Buchanan was never able to speak to Mr. Moyer directly. SOF ¶ 156 (Buchanan Depo. (Ex. 50) at 135:21–136:12, 142:17–145:15). Instead, her correspondence with Mr. Moyer was exclusively by email, a complete copy

---

[13] In her deposition, Ms. Buchanan stated that she did not recall using the word "manipulate," but otherwise the statements attributed to her in the AP Story accurately reflected the information she provided to Mr. Barakat.  SOF ¶ 151 (Buchanan Dep. (Ex. 50) at 76:18–77:7).

[14] Ms. Buchanan clarified that this quote contained a "typo" when it said that "The *store* found that nine managers . . ."  SOF ¶ 152 (Buchanan Depo. (Ex. 50) at Buchanan Dep. (Ex. 50) at 94:6–94:8).  As Ms. Buchanan explained, this should have said the "company"—i.e., Whole Foods. SOF ¶ 152.

of which is attached hereto as Exhibit 53.  SOF ¶¶ 156–57. In those emails, Ms. Buchanan provided

the following two statements:

> 9 store managers around what we call gain sharing. Not naming the stores and no
> charges filed.
>
> . . . .
>
> [Gainsharing is] a type of bonus/profit sharing in our stores. [The incident is]
> isolated to those 9 stores in our mid-atlantic region that includes MD, VA, and DC.
> As you know we have over 450 locations. I'm surprised the Washington Post is
> writing on something like this over a day after the story was initially published.

SOF ¶ 157 (Ex. 53 at 3–4). Once again, Whole Foods did not initiate correspondence with Mr.

Moyer or instigate Mr. Moyer's news article. Instead, Whole Foods merely provided the above

responsive information to Mr. Moyer, who already clearly intended to publish an article. The

Washington Post published Mr. Moyer's story on December 15, 2016 (the "Washington Post

Story").  SOF ¶ 159 (*see* Ex. 2).

### F.    Procedural History.

Within five days of the Washington Post Story, Plaintiffs in this case and in the *Molock*

lawsuit filed nearly identical complaints. SOF ¶ 160 (*see, generally*, Original Compl. [Dkt. 1–6];

*Michael Molock, et al. v. Whole Foods Mkt. Grp., Inc.*, Case No. 1:16-cv-02483, pending in the

United States District Court for the District of Columbia, Dkt. 1). Once the *Molock* and *Vasquez*

lawsuits were filed, Whole Foods' internal investigation ceased and was taken over by Whole

Foods' legal team.  SOF ¶ 135 (Allshouse Dec. 9, 2021 Dep. (Ex. 5) at 106:14-107:13).

Plaintiffs' own documents confirm that prior to filing these lawsuits, they were already

communicating with the *Molock* Plaintiffs' counsel regarding potential class representatives and

forwarding confidential Whole Foods' documents to the *Molock* Plaintiffs. SOF ¶ 161 (*see* Ex. 73

(Plaintiff Sadoudi forwarding copy of "Randy Cuczor [sic]" confidential severance agreement with

Whole Foods)). This is further confirmed because both pleadings are nearly identical—including

18

multiple identical quotes—and both falsely assert that the Plaintiffs in this case "blew the whistle" on Improper Labor Shifting. *Molock, v. Whole Foods Mkt. Grp., Inc.*, Case No. 1:16-cv-02483, Dkt. 1 ¶ 17.

Furthermore, Plaintiffs' privilege log confirms that their attorney, Brendan Klaproth, was engaging in communications with *Molock* Plaintiffs' counsel, Salvatore Zambri, as early as December 6, 2016. *See* SOF ¶ 162 (Common-Interest Privilege Log [Dkt. 73-1] at 1). Plaintiffs' counsel has represented to the Court that these communications were in furtherance of Plaintiffs' existing intention to coordinate lawsuits with the *Molock* Plaintiffs. SOF ¶ 162 (*see* Pltfs.' Br. Re the Common Interest Priv. [Dkt. 66] at 2–5). Therefore, Plaintiffs intended to sue Whole Foods for their termination before the AP Story or Washington Post Story were published. SOF ¶ 163. Alternatively, Plaintiffs intended to assist the *Molock* Plaintiffs in bringing a class-action lawsuit against Whole Foods before the AP Story or Washington Post Story were published. SOF ¶ 164.

When they filed suit, Plaintiffs—and indeed the *Molock* Plaintiffs—falsely asserted that the Plaintiffs were "whistle-blowers" who "blew the whistle on the corporate practice" of Improper Labor Shifting. *See* Orig. Compl. [Dkt. 1-1] ¶ 1–2, 32. In fact, Plaintiffs knew this allegation was false when they made it, because when six of nine Plaintiffs were confronted with accusations of Improper Labor Shifting during the interviews in the initial investigation, they denied it. *See* SOF ¶¶ 41–71. Moreover, none of the Plaintiffs alleged they believed there was a "corporate policy" of Improper Labor Shifting when they were interviewed. *See* SOF ¶ 72 (Exs. 14–22). Indeed, after lying during the investigation and professing their innocence, Plaintiffs have all since admitted to engaging in Improper Labor Shifting themselves. *See* SOF ¶¶ 165–73. Thus, from the beginning of this investigation through the filing of this lawsuit and then deposition, the Plaintiffs' stories have changed to fit the narrative they believe served them best at the time.

G.    **There is no evidence that Whole Foods' statements were actual or proximate causes of any injury to Plaintiffs.**

Plaintiffs' Initial Disclosures do not include any computation of damages in any category, whether general or special. SOF ¶ 174 (*see* Ex. 74 at 7). Furthermore, Whole Foods asked each Plaintiff to identify specifically (a) what potential employers were able to identify them from the AP Story or Washington Post Story and all (b) special damages they were seeking in this case. Each Plaintiff answered this Interrogatory by listing "lost wages" from various employers who did not hire them as their only special damages.[15]  However, none of the Plaintiffs have offered any evidence—other than their own speculation or hearsay testimony—that the AP Story or the Washington Post Story were the reason they were not hired.

In fact, the only evidence in this case concerning the link—or lack thereof—between the news articles and Plaintiffs' subsequent job history is the analysis of Whole Foods' expert, Dr. Scott Beveridge. SOF ¶¶ 202–26.   Dr. Beveridge's conclusions regarding each Plaintiffs' employment can be summarized as follows:

1.    Ms. Bautista quickly left the workforce for several years to attend nursing school. After graduating three years after her termination from Whole Foods, she obtained full employment as a nurse. *See* SOF ¶¶ 204–05 (Ex. 72-B).

2.    Mr. Amegnaglo did not aggressively seek employment after his termination—applying for only 7 jobs in 6 months. Nevertheless, after 6 months, Mr. Amegnaglo became a store manager at Safeway earning $120,000 a year, which is equivalent to his Whole Foods' salary. SOF ¶¶ 206–07 (Ex. 72-C).

3.    Mr. Berger was able to obtain a new job as a Deli Bakery Merchandiser at Earth Fare within 4 months of his termination from Whole Foods. This is

---

[15]    *See* SOF ¶¶ 175–201 (Vasquez Interrog. Resp. (Ex. 63) at 5–6, 8–11; Amegnaglo Interrog. Resp. (Ex. 64) at 6–7, 9–14; Ba Interrog. Resp. (Ex. 65) at 5–6, 10–13; Miano Interrog. Resp. (Ex. 66) at 6–7, 13–18; Njie Interrog. Resp. (Ex. 67) at 6–8, 10–13; Sheikh Interrog. Resp. (Ex. 68) at 7–9, 16–20; Berger Interrog. Resp. (Ex. 69) at 5–13; Bautista Interrog. Resp. (Ex. 70) at 6–7, 10–13; *See* Sadoudi Interrog. Resp. (Ex. 70) at 6–7, 9–13).

ACTIVE 64281300v18

in-line with the usual time necessary to find new employment. Furthermore, after 18 months, Mr. Berger transitioned to another employer, and currently makes more per year than he did when he was terminated from Whole Foods.  SOF ¶¶ 208–10 (Ex. 72-D).

4.   Ms. Sadoudi did not seek employment for almost a year after leaving Whole Foods. She worked to obtain a Real Estate license, but stopped working and gave up that career shortly thereafter. When she did work, Ms. Sadoudi was underemployed (e.g., bartender, waitress). Based on this evidence, Ms. Sadoudi is voluntarily unemployed or underemployed. SOF ¶¶ 211–13 (Ex. 72-E).

5.   Mr. Ba obtained employment at Safeway within 4 months of being terminated. This is within the 2-6 month average that it usually takes employees to obtain new employment. Furthermore, Mr. Ba makes more per hour working for Safeway than he did for Whole Foods. SOF ¶¶ 214–16 (Ex. 72-F).

6.   Mr. Vasquez began working as a store manager for Big Lots within 3 months of being terminated by Whole Foods. He has since transferred to other store management positions, where he currently makes more than he did working for Whole Foods. SOF ¶¶ 217–18 (Ex. 72-H).

7.   Mr. Sheikh became store manager at another grocer within two months of being terminated by Whole Foods. Mr. Sheikh quit after approximately six weeks because he did not like his employer. In August or September of 2017, Fresh Market hired Mr. Sheikh as an Assistant Store Manager, and Mr. Sheikh is currently making a comparable wage as Store Team leader for Fresh Market.  SOF ¶¶ 219–21 (Ex. 72-I).

8.   Mr. Miano began working as a Regional Manager for Eastern National within four months of being terminated by Whole Foods. This employer was aware of his termination, but it did not affect the decision to hire him or his salary. Mr. Miano has since had opportunities to work as a store manager for a competing grocery chain but decided for "personal reasons" to not rejoin the industry. SOF ¶¶ 222–24 (Ex. 72-G).

9.   Mr. Njie obtained a job at Trader Joe's within weeks of being terminated by Whole Foods. He has since worked as a Store Manager for various grocery chains, for which he currently makes more than he did while working for Whole Foods. SOF ¶¶ 225–26 (Ex. 72-J).

Thus, Dr. Beveridge's analysis clearly demonstrates that none of the Plaintiffs were injured in their profession by these allegedly defamatory statements. Seven of the nine Plaintiffs obtained

equivalent jobs within four months of being fired. The remaining two Plaintiffs stopped working voluntarily either to return to school or simply ceased working all together.

## SUMMARY JUDGMENT STANDARD

Courts must grant summary judgment where, as here, "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In response to a motion for summary judgment, the non-moving party will prevail only by providing "significant probative evidence" creating a genuine dispute of material fact. *Barrett v. Covington & Burling LLP*, 979 A.2d 1239, 1245 (D.C. 2009). This demands more than mere "self-serving testimony." *Fields v. Office of Johnson*, 520 F. Supp. 2d 101, 105 (D.D.C. 2007) ("Self-serving testimony does not create genuine issues of material fact, especially where that very testimony suggests that corroborating evidence should be readily available."); *see also Brooks v. Kerry*, 37 F. Supp. 3d 187, 201 (D.D.C. 2014) (non-movant's allegations are insufficient to establish a triable issue of fact when the allegations are "generalized, conclusory and uncorroborated by any evidence other than the non-movant's own deposition testimony."). "Sheer hearsay" "counts for nothing." *Greer v. Paulson*, 505 F.3d 1306, 1315 (D.C. Cir. 2007). Even in cases "where elusive concepts such as motive or intent are at issue, [Rule 56's] standard compels summary judgment if the non-moving party rests merely upon conclusory allegations, improbable inferences, and unsupported speculation." *Spiegel v. Leavitt*, No. 1-2195, 2005 WL 2402322, at *8 (D.D.C. Sept. 22, 2005) (internal quotation omitted).

## CHOICE OF LAW

Plaintiffs only live claims are for defamation and "false light invasion of privacy," both of which are state-law causes of action. *See Mastro v. Potomac Elec. Power Co.*, 447 F.3d 843, 857–58 (D.C. Cir. 2006). "When deciding state-law claims under diversity . . . jurisdiction, federal courts apply the choice-of-law rules of the jurisdiction in which they sit." *Id.* at 857 (internal

quotations and citations omitted).  The District of Columbia "employs the governmental interest analysis test of the Restatement Second of Conflict of Laws." *Id.* (internal quotations omitted).

Explaining choice-of-law in defamation cases, the D.C. Circuit has stated: "Applying it to defamation actions, the weight of authority considers that the law to be applied is that of the place where plaintiff suffered injury by reason of his loss of reputation." *Id.* (quoting *Weyrich v. New Rep., Inc.*, 235 F.3d 617, 626 (D.C. Cir. 2001)). In the context of defamation affecting professional reputation, the reputational injury is suffered where Plaintiff was employed, not where he lived. *Id.* at 857–58 (holding that D.C. law applied where Maryland resident worked in the District of Columbia); *see also Weyrick*, 235 F.3d at 626–27 ("[G]iven that [plaintiff] worked in Washington, D.C. at the time the article was published, . . . we apply the District's common law of defamation and false light invasion of privacy . . . .").

Therefore, as outlined above, the District of Columbia law applies to Mr. Vasquez's claims; Virginia law applies to Plaintiffs Sheikh's, Sadoudi's, Ba's, Amegnaglo's, and Berger's claims; and Maryland law applies to Plaintiffs Bautista's, Miano's, and Njie's claims. *See* Second Am. Compl. [Dkt. 16-2] ¶¶ 9–17. Whole Foods will note where the substantive law of each jurisdiction differs as it relates to the specific issues raised in this Motion.

## ARGUMENT

### I.  MS. BUCHANAN'S STATEMENTS TO THE PRESS WERE SUBSTANTIALLY TRUE.

In all three jurisdictions, an essential element in defamation is that the alleged defamatory statement was false. *See* D.C. Civ. Jury Inst. § 17.06; Md. P. J. Inst. Cv 12:1; Va. Instruction No. 37.020. The Plaintiffs bear the burden of proving the falsity. *See* D.C. Civ. Jury Inst. § 17.06; *Jacron Sales Co. v. Sindorf*, 350 A.2d 688, 698 (Md. 1976); Va. Instruction No. 37.090. In determining falsity, the issue is whether the statement, taken as a whole, is substantially true. *See* D.C. Std. Civ. Jury Inst. No. 17.06; Md. P. J. Inst. Cv 12:4; *Jordan v. Kollman*, 612 S.E.2d 203,

23

207 (Va. 2005). It need not be true in every detail—minor inaccuracies do not amount to falsity. If the "gist" or "sting" of the statement is true, then the defendant is not liable for defamation. *See* D.C. Std. Civ. Jury Inst. No. 17.06; Md. P. J. Inst. Cv 12:4; *Jordan*, 612 S.E.2d at 207.

Moreover, statements of opinion cannot be proven true or false, and therefore cannot form the basis of a defamation claim. *Sigal Const. Corp. v. Stanbury*, 586 A.2d 1204, 1209–10 (D.C. 1990); *Jordan*, 612 S.E.2d at 207. Whether a statement is one of fact or opinion is a question of law for the Court. *Sigal Const.*, 586 A.2d at 1210; *Jordan*, 612 S.E.2d at 207.

As discussed above, Ms. Buchanan made the following statements to the reporters, Mr. Barakat and Mr. Moyer:

1. Whole Foods supermarkets says it has fired nine store managers in the mid-Atlantic region for manipulating a bonus program to their benefit.

2. Plaintiffs "were dismissed in recent weeks after a company-wide investigation."

3. "The [company] found that nine managers in the stores in Maryland, Virginia and the District of Columbia engaged in a policy infraction that allowed the managers to benefit from a profit-sharing program at the expense of store members."

4. "Whole Foods is still investigating exactly how much money is involved and plans to ensure that employees at the affected stores are compensated properly. The amounts involved, though, will not be material to the company's quarterly earnings."

5. "9 store managers [were terminated] around what we call gain sharing. Not naming the stores and no charges filed."

6. "[Gainsharing is] a type of bonus/profit sharing in our stores. [The incident is] isolated to those 9 stores in our mid-atlantic region that includes MD, VA, and DC. As you know we have over 450 locations."

*See* SOF ¶¶ 150–53, 156–57 (Buchanan Dep. (Ex. 50) at 76:18–77:21; Ex. 53 at 3–4). Based on the undisputed facts, each of these statements to the press were substantially true. Alternatively, they are opinions that cannot be actionable.

24

### A.     Ms. Buchanan's statement regarding the investigation and Whole Foods' ongoing efforts to pay potentially affected employees are substantially true.

The first three statements all center around the same operative facts that, as the record shows, are substantially true. Plaintiffs were terminated two weeks prior to Ms. Buchanan's statement to Mr. Barakat. *See* Second Am. Compl. [Dkt. 16-2] ¶ 38. They were terminated as a result of Whole Foods' investigation of each of the nine stores where Plaintiffs were STLs, which found that the Plaintiffs engaged in Improper Labor Shifting in violation of the Gainsharing Guide. *See supra* at 6–9.

Furthermore, prior to these statements to Mr. Barakat, Whole Foods conducted an investigation of all stores nationwide. *See supra* at 9–13. This nationwide investigation included gathering labor transfer data and gainsharing data for all stores, creating and applying "triggers" to determine when that data supported further individualized investigation of stores, and then regional investigations based on those stores that were identified. *Id.* Plaintiffs have produced nothing to call the existence of this investigation into question.  Thus, there is no material dispute that Whole Foods in fact conducted a nationwide investigation.

Similarly, there is no genuine dispute that Plaintiffs stood to benefit from Improper Labor Shifting as a means of keeping teams out of Labor Deficit. As outlined above, an STL's individual EVA Payouts could be reduced by 50% of the Labor Deficit for any team in their store. *See supra* at 5–6. And again, Plaintiffs have produced no evidence to the contrary.  Therefore, by improperly shifting labor to bring a team out of deficit—which is a major infraction under the Gainsharing Guide—an STL could seek to avoid deductions from his or her own EVA Payout. Finally, as Plaintiffs themselves acknowledge, Improper Labor Shifting can negatively impact store members on teams to which hours were improperly transferred, thus depriving those team members of

bonuses to which they were otherwise entitled.  *See* Second Am. Compl. [Dkt. 16-2] ¶ 29. Thus, the first three statements attributed to Ms. Buchanan are all substantially true.

Similarly, statement 4 is substantially true because, at the time Ms. Buchanan made the statement to Mr. Barakat, Whole Foods was still investigating the issue of how to determine Gainsharing payments to be made to affected Whole Foods' employees at Plaintiffs' stores. *See* Ex. 75. This investigation ultimately led to the retention of Anthony Campanelli, an outside consultant at Deloitte who led a team that calculated the Gainsharing payments that were made to affected team members at the original nine stores following Whole Foods' business decision to do so. *See supra* at 13–14. As Mr. Campanelli explained at length, Whole Foods directed him to be overly inclusive in his reimbursement calculation—effectively reimbursing every Team Member who had worked at the nine stores from which Plaintiffs were terminated if there was not sufficient documentation to support a given time transfer to that Team Member's team. *See supra* at 13–14. Mr. Campanelli confirmed that this analysis was not designed to—and in fact could not—confirm whether individual labor transfers were actually improper. *Id.*  Further, the investigation that was initiated in November by Mr. Grady and then conducted by the Regional Presidents ultimately morphed into a litigation defense analysis conducted pursuant to the attorney-work product protection undertaken under the supervision of in house and outside litigation counsel once this suit and the *Molock* suit were filed.  SOF ¶ 135 (Allshouse Dec. 9, 2021 Dep. (Ex. 5) at 106:14-107:13).

Finally, statements 5 and 6 are substantially true because (a) the Plaintiffs were terminated as a result of their conduct relating to the Gainsharing program; (b) Gainsharing is a type of bonus/profit sharing at Whole Foods; and (c) based on Whole Foods' investigation as it stood at the time of Ms. Buchanan's statement, Whole Foods had only determined that Improper Labor

26

Shifting occurred at nine stores. *See supra* at 6–13. Plaintiffs have produced no admissible evidence that contradicts any of these statements or calls their truth into question.

Thus, this case is similar to the facts in *Poullard v. Smithkline Beecham Corp.*, No. Civ. A. 02-1590, 2005 WL 3244192, at *17 (D.D.C. Nov. 30, 2005). In *Poullard*, plaintiff sued her former employer for defamation for telling other employees that plaintiff had "embezzled" funds. *Id.* The court granted defendant's motion for summary judgment because these statements were substantially true given that the record established that plaintiff withdrew $8,850 worth of funds but then never returned documents to substantiate those withdrawals as a business expense. *Id.* The court specifically rejected plaintiff's argument that defendant failed to prove that the money was actually embezzled, noting that it was plaintiff's burden to provide defendant with this information before she was terminated. *Id.* at *14.

Similarly here, all of the record evidence establishes that Whole Foods investigation revealed that Plaintiffs manipulated the Gainsharing Program directly in violation of the Gainsharing Guide.  Furthermore, at the time of Buchanan's statements, Whole Foods' ongoing nationwide investigation had not found that this same Improper Labor Shifting occurred at any other stores.  Thus, the complained-of statements in this case are substantially true, which is complete defense to Plaintiffs' defamation and false light claims.

### B.    Ms. Buchanan's statement regarding Plaintiffs' motivation is an opinion that cannot constitute defamation.

Whole Foods anticipates that Plaintiffs will argue that Ms. Buchanan's statement that Plaintiffs "manipulated a bonus program to their benefit" is false because Plaintiffs engaged in Improper Labor Shifting for some reason other than personal benefit. However, as courts in this District and across the country have recognized, an "assertion that [plaintiff] was motivated out of greed or ambition is a subjective judgment that is not verifiable" and therefore not defamatory.

27

*Montgomery v. Risen*, 197 F. Supp. 3d 219, 248 (D.D.C. 2016) (collecting cases from Ninth Circuit, Central District of California, and Eastern District of Pennsylvania); *see also Underwager v. Channel 9 Australia*, 69 F.3d 361, 367 (9th Cir. 1995) (noting that statements as to plaintiff's "motivation and personality" are "not capable of verification").

In *Montgomery*, a security contractor sued an author of a book describing various alleged instances of government waste, fraud, and abuse. 197 F. Supp. 3d at 226. The author wrote that plaintiff "provides the perfect case study to explain how during the war on terror greed and ambition have been married to unlimited rivers of cash . . . ." *Id.* at 248. The author filed a motion to dismiss, asserting, among other things, that his statements regarding plaintiff's motivations were not actionable. The Court agreed, holding that any statement regarding plaintiff's motivations for his work as a contractor were statements of opinion that cannot be actionable as defamation. *Id.*

Similarly, in *Haynes v. Alfred A. Knopf, Inc.*, the Seventh Circuit affirmed dismissal of a defamation claim based, in part, on an allegation about why the plaintiff left his first wife. 8 F.3d 1222, 1226–27 (7th Cir. 1993). In that case, defendant stated that plaintiff's "motives for leaving Ruby for Dorothy were financial." *Id.* But the Seventh Circuit noted that one the plaintiff's motives "can never be known for sure (even by [plaintiff]) and *anyone is entitled to speculate on a person's motives* from the known facts of his behavior." *Id.* (emphasis added).

Therefore, Ms. Buchanan's statements regarding Plaintiffs' motivation for Improper Labor Shifting is a statement of opinion that cannot be verified as true or false. Thus, as a matter of law, these statements cannot support a defamation claim.

28

II.     **WHOLE FOODS DID NOT ACT WITH ACTUAL MALICE REGARDING THE TRUTHFULNESS OF ITS STATEMENTS.**

A.     **The "actual malice" standard applies to the statements at issue in this case**

This is a defamation case in which the "actual malice" standard applies for two reasons. First, Plaintiffs have not alleged that Whole Foods acted negligently, and therefore cannot rely on a lesser negligence scienter to prove defamation.  Second, the subject matter of the statements was a matter of public concern for which Plaintiffs were limited-purpose public figures.  Whole Foods addresses each issue in turn.

1.     Plaintiffs have only alleged that Whole Foods acted with knowledge or reckless disregard to the truth, and therefore have not alleged negligence in this case.

Whole Foods anticipates that Plaintiffs may argue they can satisfy the lesser scienter of negligence—i.e., that Whole Foods was negligent as to the truthfulness of its statements. However, in this case, Plaintiffs have not alleged that Whole Foods acted negligently regarding the truthfulness of its statements. Instead, they exclusively alleged that "Defendants acted with malice" and "Defendants had actual knowledge of the falsity of the statements and/or published the statements with a reckless disregard for the truth." Second Am. Compl. [Dkt. 16-2] ¶ 78.

Given that Plaintiffs have only alleged actual malice but not negligence, they cannot rely on this lesser degree of scienter to prove defamation.  *See Mejia v. Telemundo Mid-Atlantic LLC*, 440 F. Supp. 3d 495, 501–02 (D. Md. 2020) (rejecting argument that plaintiff could rely on negligent defamation when he failed to allege negligence); *Glocoms Group, Inc. v Center for Public Integrity*, No. 17-cv-6854, 2018 WL 2689434, *6 (N.D. Ill. June 5, 2018) (same); *see also Garfield v. Shutterfly, Inc.*, 857 Fed. App'x 71, 79 (4th Cir. 2021) (holding that although the complaint did "allege negligence in a few instances, [] the gravamen of the Complaint is that management was 'aware of the truth' and proceeded to intentionally deceive shareholders."). Here, Plaintiffs do not that Whole Foods acted negligently with regard to the truthfulness of the

29

allegedly defamatory statements, Plaintiffs cannot rely on a negligent standard to survive summary judgment.

2.   Alternatively, Plaintiffs are limited-purpose public figures, and therefore are required to prove actual malice.

Even if the Court chose to overlook the fact that negligence has not been pleaded—which it should not—negligence is still insufficient because Plaintiffs are limited-purpose public figures relating to their termination and the then ongoing investigation of Whole Foods stores. Specifically, Ms. Buchanan's statement concerned the ongoing investigation of a potential—and ultimately executed—payment to "employees at the affected stores" to ensure they are "compensated properly." AP Story (Ex. 1). Because this is a matter of public concern for which Plaintiffs were centrally involved, the heightened "actual malice standard" for defamation applies.

As the D.C. Circuit has explained, "[i]f the issue [of the alleged defamatory statement] was being debated publicly and if it had foreseeable and substantial ramifications for nonparticipants, it was a public controversy." *Waldbaum v. Fairchild Pub., Inc.*, 627 F.2d 1287, 1297 (D.C. Cir. 1980). This case established the "*Waldbaum*" "three-part test for whether a defamation plaintiff is a limited-purpose public figure." *Moss v. Stockard*, 580 A.2d 1011, 1030–31 (D.C. 1990) (citing *Waldbaum*, 627 F.2d at 1297). As this district has recognized, the Supreme Court "placed renewed emphasis on the character of the *speech* at issue in a defamation case, as opposed to the status of the victim of the speaker, in determining when the actual malice standard should apply." *Lewis v. Elliot*, 628 F. Supp. 512, 520 (D.D.C. 1986) (citing *Dyun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*, 472 U.S. 749 (1985)).

Under the *Waldbaum* test, the court first considers "whether the controversy to which the defamation relates was the subject of public discussion *prior* to the defamation." *Moss*, 580 A.2d at 1030 (internal citations omitted); *see also Waldbaum*, 627 A.2d at 1298 n.19 (explaining that

30

facts are analyzed before statement was made because statement cannot create the public concern). Here, the undisputed material facts clearly show that this factor is met because Plaintiffs' termination for Improper Labor Shifting was already being discussed in multiple online message boards. *See* Ex. 48; *see also supra* at 14–18 (summarizing posts). Furthermore, it is undisputed that a reporter with the Associated Press reached out to Whole Foods for comment regarding a story Barakat was reporting on that "stores in the mid-Atlantic area have fired managers, and that *lawsuits may be forthcoming*, over improper actions by managers to manipulate a program at the company in a way that regular store employees were cheated out of shares." *See* Ex. 51 at 2. These facts demonstrate that this controversy was being discussed publicly *before* Ms. Buchanan spoke to the press.

The second *Waldbaum* step asks whether "a reasonable person would have expected persons beyond the immediate participants in the dispute to feel the impact of its resolution." *Moss*, 580 A.2d at 1030 (quoting *Waldbaum*, 627 F.2d at 1297). As *Waldbaum* explains, the matter must "be a real dispute, the outcome of which affects the general public or *some segment of it* in an appreciable way." 627 F.2d at 1296. Here too, this second factor is clearly met because Whole Foods was calculating the amount of money needed "to ensure that employees at the affected stores are compensated properly." AP Story (Ex. 1). After this calculation was complete, Whole Foods made payments to current and former employees. *See* SOF ¶¶ 131–32 (Campanelli Dep. (Ex. 47) at 203:4–204:8; Allshouse Dec. 9, 2021 (Ex. 5) at 81:7–84:1). Thus, Whole Foods' statements did not just concern Whole Foods and Plaintiffs, its resolution potentially impacted at least hundreds of Whole Foods employees. *Waldbaum*, 627 F.2d at 1297. Given that these first two steps are

met, as a matter of law, Whole Foods statements qualify as a matter of public concern.[16] *See id.* (noting that if these steps are met, "it was a public controversy.").

Finally, the third *Waldbaum* step asks "whether the alleged defamation was germane to the plaintiff's participation in the controversy." *Moss*, 580 A.2d at 1031 (citing *Waldbaum*, 627 F.2d at 1298. *Waldbaum* instructs a "plaintiff must have been purposely trying to influence the outcome[17] or could realistically have been expected, because of his position in the controversy, to have an impact on its resolution." 627 F.2d at 1297 (citing *Gertz*, 418 U.S. at 354).

Here, given that Plaintiffs knew they were terminated for Improper Labor Shifting in a manner that could impact their employees, they realistically should have expected that they would have an impact in the resolution of this controversy. *See supra* at 6–9. This is evidenced by the public message boards that were already identifying Plaintiffs' former stores as the ones in which managers were fired for Improper Labor Shifting. *See supra* at 14–18.

Furthermore, Plaintiffs were in communication with Salvatore Zambri, class counsel for the *Molock* putative class action, as early as December 6, 2021. *See* Common-Interest Privilege

---

[16] Beyond the question of actual malice, this conclusion is critical to this Motion because Virginia does not allow presumed damages (even in defamation *per se* cases) if the statements touch upon a matter of public concern. *See* Va. Pattern J. Inst. 37.105 (nominal damages permitted if "private plaintiff show[s] negligence . . . in a case where the statement *does not involve matters of public concern*.") (emphasis added). Thus, because Whole Foods' statements were on a matter of public concern, the Vasquez Plaintiffs must prove these statements actually caused them direct injury. *See infra* at 43–44 (explaining no proof of causation of injury).

[17] In this case, there is evidence that Plaintiffs in fact were the source of Mr. Barakat's story, and thus potentially directly injected themselves into this controversy. *See, generally* Whole Foods' Resp. to Barakat Mtn. to Quash [Dkt. 156] (discussing Buchanan testimony that Barakat told her one of the Plaintiffs contacted him directly about the story). However, because there is a dispute as to this fact, Whole Foods is not moving for summary judgment on this ground. However, Whole Foods reserves the right to argue that the Plaintiffs, in fact, were the source of this information, and thus are automatically limited-purpose public figures. *See Clyburn v. News World Commc'n, Inc.*, 705 F. Supp. 635, 641 (D.D.C 1989) (noting that plaintiff who spoke to reporter injected himself into public controversy).

*ACTIVE 64281300v18*

Log [Dkt. 73-1] at 1.  Plaintiffs have represented to the Court that they were communicating with Mr. Zambri as part of a joint interest to prosecute claims against Whole Foods.  *See* Pltfs.' Br. Re the Common Interest Priv. [Dkt. 66] at 2–5.  Indeed, their documents confirm that Plaintiffs communicated with the Mr. Zambri regarding potential class-action members.  Ex. 73.  This evidence demonstrates that Plaintiffs were intending to sue Whole Foods at least a week before the AP Story was published, meaning they already intended to publicly raise issues concerning their termination.  At a minimum, Plaintiffs intended to assist Mr. Zambri in preparing a putative class action suit against Whole Foods, which again would bring Plaintiffs' role in Whole Foods' investigation to public scrutiny. Thus, given the fact that plaintiff were central in this controversy, they should have reasonably expected to impact its resolution.

Here, all three *Walbaum* steps are met, and Plaintiffs qualify as limited-purpose public figures regarding their termination.  *See* 627 F.2d at 310–12.  Therefore, Plaintiffs cannot rely on unpled accusations of negligence, and are required to prove through clear and convincing evidence that Whole Foods acted with actual malice.

### B.   Plaintiffs cannot satisfy the heightened actual malice standard.

Given that Plaintiffs cannot rely on a lesser showing of negligence, they must satisfy the more exacting standard of "actual malice" to state a claim for defamation.  Nearly sixty years ago, the United States Supreme Court established what has become known as the actual malice test for defamation. *See New York Times Co. v. Sullivan*, 376 U.S. 254, 279–80 (1964). As the court explained, actual malice means the defendant made the statement "with knowledge that it was false or with reckless disregard of whether it was false or not." *Id.* The Supreme Court subsequently clarified that to establish actual malice, plaintiffs must present "clear and convincing proof that the defamatory falsehood was made with knowledge of its falsity or with reckless disregard to the truth." *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 342 (1974); *see also Tavoulareas v. Piro*, 817

33

F.2d 762, 788–89 (D.C. Cir. 1987) (explaining that clear and convincing evidence is "exacting standard" and "courts may not abdicate to triers of fact the responsibility for developing the contours of the actual malice rule.").

This actual malice standard—including the clear-and-convincing evidence requirement—has been adopted by Virginia, Maryland, and the District of Columbia in several key respects. First, all three jurisdictions require proof of actual malice to recover punitive damages. D.C. Std. Civ. Jury Instr. No. 17-13; *Gov. of Micro Res. Inc. v. Jackson*, 624 S.E.2d 63, 42 (Va. 2006); Md. Pattern J. Inst. CV 12:8 (only allowing punitive damages on showing of actual knowledge of falsity). Second, under Maryland law, "[w]here a plaintiff does not demonstrate that defendants made defamatory statements with [constitutional] malice, actual damages must be proved." *Brown v. Prince George's Hosp.*, No. 09CV295, 2011 WL 2413344, at *24 (D. Md. June 9, 2011) (internal citation omitted). Thus, even in the context of defamation *per se*, a plaintiff cannot recover general or nominal damages without proof of actual malice. *Id.* Therefore, even if the Court allows Plaintiffs to rely on lesser proof of negligence generally, it should still decide whether Plaintiffs can satisfy the actual malice standard. This standard has two components: (1) heightened scienter of actual knowledge or reckless disregard to the truth and (2) a heightened burden of proof of clear and convincing evidence. *Tavoulareas*, 817 F.2d at 788–89.

Actual knowledge is exactly what it sounds like, there must be proof that defendant knew that its statement was false when it was made. Reckless disregard, on the other hand, requires proof "to permit the conclusion that the defendant in fact entertained serious doubt as to the truthfulness of its publications." *St. Amant v. Thompson*, 390 U.S. 727, 731 (1968). Although there is no set test for assessing this "serious doubt" standard, the Supreme Court has provided significant guidance regarding an allegation regarding failure to investigate. *See Tavoulareas*, 817 F.2d at

34

789–90 (citing *St. Amant*, 390 U.S. at 732).   In this context, there must be evidence that the defendant subjectively believed the story was doubtful because it was "(1) fabricated; (2) so inherently improbable that only a reckless person would have put it [in] circulation; or (3) based wholly on an unverified anonymous telephone call or some other source that appellees had obvious reasons to doubt." *Tavoulareas*, 817 F.2d at 790 (internal quotations omitted).   Merely failing to investigate is not enough.   *Id.*

Furthermore, the D.C. Circuit has made clear that this heightened clear-and-convincing burden of proof creates a corresponding increased burden on plaintiffs to survive summary judgment.   *See Jankovic v. Int'l Crisis Grp.*, 822 F.3d 576, 590 (D.C. Cir. 2016).   Because a jury verdict would only be valid if it met the above standard, to "prevail on summary judgment, [plaintiff] must show that the 'evidence in the record could support a reasonable jury finding . . . that [he] has shown actual malice by clear and convincing evidence." "[B]ecause of the heightened burdened imposed by the clear and convincing standard and the challenges associated with offering evidence about state of mind, this standard is not easily met, even at summary judgment."   *Id.* (citing *Lohrenz v. Donnelly*, 350 F.3d 1272, 1283 (D.D.C. 2003)).   Indeed, as the Circuit notes in *Jankovic*, few plaintiffs have been able to meet this heavy burden.   *Id.* (quoting *McFarlane v. Sheridan Square Press, Inc.*, 91 F.3d 1501, 1515 (D.C. Cir. 1996)).

Here, it should be undisputed that there is no evidence, much less clear and convincing evidence, that Whole Foods had actual knowledge that its statements were false when Ms. Buchanan spoke to the press.   No witness for Whole Foods has testified that they believed any of Ms. Buchanan's statements were false.   To the contrary, every witness—other than Plaintiffs in their self-serving accusations—has confirmed the Improper Labor Shifting violates Whole Foods

policy and that the nationwide investigation had only found Improper Labor Shifting at the nine stores where Plaintiffs worked.

Similarly, there is not clear and convincing evidence that Whole Foods acted with reckless disregard because there is no evidence that Whole Foods subjectively harbored serious doubts about the truthfulness of its publication.  First, Ms. Buchanan's statements were not wholly fabricated, but rather the product of a six-week investigation involving countless employees throughout Whole Foods.  Second, it is not so inherently improbable that nine store managers would violate Whole Foods policy on their own that Whole Foods could only have reached that conclusion if acting recklessly.  In fact, the Plaintiffs' consciousness of guilt is evidenced by the fact that 6 out of the 9 Plaintiffs lied about Improper Labor Shifting when they were confronted with management.  *See supra* at 7–9.  Even among the three who confessed, all but one admitted they were never told by their regional superiors to engage in this behavior.  *See id.*  Finally, Whole Foods did not rely on anonymous sources in conducting its investigation—it interviewed and documented interviews and communications with multiple team members, including Plaintiffs.  Thus, there is not sufficient evidence from which a jury could properly find that Whole Foods acted with reckless disregard to the truth of Ms. Buchanan's statements.

Indeed, the facts of this case are stronger than those in similar cases where summary judgment for defendant was affirmed.  For example, in *Lohrenz*, there was evidence that the defendant made the defamatory statement as part of "a mission to reinstate the ban against women being assign[ed] to combat positions in the military."  350 F.3d at 1284.  The D.C. Circuit noted that the defendant "acted on the basis of a biased source and incomplete information" does not constitute clear and convincing evidence the defendant subjectively believed the information was false.  *Id.* (citing *Bose Corp. v. Consumers Un. of U.S.*, 466 U.S. 484, 511 (1984)).  Similarly, in

*St. Amant*, the Supreme Court held that evidence that a reporter "failed to investigate independently the obviously serious charge of bribery and failed to seek confirmation of information from others who might know facts" could not support an actual malice finding.  *See* 390 U.S. at 733; *see also Jankovic*, 822 F.3d at 273 (citing standard in context of summary judgment).

In this case, Plaintiffs cannot meet the onerous burden of providing clear and convincing evidence that Whole Foods' statements were made with actual malice.[18]  This lack of evidence is fatal to their defamation claim, claim for punitive damages, and the Maryland Plaintiffs' claim for "presumed damages." D.C. Std. Civ. Jury Instr. No. 17-13; *Gov. of Micro Res. Inc. v. Jackson*, 624 S.E.2d 63, 42 (Va. 2006); Md. Pattern J. Inst. CV 12:8; *Brown*, 2011 WL 2413344, at *24.

### III.   WHOLE FOODS' STATEMENTS DID NOT IDENTIFY PLAINTIFFS OR THEIR STORES, AND THEREFORE DO NOT HAVE A DEFAMATORY MEANING AS TO PLAINTIFFS.

In addition to falsity and a culpable mental state, an essential element of Plaintiffs' defamation claim is that the Whole Foods' statement was defamatory as to Plaintiffs.  *Weyrich v. New Rep., Inc.*, 235 F.3d 617, 620 (D.C. Cir. 2001).  Importantly here, "it is necessary that the recipient of the defamatory communication understand it as intended to refer to the plaintiff." Restatement (Second) of Torts § 564(a); *see also Harmon v. Liss*, 116 A.2d 693, 695 n.3 (D.C. 1955) (adopting predecessor Restatement to D.C. defamation case); *Gazette, Inc. v. Harris*, 325

---

[18] Even if Plaintiffs are permitted to rely on the negligence standard—which they should not be— there is no evidence in the record to support even this lowest standard of scienter.  Plaintiffs have offered no expert testimony regarding what a reasonable investigation of this alleged Improper Labor Shifting would have involved, what such an investigation would have revealed, or how any such investigation would reveal a "company-wide practice" of Improper Labor Shifting alleged in the complaint.  *See* Second Am. Compl. [Dkt. 16-1] ¶¶ 1–6 (alleging Whole Foods engaged in corporate-wide fraud and wage theft nationwide).  Thus, there is no admissible evidence that Whole Foods' statements about its investigation fell below a reasonable standard of care in the industry.  *See Parker v. Amtrak*, 214 F. Supp. 3d 19, 29 (D.D.C. 2016) (granting summary judgment where plaintiff failed to produce expert testimony "demonstrating OIG's investigation was flawed in the way that he claims").  "Simply saying the investigation was fundamentally flawed does not make it so."  *Id.*

ACTIVE 64281300v18

S.E.2d 713, 738 (Va. 1985) (same for Virginia); *Publish Am., LLP v. Stern*, 84 A.3d 237, 247 (Md. 2014) (same for Maryland).   As the D.C. Court of Appeals explained, if the plaintiff is not specifically named, the "surrounding circumstances [must] be such as to leave no doubt in the mind of the hearer as to [plaintiff's] identity." *Harmon*, 116 A.2d at 695–96.

In this case, there is no evidence that Mr. Barakat and Mr. Moyer had no doubt in their minds as to Plaintiffs' identities.   In fact, the evidence demonstrates exactly the opposite.   Mr. Moyer specifically asked Ms. Buchanan to identify the store managers or, alternatively, the stores at which they worked.   [Buchanan Dec 14 email at 5:32 PM].   Ms. Buchanan expressly refused to identify either, thus negating any argument that Mr. Moyer knew to whom she was referring.

Thus, this case is substantially indistinguishable from *Stovall v. James*, 810 F. Supp. 2d 237, 249 (D.D.C. 2011).   In *Stovall*, plaintiff claimed that LeBron James's mother made disparaging remarks regarding "LeBron James's father" to third parties.   The court dismissed this defamation claim, noting that there was no allegation that the persons who heard these statements knew that plaintiff was James's potential father.   *Id.*   The court specifically rejected the argument that the speculation that the listeners could "connect the dots," noting that plaintiff had failed to make any allegations to support such an assumption.   *Id.*; *see also Brummett v. Taylor*, 569 F.3d 890, 892–93 (8th Cir. 2009) (affirming j.n.o.v. where there was no evidence recipient of defamatory statement knew it referred to each plaintiff).

Whole Foods notes that it also raised this issue in its Motion to Dismiss, which the Court rejected.   *See* Mem. Op. & Order [Dkt. 30] at 38–40.   The Court cited the same standard discussed above, stating that "plaintiff can rely upon extrinsic evidence to show that *listeners* understood the statements to pertain to the plaintiff.   *Id.* (citing Restatement (Second) Torts § 564 cmt. B).   Thus,

the Court held that "plaintiffs have sufficiently *pleaded* facts" that prospective employers and colleagues could identify them from the news articles.

Although that ruling may be correct in the context of a motion to dismiss, we are now through several years of discovery in which Plaintiffs have had ample opportunity to develop evidence to support those accusations.  Despite that opportunity, Plaintiffs have produced no evidence—other than their own testimony regarding what other people told them—to support their accusation that employers or colleagues identified them from these news stories.   This is particularly damning given that there is evidence in the record showing Plaintiffs' stores were being discussed publicly at locations involving Improper Labor Shifting. *See* Ex. 48.  Furthermore, Plaintiffs themselves filed a lawsuit five days after the Washington Post Story was published, in which they publicly identified themselves as the employees who were fired. *See Austin v. Howard Univ.*, 267 F. Supp. 2d 22, 29–30 (D.D.C. 2003) (noting that the District of Columbia and Virginia do not recognize "self publication" theory of defamation). Thus, there is no admissible evidence that any employer or former coworker was able to identify Plaintiffs from the AP Story or Washington Post Story, as opposed to the numerous other public accounts.

Therefore, Plaintiffs have failed to produce sufficient evidence that the recipients of the allegedly defamatory statements knew these statements referred to Plaintiffs.  As such, Plaintiffs cannot establish that the statements were "of and concerning" them, and therefore fail to establish an essential element of their defamation claim.

IV.   **WHOLE FOODS' STATEMENTS ARE SUBJECT TO THE QUALIFIED SELF-DEFENSE PRIVILEGE.**

Even if Plaintiffs could survive all of the above challenges to their prima facie case, Plaintiffs claims are still subject to summary judgment because Whole Foods' statements were protected by the "self defense" privilege.  "The District of Columbia recognizes 'self defense' as

39

a qualified privilege constituting complete defense to a claim for libel or defamation." *Novecon Ltd. v. Bulgarian–Am. Enter. Fund*, 190 F.3d 556, 566 (D.C. Cir. 1999).[19]  The question of whether the qualified privilege applies in this case is one of law for the Court.  *Id.* (internal citations omitted). The question of whether plaintiff can overcome the privilege is one of fact which must be established by a preponderance of the evidence.  *Id.*

### A.      Whole Foods is entitled to rely on the qualified self-defense privilege.

The self-defense privilege applies "if the circumstances induce a correct or reasonable belief that (a) there is information that affects a sufficiently important interest of the publisher and (b) the recipient's knowledge of the defamatory matter will be of service in the lawful protection of the interest."  *Washburn v. Lavoie*, 437 F.3d 84, 90 (D.C. Cir. 2006).  In *Washburn*, the D.C. Circuit held that students had a sufficient self-defense interest when they responded to their neighbor's complaints about noise because the complaints "threatened common-law nuisance lawsuit," as well as the potential to expelled or evicted.  *Id.*  This, according to the court, supported the students making statements to their landlord and their Coordinator of Off-Campus Student Life regarding their neighbors own allegedly illegal behavior.  *Id.* at 87, 90.  Thus, the court held that the students were entitled to a self-defense privilege which had to be overcome by their neighbor.

Similarly here, the undisputed record shows that prior to making its statements, Whole Foods had a correct and reasonable belief that the alleged scope of the Improper Labor Shifting would potentially lead to litigation and that it would adversely affect employees' and the public's perceptions.  First, the public comments on message boards reviewed by Whole Foods alleged that

---

[19] Because the District's law on this defense appears more developed, Whole Foods will focus on District of Columbia cases.  However, this same substantial defense exists under Virginia and Maryland law.  *Haycox v. Dunn*, 104 S.E.2d 800, 811 (Va. 1958) (adopting same defense in Virginia); *Telnikoff v. Matusevitch*, 702 A.2d 230, 249 (Md. 1997).

"Regional has been complicit from the beginning" and "labor shuffling has been going on since the 90s when gainsharing began." *See supra* at 14–18 (discussing posts alleging wider conspiracy and encouraging class action). Furthermore, Mr. Barakat himself told Ms. Buchanan that "*lawsuits may be forthcoming*." *See* Ex. 51 at 2. Therefore, Whole Foods had a reasonable belief that lawsuits regarding the Improper Labor Shifting were potentially forthcoming and that employees believed this conduct was more widespread.

Furthermore, Whole Foods had a reasonable belief that speaking to the press to ensure they had accurate information would help protect the company's interests. As Ms. Buchanan explained, Whole Foods commented to the press because "[w]e wanted to ensure that [there was] an accurate portrayal of what happened, and why those store team leaders were, in fact, terminated because of a policy infraction was accurate [sic]." Buchanan Dep. (Ex. 50) at 54:14–59:21. Thus, the evidence shows that Whole Foods believed that communicating information about its investigation would be important to protect the company. *Id.* Based on this record, the Court should conclude, as a matter of law, that Whole Foods is entitled to the self-defense privilege. *See Washburn*, 437 F.3d at 90–91 (affirming summary judgment based on self-defense privilege).

**B.      Plaintiffs cannot establish common-law malice sufficient to overcome the self-defense privilege.**

"When the author of a libel writes for the protection of his own rights or interests, that which he writes is a privileged communication unless the write be actuated by malice." *Id.* (internal quotations omitted). This "common-law malice" standard "is considerably different from the 'actual malice'" constitutional standard discussed above. *Id.* at 567. Whereas actual-malice concerns knowledge of the falsity of the statement, common-law malice "emphasizes bad faith and evil motive." *Id.* (internal quotations omitted). "[U]nless the statement itself is 'so excessive, intemperate, unreasonable, and abusive as to forbid any other reasonable conclusion than that the

41

defendant was actuated by express malice, malice must be proven by extrinsic evidence." *Id.* This evidence must show that the speaker's primary motivation was to harm plaintiff in their reputation.

Here, there is no evidence that any Whole Foods employee acted out of malice toward the Plaintiffs. None of Ms. Buchanan's statements were so intemperate, unreasonable, or abusive as to compel the conclusion that she was motivated by malice. Instead, the only evidence is that Ms. Buchanan communicated information regarding Whole Foods' investigation because the company has an interest in ensuring that truthful information is made public. Buchanan Dep. (Ex. 50) at 54:14–59:21. Thus, Plaintiffs cannot present any evidence that Whole Foods' statements were motivated by evil motive or bad faith, and therefore cannot overcome Whole Foods' qualified privilege. *See Washburn*, 437 F.3d at 91 ("District of Columbia law makes it quite difficult for a plaintiff to overcome a qualified privilege.").

## V.   PLAINTIFFS' FALSE LIGHT CLAIMS MUST BE DISMISSED.

As a house-keeping matter, the Court should dismiss Plaintiffs' false-light invasion of privacy claims because they are barred as matter of law. *See* Second Am. Compl. [Dkt. 16-2] ¶¶ 83–91. First, Virginia has abrogated the common-law cause of action of false light of invasion of privacy by statute. *See WJLA-TC v. M. Levin, M.D.*, 564 S.E.2d 383 394 n.5 (Va. 2002) (citing Va. Code § 8.01-40). Thus, all five Virginia Plaintiffs' false-light claims must be dismissed for failure to state a cognizable cause of action. Second, Maryland and the District of Columbia courts both hold that where a false-light invasion of privacy claim is indistinguishable from an also alleged defamation claim, the false-light claim is redundant and will be treated as the same as the defamation claim. *See Bodgett v. Univ. Club*, 930 A.2d 210, 222–23 (D.C. 2007); *Piscatelli v. Van Smith*, 35 A.3d 1140, 1146–47 (Md. 2012). As both states recognize, defamation and false-light invasion of privacy "must meet the same legal standards," "rendering superfluous a separate analysis of [a] false light claim." *Piscatelli*, 35 A.3d at 1147; *see also Bodgett*, 930 A.2d at 23.

42

Therefore, Whole Foods arguments regarding summary judgment as to defamation apply equally to Plaintiffs' false light claim.  The Court need not analyze the two claims separately, and should grant summary judgment on the D.C. Plaintiff's and Maryland Plaintiffs' false light invasion of privacy claims for all the reasons set forth herein.

## VI.     THERE IS NO EVIDENCE OF CAUSATION TO SUPPORT SPECIAL DAMAGES.

Lastly, in addition to all of the other essential elements for defamation, Plaintiffs have produced no admissible evidence that they were actually injured by Whole Foods' allegedly defamatory statements.  In all three jurisdictions, causation of actual injury is an essential element for defamation liability.  *See* D.C. Pattern J. Inst. 17-1; Va. Pattern J. Inst. 37.097; Md. Pattern J. Inst. CV 12:6.  As with other torts, this requires both a showing that the statements were both a but-for cause and proximate cause of Plaintiffs' injury.  *See Askew v. Collins*, 722 S.E.2d 249, 251 (Va. 2012) (analyzing proximate cause of defamation injury); *Hall v. Dist. of Columbia*, 867 F.3d 138, 149 (D.C. Cir. 2017) (same applying D.C. law).

Plaintiffs offer only their own testimony about why they believe they were not able to obtain jobs after their termination from Whole Foods.  These statements are, at best, inadmissible hearsay and, more frequently, inadmissible speculation as to the motivations of third parties.  Furthermore, the only admissible evidence establishes that 7 of the 9 Plaintiffs were able to obtain and maintain employment promptly after their termination.  *See supra* at 21–22.  The remaining two Plaintiffs either unilaterally decided to stop seeking work or decided to return to school to pursue nursing.  *Id.*  Thus, the only admissible evidence on point demonstrates that Plaintiffs were not harmed in their professional reputations by the AP Story and Washington Post Story.

This same issue was addressed in *Poullard v. Smithkline Beecham Corp.*, in which the court granted defendant's summary judgment because plaintiff failed to introduce any evidence that she was harmed by the allegedly defamatory statements.  *Poullard v. Smithkline Beechham Corp.*,

43

Case No. 02-1590, 2005 WL 3244192, at *17 (D.D.C. Nov. 3, 2005).  In that case, the record showed that plaintiff obtained and maintained gainful employment within weeks of termination. Furthermore, plaintiff "presented no evidence supporting her contention that such statements somehow caused her mental anguish," noting that the only evidence of psychological treatment occurred years after the statements were made.  *Id.*  Thus, "Plaintiff has simply produced no evidence showing that she was injured either professionally or personally from any such statements stemming from" defendant.[20]  *Id.*

## CONCLUSION

For the forgoing reasons, Defendants Whole Foods Market Services, Inc. and Whole Foods Market Group, Inc. respectfully request that the Court grant their Motion for Summary Judgment and render judgment in favor of Defendants for Plaintiffs' claims.

|  | **GREENBERG TRAURIG, LLP** |
|---|---|
|  | By: */s//s/ Gregory J. Casas*<br>   Gregory J. Casas<br>   Bar No. 455329<br>   300 West 6th Street, Suite 2050<br>   Austin, Texas 78701<br>   Telephone: 512.320.7238<br>   Facsimile: 512.320.7210<br>   Email: casasg@gtlaw.com |

---

[20]  Whole Foods anticipates that Plaintiff will seek to avoid this argument by claiming that Whole Foods' statements constitute defamation *per se*, and therefore seek to recover presumed damages. As discussed above, Maryland and Virginia do not permit presumed damages in this case, even in the context of defamation *per se*.  Maryland requires clear and convincing evidence of actual malice in order to recover presumed damages.  *See Brown*, 2011 WL 2413344, at *24; *see supra* at 33–36 (explaining lack of actual malice).  Furthermore, Virginia does not allow presumed damages if the statements are on a matter of public concern.  *See* Va. Pattern J. Inst. 37.105; *see also supra* at 40–41 (discussing existence of public interest and/or public controversy).  Similarly, Vasquez, the sole D.C. Plaintiff, cannot recover special damages based on this lack of proof.

*ACTIVE 64281300v18*

|  | David Sellinger<br>Bar No. 282780<br>500 Campus Drive, Suite 400<br>Florham Park, New Jersey 07932<br>Telephone: 973.360.7900<br>Facsimile: 973.301.8410<br>Email: sellingerd@gtlaw.com<br><br>**WHOLE FOODS MARKET SERVICES, INC.**<br>John H. Hempfling, II (*Pro Hac Vice*)<br>828 West 6th Street, Suite 200<br>Austin, TX 78703<br>Telephone: 512.542.0213<br>Facsimile: 512.482.7213<br>Email: john.hempfling@wholefoods.com<br><br>*Attorneys for Defendants Whole Foods Market Services, Inc. and Whole Foods Market Group, Inc.* |
|---|---|

## CERTIFICATE OF SERVICE

I hereby certify that the above and foregoing was electronically filed with the Court and that counsel of record, who are deemed to have consented to electronic service, are being served this 3rd day of May, 20222, via the court's CM/ECF System.

*/s/ Gregory J. Casas*
Gregory J. Casas

45