## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| VICTOR VASQUEZ, *et al.*,<br><br>    *Plaintiffs*,<br><br>      v.<br><br>WHOLE FOODS MARKET, INC., *et al.*,<br><br>    *Defendants*. | Civ. No. 1:17-cv-00112(APM) |

## PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AS TO DEFENDANT WHOLE FOODS MARKET GROUP, INC.'S COUNTERCLAIMS

KLAPROTH LAW PLLC

Brendan J. Klaproth (D.C. Bar No. 999360)
Jesse C. Klaproth (Bar No. PA0063)
2141 Wisconsin Ave NW, Suite M3
Washington, D.C. 20007
Tel:     202-618-2344
Fax:     202-618-4636
bklaproth@klaprothlaw.com
jklaproth@klaprothlaw.com
*Attorneys for Plaintiff*

# TABLE OF CONTENTS

I.     INTRODUCTION ............................................................................................... 1

II.    STATEMENT OF FACTS ................................................................................. 1

    A.  Plaintiffs were Well-Performing Store Team Leaders for Whole Foods............... 1

    B.  The Gainsharing Program and Corporate Oversight of Gainsharing ................. 3

    C.  Whole Foods' "Investigation" into Labor Transfers ........................................ 7

    D.  Termination and Defamation of Plaintiffs ................................................... 12

    E.  Whole Foods Hires Deloitte to Coverup its Misconduct; It Backfires ............... 13

    F.  Whole Foods' Lack of Evidence................................................................. 15

III.   STANDARD OF REVIEW............................................................................... 16

IV.    ARGUMENT ................................................................................................... 17

    A.  Whole Foods Cannot Convert a Breach of Contract Claim into Torts............... 17

        1.  The Economic Loss Doctrine Requires Dismissal of Counts I, III, IV, and VI ..... 17

        2.  The *Choharis* Rule Requires Dismissal of Counts I, III, IV, and VI..................... 18

    B.  Plaintiffs Are Entitled to Summary Judgment on Whole Foods Claims of
        Fraud (Count I) ...................................................................................... 20

    C.  Plaintiffs Are Entitled to Summary Judgment on Whole Foods Claims of
        Negligent Misrepresentation (Count III) ................................................... 23

    D.  Plaintiffs are Entitled to Summary Judgment on the Claim of Unjust
        Enrichment (Count II).............................................................................. 25

    E.  There Was No Breach of a Duty of Loyalty (Count IV) ................................. 26

    F.  There was No Breach of Good Faith and Fair Dealing (Count V) ..................... 27

    G.  There is No Chattel to be Converted (Count VI) ......................................... 28

V.     CONCLUSION ................................................................................................ 29

## TABLE OF AUTHORITIES

**CASES**

*Abi-Najm v. Concord Condo., LLC*,
280 Va. 350, 360, 699 S.E.2d 483, 488 (2010) ..............................................18

*Aguilar v. RP MRP Washington Harbour, LLC*,
98 A.3d 979, 985–86 (D.C. 2014) ..............................................................17, 18

*Alford v. Providence Hosp.*,
945 F. Supp. 2d 98, 109 (D.D.C. 2013)..........................................................21

*Allworth v. Howard Univ.*,
890 A.2d 194, 202 (D.C. 2006) ......................................................................28

*Am. Prop. Const. Co. v. Sprenger Lang Found.*,
274 F.R.D. 1, 11 (D.D.C. 2011) ....................................................................23

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242, 247 (1986) ...............................................................................17

*Balfour Beatty Infrastructure, Inc. v. Rummel Klepper & Kahl, LLP*,
451 Md. 600, 611, 155 A.3d 445, 451 (2017) ................................................18

*Bennett v. Kiggins*,
377 A.2d 57, 61 (D.C. 1977) ..........................................................................22

*Blanken v. Harris, Upham & Co.*,
359 A.2d 281, 283 (D.C. 1976) ......................................................................28

*Blondell v. Littlepage*,
413 Md. 96, 114, 991 A.2d 80, 91 (2010) ......................................................27

*Bolton v. Crowley, Hoge & Fein, P.C.*,
110 A.3d 575, 582 (D.C. 2015) ......................................................................18

*Choharis v. State Farm Fire & Cas. Co.*,
961 A.2d 1080, 1089 (D.C. 2008) ..................................................................19

*Cty. Comm'rs of Caroline Cty. v. J. Roland Dashiell & Sons, Inc.*,
    747 A.2d 600 (2000)..................................................................................25

*Commonwealth Land Title Ins. Co. v. KCI Techs., Inc.*,
    922 F.3d 459 (D.C. Cir. 2019)....................................................................17

*Dan Ryan Builders, Inc. v. Crystal Ridge Dev., Inc.*,
    783 F.3d 976 (4th Cir. 2015) ......................................................................19

*Darcars Motors of Silver Spring, Inc. v. Borzym*,
    841 A.2d 828 (2004)..................................................................................29

*Defenders of Wildlife v. Jewell*,
    68 F. Supp. 3d 193 (D.D.C. 2014)..............................................................17

*Draim v. Virtual Geosatellite Holdings, Inc.*,
    631 F. Supp. 2d 32 (D.D.C. 2009).........................................................26, 28

*Economopoulos v. Kolaitis*,
    528 S.E.2d 714 (2000)...............................................................................29

*EDCare Mgmt., Inc. v. DeLisi*,
    50 A.3d 448 (D.C. 2012) ............................................................................18

*E.M. v. Shady Grove Reprod. Sci. Ctr. P.C.*,
    496 F. Supp. 3d 338 (D.D.C. 2020)............................................................24

*Falconi-Sachs v. LPF Senate Square, LLC*,
    142 A.3d 550 (D.C. 2016) ..........................................................................25

*Fort Lincoln Civi Ass'n, Inc. v. Fort Lincoln New Town Corp.*,
    944 A.2d 1055 (D.C. 2008) .........................................................................20

*Harrington v. Trotman*,
    983 A.2d 342 (D.C. 2009).........................................................................25

*Hill v. Cross Country Settlements, LLC*,
    936 A.2d 343 (2007)..................................................................................25

*James G. Davis Constr. Corp. v. FTJ, Inc.*,
    841 S.E.2d 642 (2020) ...................................................................................26

*Lloyd v. Gen. Motors Corp.*,
    916 A.2d 257 (2007) .....................................................................................25

*McMullen v. Synchrony Bank*,
    300 F. Supp. 3d 292 (D.D.C. 2018)........................................................21, 22

*Molock v. Whole Foods Mkt., Inc.*,
    297 F. Supp. 3d 114 (D.D.C. 2018).............................................................26

*Naartex Consulting Corp. v. Watt*,
    722 F.2d 779 (D.C. Cir. 1983).................................................................20, 23

*Nails v. S & R, Inc.*,
    639 A.2d 660 (1994) .....................................................................................20

*Phillips v. Mabus*,
    894 F. Supp. 2d 71 (D.D.C. 2012)...............................................................26

*Poola v. Howard Univ.*,
    147 A.3d 267 (D.C. 2016) ...........................................................................28

*Rubin v. Est. of Warner*,
    881 F. Supp. 23 (D.D.C. 1995).....................................................................20

*S. Bank & Tr. Co. v. Woodhouse*,
    92 Va. Cir. 402 (2016)..................................................................................27

*Scott v. Harris*,
    550 U.S. 372 (2007)......................................................................................17

*Shepherd v. Am. Broad. Companies, Inc.*,
    62 F.3d 1469 (D.C. Cir. 1995)......................................................................20

*Sun Hotel, Inc. v. SummitBridge Credit Invs. III, LLC*,
    86 Va. Cir. 189 (2013)..................................................................................24

*Sundberg v. TTR Realty, LLC*,
    109 A.3d 1123 (D.C. 2015) ......................................................................24, 28

*Thompson v. Bacon*,
    425 S.E.2d 512 (1993) .......................................................................................20

*Tingler v. Graystone Homes, Inc.*,
    834 S.E.2d 244 (2019) .......................................................................................19

*Truitt v. Miller*,
    407 A.2d 1073 (D.C. 1979) ..............................................................................20

*Virginia Acad. of Clinical Psychologists v. Grp. Hospitalization*
    *& Med. Servs., Inc.*,
    878 A.2d 1226 (D.C. 2005) ..............................................................................22

*VMI Liquidating Trust v. FDIC*,
    110 F. Supp. 3d 44 (D.D.C. 2015) ...................................................................28

*Weichert Co. of Maryland v. Faust*,
    19 A.3d 393 (2011) ............................................................................................27

*White v. Kennedy Krieger Inst., Inc.*,
    110 A.3d 724 (2015) ....................................................................................20, 24

*Whitt v. Am. Prop. Constr., P.C.*,
    157 A.3d 196 (D.C. 2017) ................................................................................18

*Williams v. Dominion Tech. Partners, L.L.C.*,
    576 S.E.2d 752 (2003) .......................................................................................26

*Wultz v. Islamic Republic of Iran*,
    755 F. Supp. 2d 1 (D.D.C. 2010) .....................................................................28

**STATUTES & REGULATIONS**

28 U.S.C. § 1292(b) .............................................................................................19, 36

**RULES**

Fed. R. Civ. P. 56(a)..........................................................................................16

**MISCELLANEOUS**

Restatement (Third) Of Agency § 8.01 (2006)........................................................27

Plaintiffs Victor Vasquez, Nadeem Sheikh, Katia Sadoudi, Svetlana Bautista, Ibrahima Ba, Nicholas Miano, Pa M. Njie, Michael Amegnaglo and David Berger ("Plaintiffs") respectfully move for summary judgment as to Defendant Whole Foods Market Group, Inc.'s ("Whole Foods")[1] Counterclaims.

# I.   INTRODUCTION

After terminating nine of its employees and defaming them in national publications, Whole Foods responded to the lawsuit filed by those employees by filing a six-count Counterclaim. The claims are all based on Whole Foods' allegations that its own employees somehow bamboozled Whole Foods into keeping bonus money earned by its employees. The problem with the allegations is that Whole Foods failed to provide any evidence to substantiate them. Coupled with the legal defects of the claims, there exists no genuine issue of material fact that would permit Whole Foods to present these claims to a jury. The claims must be summarily dismissed.

# II.   STATEMENT OF FACTS

## A.  Plaintiffs were Well-Performing Store Team Leaders for Whole Foods

Each of the Plaintiffs were employed by Whole Foods as Store Team Leaders ("STLs") in stores located in the Mid-Atlantic region. Countercl. ¶ 6. At the time Whole Foods terminated

---

[1]     Defendant Whole Foods Market Services, Inc. did not file a Counterclaim and is therefore not subject to this Motion. Although Whole Foods' employees were unable to disentangle the several corporate entities comprising of Whole Foods, Defendant Whole Foods Market Services, Inc. is typically referred to as "Global," or the corporate headquarters.

Whole Foods Market Group, Inc. operates Whole Foods stores in Connecticut, Maine, Massachusetts, New Hampshire, Rhode Island, Kentucky, Maryland, New Jersey, Pennsylvania, Ohio, Virginia, D.C. New York, Alabama, Georgia, Mississippi, North Carolina, South Carolina, Tennesse, Illinois, Indiana, Iowa, Michigan, Minnesota, Missouri, Nebraska, and Wisconsin. Yost Decl. at ¶ 7 [ECF No. 12-3].

Plaintiffs, Vasquez[2] worked in the P Street store in Washington, D.C.; Bautista[3] worked in the

Columbia, Maryland store; Ba[4] worked in the Arlington, Virginia store; Miano[5] worked in the

Alexandria Old Town store, Njie[6] worked in the Kentlands, Maryland store; Sheikh[7] worked in the

---

[2]    Vasquez was employed by Whole Foods for more than twenty-one years at the P Street store in Washington, D.C. He worked as the STL there from January 2004 to December 2016. Vasquez Ans. to Interrog. Nos. 1 and 20 [Exhibit 1(i) and 2(i)]; *see also* Second Amended Compl. at ¶ 9 (for dates of employment).

[3]    Bautista was employed as a Store Team Leader for the Whole Foods store located at 10275 Little Patuxent Pkwy, Columbia, MD 21044 from August 2014 until December 2016. Bautista Ans. to Interrog. No. 1 [Exhibit 1(c)] Ms. Bautista also worked at Whole Foods stores in Alexandria, Virginia; Mason, Ohio; Cincinnati, Ohio; Columbus; Ohio; Cleveland, Ohio; and multiple stores in Portland, Oregon.  *Id.*; Bautista Dep. 42:11-19 (identifying the Oregon stores). Bautista worked for Whole Foods for more than 15 years.  Bautista Ans. to Interrog. No. 20 [Exhibit 2(c)].

[4]    Ba worked for Whole Foods for more than 14 years and worked at the Whole Foods store located at 2700 Wilson Blvd, Arlington, Va.; Chevy Chase, Maryland; Fairfax, Virginia; and Alexandria, Virginia. Ba Ans. to Interrog. Nos. 1 and 20 [Exhibit 1(b) and 2(b)].

[5]    Miano worked for Whole Foods for more than 15 years and worked at the Bethesda, Maryland Store; Old Town Alexandria store; Kentlands, Maryland store; P Street store in Washington, D.C.; and the Georgetown store in Washington, D.C.  *See* Miano Ans. to Interrog. No. 19 [Exhibit 2(e)]; *see also* Second Am. Compl. at ¶ 14 (identifying the stores worked).

[6]    Njie worked for Whole Foods for more than 20 years and worked at the stores in Gaithersburg, Md., Tysons Corner, VA, Tenley Town, Md., Silver Spring, Md., Rockville, Md.. Njie Ans to Interrog. Nos. 1 and 20 [Exhibits 1(f) and 2(f)].

[7]    Sheikh worked for Whole Foods for 12-years and worked for the Whole Food Stores located at Washington, D.C. (Georgetown); Washington, D.C. (P Street); Reston, Virginia; Springfield, Virginia; and Rockville Maryland.  Sheik Ans. to Interrog. No. 19 [Exhibit 2(h)].

Reston, Virginia store; Sadoudi[8] worked in the Vienna, Virginia store; Amegnaglo[9] worked in a separate Arlington, Virginia store; and Berger[10] worked in the Charlottesville store. *Id.*  In sum, Plaintiffs collectively worked for Whole Foods for more than 138 years and across 31 different stores.

According to their supervisors,[11] Plaintiffs were all well-performing STLs with no disciplinary issues. Wescoe Dep 54:17-59:04; Mueller Dep. 93:02-95:08.  Just one month or so before he was fired, Njie was even given the "All Star Award" for the top STL in the mid-Atlantic region, an award given the "best of the best." Wescoe Dep. 55:11-57:18; *see also* Email re Allstar Award [Exhibit 5].

## B.  The Gainsharing Program and Corporate Oversight of Gainsharing

At all times relevant during Plaintiffs' employment, Whole Foods had a corporate "Gainsharing" bonus program. Under the "Gainsharing" program, Whole Foods awarded bonuses to employees whose departments come in under budget for the department. Grady Dep. 29:04-31:04; Mueller Dep. 112:09-113:09. In short, the "Gainsharing" program incentivizes employees to increase department productivity and increase department revenue while

---

[8]    Sadoudi worked for Whole Foods for more than 16 years and worked in the stores located at Vienna, Virginia; P Street in Washington, D.C.; Arlington, VA; Georgetown in Washington, D.C.; Foggy Bottom in Washington, D.C.; and Richardson, Texas. Sadoudi. Ans to Interrog. Nos. 1 and 20 [Exhibits 1(g) and 2(g)].

[9]    Amegnaglo worked for Whole Foods for more than 25 years and worked in the stores in Arlington, VA, Bethesda, MD, Durham, NC, Tyson Corner, VA, Crystal City, VA, Alexandria, Va, and Springfield, VA. Amegnaglo Ans to Interrog. Nos. 1 and 20 [Exhibits 1(a) and 2(a)].

[10]    Berger worked for Whole Foods for more than 9 years and worked in the stores located at Charlottesville, VA, Long Beach, CA, Tustin, CA, Phoenix AZ, and Chandler AZ. Berger Ans to Interrog. Nos. 1 and 20 [Exhibits 1(d) and 2(d)].

[11]    Plaintiffs were supervised by Nicole Wescoe and Jane Mueller, who were "Executive Coordinators" in the Mid-Atlantic region.

minimizing/maintaining labor costs. *Id.* If a department comes in under budget, the surplus is distributed among the employees in that department as a Gainsharing bonus. *Id.*

As part of the Gainsharing program, STLs were instructed by their executive coordinators at the corporate office to "transfer" or "shift" labor from teams in deficits to teams in surplus. *See* Pls. Ans. to Interrog. Nos. 1-3, and 19 [Exhibits 1(a)-1(i) and 2(a)(2(i)]. Notably, Plaintiffs did not receive training on the Gainsharing program. *See e.g.* Bautista Dep. 82:30-12. They learned to transfer or shift labor through their mentors (*e.g.* Nicole Wescoe, Sam Park, and Jane Mueller), store leadership and the executive leadership in the region. *Id.*; *see also* Bautista Dep. 31:13-35:15; *see also* Njie Dep. 56:23-58:8; Vasquez Dep. 136:7-139:7.

For example, on April 20, 2015, Jane Mueller sent Miano the following email directing him to transfer labor:

> -------- Original message --------
> From: "Jane Mueller (MA MAC)" <Jane.Mueller@wholefoods.com>
> Date: 04/20/2015 10:48 AM (GMT-05:00)
> To: "Nick Miano (MA BET)" <Nick.Miano@wholefoods.com>
> Subject: FP7 Labor Deficits - IMMEDIATE ACTION NEEDED
>
> Hi Nick – are you OK to spread the Grocery, Prep foods and WB deficits to the other teams that made labor? We are doing this with a few stores so teams don't get too far behind.
>
> **Jane Mueller**
> Executive Coordinator of Operations | Whole Foods Market Mid-Atlantic Region
> p: 301.452.5021| e: jane.mueller@wholefoods.com | w: www.wholefoods.com
> 5515 Security Lane, Suite 900, Rockville, MD 20852

*See* Mueller Email Instructing Miano to Transfer Labor (highlights added) [Exhibit 6].[12]

Importantly, the subject of the email is "Labor Deficits – IMMEDIATE ACTION NEEDED."

---

[12]     This email was *not* produced by Whole Foods in discovery. Plaintiffs testified that they received similar emails from the Executive Coordinators, which were also not produced by Whole Foods, but are no longer accessible to Plaintiffs.

Mueller then asks Miano to spread the labor costs for teams that have "deficits to the other teams that made labor[.]" *Id.* Mueller then admitted that "we [those in Whole Foods' corporate office] are doing this with a few stores." *Id.*

Nevertheless, the corporate regional office was aware of this practice and acquiesced to this practice, as the corporate office for the mid-Atlantic would track each store's performance in the region by monitoring a "weekly labor spreadsheet," "flash recap" reports and "gainsharing reports." Mueller Dep. 96:01-97:22. An example of Ms. Mueller's close monitoring of labor deficits is attached as Exhibit 7.  The weekly labor spreadsheet tracked the data for each store, "the sales, the allocated labor dollars, and the actual labor dollars and hours." *Id.* Indeed, the Associate Store Team Leader ("ASTL") for the Tenley Town store, Zeeshan Naqvi,[13] testified that Nicole Wescoe and Scott Allshouse monitored team deficits for the stores, and if there were improper labor transfers both of the corporate executives would know. Naqvi Dep. 103:05-13.

Global, the corporate headquarters for Whole Food, had a gainsharing team that performed audits on gainsharing. May Dep. 56:18-57:18.

In addition, the Payroll Benefits Specialist ("PBS") in each store was the person responsible for actually transferring the labor. Sheikh Ans. to Interog. Nos. 1, 2, 19 [Exhibit Nos. 1(h) and 2(h)].  A PBS is located in each store as well as the regional corporate office and "[t]heir sole focus is to process payroll and benefits." Gearhart Dep. (Jan. 7, 2020) 19:01-12. The PBS, not the STL, had access to the Kronos system and would manually adjust the labors hours attributed to each department in order to shift labor. Sheikh Ans. to Interrog. Nos. 1, 2, 19 [Exhibit Nos. 1(h)

---

[13]      Naqvi is one of the 34 declarants that Whole Foods disclosed belatedly. *See generally*, Order (December 16, 2020) [ECF No. 99]. Tenley Town is not one of the nine stores where Plaintiffs worked, but as discussed below, is one of the stores that Whole Foods' investigated revealed as having "blatant", improper transfers.

and 2(h)]; *see also* Gearhart Dep. (Jan. 7, 2020) 21:18-22:06. The Kronos data was then uploaded directly to "Global", Whole Foods' corporate headquarters in Austin. Gearhart Dep. (Jan. 7, 2020) 21:18-22:06.

According to Gearhart,[14] Global was responsible for overseeing the payroll data and would generate Gainsharing reports based on that data.  Gearhart Dep. (Jan. 7, 2020) 135:14-136:07. Although Gearhart tried to pin oversight responsibility for the PBSs solely on "Global," the reality is that the PBS for each store in the Mid-Atlantic region participated in periodic teleconferences once per month with Global and the regional office. Gearhart Dep. (Jan. 7, 2020) 190:16-195:12. Gearhart's HR team in the regional office also had monthly meetings with PBSs throughout the mid-Atlantic region. Gearhart Dep. (Jan. 21, 2020) 267:02-271:18. The PBSs working in the corporate regional office under Gearhart, "oversaw, guided, and supported the PBSs in the stores throughout the region."  Gearhart Dep. (Jan. 21, 2020) 270:05-19.

The shifting of labor resulted in earned bonuses not being paid to workers, which directly increased Whole Foods' profits (*e.g.* less labor costs). *See* Allshouse Dep. 212:02-214:04; May Dep. 172:20-175:116; Bautista Ans. to Interrog. No. 5 [Exhibit 1(c)].  According to Kristen May, the Vice President of Operational Finance for the Mid-Atlantic Region, the result of shifting labor is that Whole Foods paid "out less money to team members," and retained more money for Whole Foods. May Dep. 174:21-175:16. Shifting labor positively impacted the bonuses of Whole Foods' corporate executives, including the regional president Scott Allshouse, because their bonuses were tied to the profitability of the region.  Allshouse Dep. 214:09-21. In the same vein, the STLs bonuses were tied to the profits of the store and Whole Foods.  May Dep. 145:09-147:20.

---

[14]      At the time, Gearhart "was the Executive Coordinator of TMS, Team Member Services" (which is essentially the HR department), for the Mid-Atlantic region. Allshouse Dep. 27:03-10.

**C.  Whole Foods' "Investigation" into Labor Transfers**

In October 2016, Whole Foods received an anonymous "tip line call: regarding the practice of transferring labor." Allshouse Dep. 26:03-27:10. This tip line complaint related to the Kentlands store headed by Njie but the tip was closed as unsubstantiated. Allshouse Dep. 28:12-30-12. But Whole Foods could not just brush the issue under the rug, because the tip line reports kept coming. Allshouse Dep. 30:13-21. Whole Foods received three or four complaints about "inappropriate labor" that negatively impacted gainsharing. Gearhart Dep. 32:04-11.

As a result of the tip line reports, Allshouse asked Kristen May, the Vice-President of Operational Finance for the Mid-Atlantic Region, to start an investigation. May Dep. 189:07-192:13. May was one of the four individuals who participated in the investigation into labor transfers at the region-wide level. May Dep. 10:4-5, 95:1-17.  May reviewed data that she received from Mike Grady who worked at "Global" (*e.g.* the corporate headquarters in Austin, Texas) and analyzed that data for a fiscal period. May Dep. 87:10-17; 96:16-98:15 In the analyzing the data, May was looking for two Team Leaders ("TLs") or Assistant Team Leaders ("ATLs") who appeared in the same team. May Dep. 190:06-193:13. May referred to this an anomaly or red flag. *Id.*  May confirmed that it's more likely than not that two team leaders in a single team constitutes a violation of the gainsharing policy. May Dep. 85:22-87:1. May generated a report the same day she received the data from Global. 190:22-13.

According to May's report, attached as Exhibit 8, ██████████████████████ ████████████████████████████████████████████████████████ May Dep. 110:4-111-20; May Report [Exhibit 8]. Amazingly, Dave Gearhart (the head of the investigation for the Mid-Atlantic Region) never considered Kristen May's analysis as part of his investigation, and he did not investigate the stores identified by May. Gearhart Dep. (Jan. 21, 2020) 230:16-231:7. May reported this to Scott Allshouse and Dave Gearhart, and the three of them agreed it

was a "pattern that was concerning." May Dep. 193:06-17. Still, no action was taken with respect

to the stores identified by May. Gearhart Dep. (Jan. 21, 2020) 230:16-231:7

Allshouse confirmed that he undertook a similar approach to his investigation. Allshouse

Dep. 35:1-37:02. Allshouse reviewed Gainsharing Report to see if there were two TLs in a single

team. Allshouse Dep. 37:19-38:01; 42:11-43:06; 43:2244:08. Allshouse, the highest ranking

corporate official in the Mid-Atlantic region, testified that it is more likely than not an improper

labor shifting occurred when there was more than one TL in a single team in a Gainsharing Report.

Allshouse Dep. 227:13-229:13. Mr. Allshouse referred to two TLs contained in a single team as

reflected in a Gainsharing Report as a "red flag." *Id.* And Gainsharing Reports, were the documents

reviewed by Mr. Allshouse when he looked into the labor transfer issue. *Id.*

Gearhart ultimately led the investigation into labor transfers for the Mid-Atlantic. Whole

Foods Dep. (December 8, 2021) 30:15-31:03. Gearhart did not, however, investigate every store

in the region. In fact, Gearhart did not even investigate the 37 stores flagged by May. Instead, he

investigated only ten stores. Allshouse Dep. 43:22-44:08; Gearhart Dep. 220:01-22.

Whole Foods produced investigative files for each of the ten stores investigated by

Gearhart. *See* Exhibits 4(a)-4(k). Nine of the ten stores investigated by Gearhart are the stores

where Plaintiffs were the STLs. *Id.* Gearhart stopped investigating beyond those ten stores because

"Global Legal" took over the investigation. Gearhart Dep. 245:09-246:17. A spreadsheet created

by Gearhart admits that several stores that "required" investigation or where an investigation was

"recommended" were not investigated:



This spreadsheet[15] is attached as Exhibit 12 and a screenshot of the relevant portion is attached as Exhibit 13.

So, what did Global do?

James Michael Grady (referred to as "Mike Grady") was responsible for investigating Gainsharing violations for "Global" across the entire company.  Grady Dep. 158:3-160:11. Based on his and Golda Sahayam's analysis of four fiscal periods (approximately four months), Whole Foods identified 119 stores that had improper labor transfers.  *See* Grady Analysis at 2 (Bates

---

[15]      The Microsoft Excel Spreadsheets attached as Exhibits 11 and 12 will be provided to chambers on a thumb drive.



According to the meta data of Grady's missing column spreadsheet, he completed his analysis on November 23, 2016. Grady Dep. 175:3-22.

Mr. Grady also testified about the analysis he performed in an Excel spreadsheet. Grady Dep. 174:15-187:22. In this spreadsheet, there were "20 plus hidden columns" (columns A through N or missing, as well R through AB) that contained hidden analysis. Grady Dep. 176:4-187:22. One of those hidden columns was highlighted in red and stated ████████████ for approximately ██ stores. Grady Dep. 184:1-185:6. A screenshot of a portion of that column is below and attached as Exhibit 10:



For completeness, the entire spreadsheet is attached as Exhibit 11.  According to the metadata of

Grady's missing column spreadsheet, he completed his analysis on **November 23, 2016**. Grady Dep. 175:3-22.

Grady recommended that 57 stores be further investigated, and he ultimately concluded that 62 stores required further investigation. Grady Dep. 187:07-17. Grady's role in the investigation ended once he completed his analysis, and Grady has no knowledge if any further action was taken with respect to the 119 stores he identified. Grady Dep. 187:18-22. Grady believed the investigation had been then handed off to the regional presidents for the regions throughout the country. Grady Dep. 224:05-12. Grady was "expecting a thorough investigation" by the regional presidents but was concerned that it was not as thorough as he expected.  Grady Dep. 237:02-243:19. Grady understood there to be a "Playbook" for conducting the investigation. Grady Dep. 241:02-13. Indeed, although Grady had spent weeks looking into the data, the regional presidents spent a mere **four days** reporting back that there were no issues in their regions. *Id.* Grady express his concern that the Southern Pacific region, for which he had flagged 17 stores that required further investigation "may have gotten results of their STL investigation directly from the STLS." *See* Grady Email November 29, 2016 [Exhibit 14]. Grady's concerns were well-founded.

According to Whole Foods, an "investigation" was required for each of the 119 stores identified by Grady and that investigation was to be done according to the "Playbook" created by Gearhart.  *See* The Playbook at Exhibit 15.  According to Grady's slide deck, Gearhart completed the Playbook on November 23, 2016. *See* Exhibit 9 at [bates number0053239]. The Playbook was distributed on November 25, 2016 to the regional presidents throughout the country. *See* The Playbook at Exhibit 15*; see also* Whole Foods Dep. (Dec. 9, 2021) 183:08-185:02.

The first step of the investigative process according to the Playbook was to inform each individual being interviewed of the internal investigation and to have the individual read and sign

an investigation acknowledgement sheet. *See* The Playbook at Exhibit 15. This investigation acknowledgment sheet is contained in each of the ten investigative files for the stores investigated by Gearhart and attached as Exhibit 4.

According to the Playbook, a staff member would take notes of the conversation and the interviewee "would be given an opportunity to write a statement that they feel reflects what we talked about…and have the opportunity to review the notes to insure (sic) accuracy and anything that wasn't accurate would be corrected." *Id.* Notes similar to this are contained in Gearhart's investigative files for the ten stores.  The Playbook also provided a script of questions to ask. *Id.*

Whole Foods, however, cannot identify a single person interviewed or a single document reflecting that any such interview even took place. Whole Foods Dep. (Dec. 9, 2021) 79:07-16. Indeed, the only record of any investigation or any interview taking place relates only to the ten stores investigated by Gearhart and contained in Exhibit 4.

**D.  Termination and Defamation of Plaintiffs**

Whole Foods fired Plaintiffs on December 1, 2016, a mere 6 days after distributing the Playbook to the regions throughout the country to investigate the 119 stores flagged by whole Foods. Whole Foods Dep. (Dec. 9, 2021) 31:14-16. According to Whole Foods, Plaintiffs were fired for improperly transferring hours, by making "false statement by representing entries on the TTFs and Labor Reports," and/or omitting "facts by not fully completing TTFs to accompany the Labor Reports." *See e.g.*  Countercl. at ¶¶ 23-24, 31-32, 40-41, 47-48, 57-58, 65-66, 73-74, 81-82, and 90-91.

Approximately, two weeks later, on December 13 and 15, Whole Foods publicly defamed the Plaintiffs by publishing, among other things, the following statements to the Associated Press, Washington Post, and ABC news:

1.  "[Whole Foods] fired nine store managers in the mid-Atlantic region for ***manipulating*** a bonus program to their benefit." (emphasis added)

2.  "Brook Buchanan, a spokeswoman for Austin, Texas-based Whole Foods Market Inc., said [the Vasquez Plaintiffs] were dismissed in recent weeks after a ***company-wide investigation."*** (emphasis added).

3.  "Whole Foods…saying the incident was still under investigation and ***'isolated' to a relatively small number of its 457 stores."*** (emphasis added)

4.  "We took swift action, but, relative to the rest of the company, ***this manipulation only happened in nine of our locations***." (emphasis added)

5.  "Whole Foods Fires 9 Store Managers who were Stealing Money from Employees."

*See* Exhibits 16-18.

One month after firing Plaintiffs, Whole Foods eliminated the Gainsharing program across the entire company and adopted "Storewide Sales Gainsharing," which essentially memorialized the policy of transferring labor across departments within a store—the very thing it fired Plaintiffs for. *See* Whole Foods Ans. to Interrog. No. 7 [Exhibit 3].

### E.  Whole Foods Hires Deloitte to Coverup its Misconduct; It Backfires

Although Whole Foods proclaimed to the world that it had conducted a "company-wide investigation" and that "this manipulation only happened in nine of our locations," one day after the AP article, Whole Foods hired Deloitte to conduct an investigation into labor transfers. *See* Deloitte Engagement Letter (December 14, 2016) [Exhibit 21]; *see also* Mem. Op. and Order at 7-15 [ECF No. 169].

Nearly 3 ½ years after the defamatory statements claiming a company-wide investigation had been completed, Deloitte began completing its investigation. *See* Deloitte Analysis as of April 17, 2020 [Exhibit 23].

Despite the fact that Whole Foods sued Plaintiffs for missing and/or allegedly false TTFs and has insisted in this litigation that "you actually need to go and look at the TTF, the time transfer

forms…in order to actually see whether there was improper gainsharing – shifting, you have to

look at both sets of documents together" (Tr. (October 1, 2018) 26:24-27-12),[16] Whole foods has

appeared to abandon this position since the Deloitte analysis does not support it. Specifically,

[16]    As Plaintiffs' Counsel stated during the October 1, 2018 hearing, the first time Whole Foods took the position that TTFs needed to be reviewed to analyze the Gainsharing Reports was at the hearing. Tr. (October 1, 2018) 28:1-5. Based on that representation by Defense Counsel, Plaintiffs sought to compel discovery of the TTFs. *See* Order (April 10, 2019) [ECF No. 61].

[17]    Plaintiffs analyzed the Gainsharing reports for the 113 stores and found labor transfers occurred in nearly all 113 stores. *See* Miano Ans. to Interrog. No. 19 [Ex. 2(e)] and Sheikh Ans. to Interrog. No. 2(h) [Ex. 2(h)].

[18]    In its Counterclaim Whole Foods repeatedly claims, "[t]he information in the Labor Reports, and the information required in the missing TTFs, involved facts that were key to the accuracy of the amount and value of hours worked by the Team Members. This information had to be accurate because it related directly to the store's operation and the Team Members' gainsharing payment…the information on the TTFs and Labor Reports needed to be accurate." *See e.g.* Countercl. at ¶ 26. How does Whole Foods reconcile this allegation with the fact that **it is missing supporting documentation, such as a TTF, for** ███████████████████ ███████████████ **across the country in a 3-month period**?

███████████████████████████████████████████████████

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

████████████████████████████████

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

██████████████████████

Despite the documented labor transfers that occurred in stores across the country as evidenced by Whole Foods internal analysis and Deloitte's analysis, Whole Foods still claims that the only stores that had improper labor transfers were the nine stores where Plaintiffs worked. Whole Foods Dep. (December 8, 2021) 77:08-13. In this face of this evidence, Whole Foods has also refused to retract the defamatory statements. Whole Foods Dep. (December 8, 2021) 131:15-134:02.

**F.  Whole Foods' Lack of Evidence**

During its Rule 30(b)(6) deposition, Whole Foods could not identify a single false statement or omission, made by the Plaintiffs. Whole Foods Dep. (Dec. 9, 2021) 119:15-123:15. Whole Foods fared no better in its interrogatory responses. When asked to identify all documents relating to Whole Foods claim that Plaintiffs falsified TTFs and labor hours, Whole Foods answered that "Whole Foods refers Plaintiffs to the TTFs…which Whole Foods asserts Plaintiffs

directly or indirectly falsified. These TTFs will be produced." WF Ans. to Interrog. No. 6. **The purported TTFs were never identified**. Indeed, under oath, Whole Foods could not identify a single TTF that Plaintiffs allegedly falsified. Whole Foods Dep. (Dec. 9, 2021) 126:05-132:14.

Similarly, Whole Foods could not testify as to how the Plaintiffs were unjustly enriched. Whole Foods Dep. (Dec. 8, 2021) 123:16-126:04. Whole Foods claims that Plaintiffs received bonuses that "would have been delayed or not qualified for." *Id.* But Whole Foods did not know what those bonuses were or the amounts of any such alleged bonuses. *Id.*

Whole Foods also does not know the damages it is suing Plaintiffs for. Whole Foods Dep. (Dec. 9, 2021) 120:20-121:18; 134:18-136:21. Whole Foods failed to provide any detail whatsoever as to the damages it claims it suffered as a result of Plaintiffs' conduct and was unable to testify as to its damages. *Id.*; WF Ans. to Interrog. No. 4; *see* WF Rule 26(a)(1) disclosures [Ex. 25].

Indeed, Plaintiffs' supervisor in the corporate headquarter testified that she did know if Plaintiffs had violated the Gainsharing program. Mueller Dep. 113:10-114:18. The same supervisor also had no knowledge of Plaintiffs falsifying documents as Whole Foods claims, despite the fact that Ms. Mueller received and reviewed the "weekly labor spreadsheet," "flash recap" reports and "gainsharing reports." Mueller Dep. 114:20-115:08.

### III.    STANDARD OF REVIEW

Summary judgment is proper if "there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Rule 56 requires more than the existence of a factual dispute, "the requirement is that there be no genuine issue of material

fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986).[19] "A dispute is 'genuine' only if a reasonable fact-finder could find for the non-moving party; a fact is only 'material' if it is capable of affecting the outcome of the litigation." *Defenders of Wildlife v. Jewell*, 68 F. Supp. 3d 193, 202 (D.D.C. 2014) (citing to *Anderson*, 477 U.S. at 247). On summary judgment, the court must "view the facts and draw reasonable inferences in the light most favorable to the party opposing the summary judgment motion." *Scott v. Harris* 550 U.S. 372, 378 (2007).

## IV.     ARGUMENT

### A.  Whole Foods Cannot Convert a Breach of Contract Claim into Torts

### 1.     The Economic Loss Doctrine Requires Dismissal of Counts I, III, IV, and VI

The gist of Whole Foods' Counterclaim is that its own employees caused Whole Foods to spend money it would not otherwise have spent. As Plaintiffs have pointed out, even the most generous reading of Whole Foods' Counterclaim makes little sense. According to Whole Foods, Plaintiffs defrauded Whole Foods into making more money for Whole Foods. But the money saved by Whole Foods by not paying Gainsharing bonuses was ill-gotten, so Whole Foods was forced to use that money to pay its employees what they were owed. In short, Whole Foods lost nothing. They paid the Gainsharing bonuses back that they were required to pay. Nonetheless, assuming *arguendo*, that Whole Foods did experience a loss, it was a pecuniary loss, which cannot form the basis of a tort claim under D.C., Maryland or Virginia law.

 "[T]he economic loss doctrine ... prohibits recovery for purely economic damages in tort." *Commonwealth Land Title Ins. Co. v. KCI Techs., Inc.*, 922 F.3d 459, 468 (D.C. Cir. 2019); *see also Aguilar v. RP MRP Washington Harbour, LLC*, 98 A.3d 979, 985–86 (D.C. 2014) (holding

---

[19] All internal citations and quotation marks are omitted and all emphasis is added herein unless otherwise noted.

"[t]he economic loss doctrine in the District of Columbia bars recovery of purely economic losses in negligence subject to only one limited exception where a special relationship exists."); *Whitt v. Am. Prop. Constr., P.C.,* 157 A.3d 196, 204 (D.C. 2017). Stated differently, "under the 'economic loss' rule, a plaintiff who suffers only pecuniary injury as a result of the conduct of another cannot recover those losses in tort." *Aguilar*, 98 A.3d at 982; *see also Balfour Beatty Infrastructure, Inc. v. Rummel Klepper & Kahl, LLP*, 451 Md. 600, 611, 155 A.3d 445, 451 (2017); *Abi-Najm v. Concord Condo., LLC*, 280 Va. 350, 360, 699 S.E.2d 483, 488 (2010) ("Tort law is not designed, however, to compensate parties for losses suffered as a result of a breach of duties assumed only by agreement.").

Here, Whole Foods has not pled the existence of any damages other than pecuniary injury, nor has it identified the existence of a legally recognized special relationship. Further, to the extent that Whole Foods has any claim against Plaintiffs based on the existence of their employment relationship, Whole Foods must sue for breach of contract, not in tort. Thus, the economic loss doctrine bars Whole Foods' tort claims of fraud, negligent misrepresentation, and breach of loyalty.[20] Counts I, III, IV, and VI must be dismissed.

2.    **The *Choharis* Rule Requires Dismissal of Counts I, III, IV, and VI**

Whole Foods' claims against Plaintiffs are all embedded in the context of the parties' relationship as employer/employee. That relationship is based in contract, *i.e.* the employee works for the employer and the employer pays the employee. Under D.C. law, "a claim in tort must exist in its own right independent of the contract, and any duty upon which the tort is based must flow from considerations other than the contractual relationship. The tort must stand as a tort even if the contractual relationship did not exist." *EDCare Mgmt., Inc. v. DeLisi*, 50 A.3d 448, 452 (D.C.

---

[20]    Breach of fiduciary duty is a tort claim. *Bolton v. Crowley, Hoge & Fein, P.C.*, 110 A.3d 575, 582 (D.C. 2015)

2012) citing *Choharis v. State Farm Fire & Cas. Co.*, 961 A.2d 1080, 1089 (D.C. 2008). The so-called *Choharis* Rule requires that a tort, such as fraud or negligent infliction of emotional distress, have an existence separate and apart from the contract itself, such that the tort would "stand as a tort even if the contractual relationship did not exist." *Choharis,* 961 A.2d at 1089.

Here, Whole Foods' claim that Plaintiffs defrauded and made misrepresentations to Whole Foods are directly tied to Plaintiffs' contract for employment. Indeed, Whole Foods is claiming that it overpaid Plaintiffs due to purported misrepresentations contained in TTFs and/or their failure to complete a TTF for a transfer, which was required as part of their job. Thus, Whole Foods' claims of fraud and negligent misrepresentation could not stand alone in the absence of the employment contract between the parties.

Likewise, Virginia law also prohibits "turning every breach of contract into a tort" and looks to whether the tort claims are "entwined with a breach of contract and do not reasonably fall outside the contract relationship." *Tingler v. Graystone Homes, Inc.*, 298 Va. 63, 92, 834 S.E.2d 244, 261 (2019). If the tort claims are so entwined or the gravamen or gist of the action sounds in contract, then the tort claims must fail. *Id.*

The Fourth Circuit has also recognized that the so-called "gist of the action" doctrine, which found that the prohibition against converting a breach of contract claim into a tort "is hornbook law in most jurisdictions, even if they do not employ the gist of the action nomenclature." *Dan Ryan Builders, Inc. v. Crystal Ridge Dev., Inc.*, 783 F.3d 976, 981 (4th Cir. 2015).

Because Whole Foods torts claims against Plaintiffs all arise out of their employment relationship, Counts I, III, IV, and VI must be dismissed.

**B.  Plaintiffs Are Entitled to Summary Judgment on Whole Foods Claims of Fraud (Count I)[21]**

Whole Foods has failed to point to any evidence to satisfy the essential elements of fraud, which are: "(1) a false representation (2) in reference to a material fact, (3) made with knowledge of its falsity, (4) with the intent to deceive, and (5) action is taken in reliance upon the representation." *Fort Lincoln Civi Ass'n, Inc. v. Fort Lincoln New Town Corp*., 944 A.2d 1055, 1073 n.22 (D.C. 2008). Common law fraud also requires a sixth element – that Whole Foods suffer damages. *Naartex Consulting Corp. v. Watt*, 722 F.2d 779, 793 (D.C. Cir. 1983).[22] "Proof of civil fraud in general therefore requires clear and convincing evidence." *Shepherd v. Am. Broad. Companies, Inc.*, 62 F.3d 1469, 1477 (D.C. Cir. 1995); *White v. Kennedy Krieger Inst., Inc.*, 221 Md. App. 601, 635, 110 A.3d 724, 744 (2015).

*First*, Whole Foods failed to identify a single false representation upon which to base its fraud claims. As discussed above, Plaintiffs sought this discovery from Whole Foods' Rule 30(b)(6) corporate designee, and the designee had no knowledge as to any particular false representations or omissions made by Plaintiffs. Whole Foods Dep. (Dec. 9, 2021) 119:15-123:15. Not only does this fall well short of the particularity *pleading* requirement, it comes nowhere close

---

[21]    Because Whole Foods' claims are based on the same underlying facts regarding Gainsharing and it is undisputed that Whole Foods was the primary beneficiary of any misapplication of the gainsharing program and directed Plaintiffs to transfer labor, Whole Foods claims are barred by the unclean hands doctrine and *in pari delicto*. *See Rubin v. Est. of Warner*, 881 F. Supp. 23, 25 (D.D.C. 1995) ("The doctrine of unclean hands is designed to preserve the integrity of the Court by protecting it from exercising its powers to aid those who are before the Court as a result of their own fraudulent behavior."); *see also Truitt v. Miller*, 407 A.2d 1073, 1080 (D.C. 1979) (discussing the two doctrines).

[22]    The elements of actual fraud under Virginia law are identical to D.C. *Thompson v. Bacon*, 245 Va. 107, 111, 425 S.E.2d 512, 514 (1993). The elements under Maryland law are almost identical, except Maryland leaves out the "material fact" element and the scienter requirement may be met with a showing of reckless indifference. *Nails v. S & R, Inc.*, 334 Md. 398, 415, 639 A.2d 660, 668 (1994).

to meeting the requisite clear and convincing *evidence* standard. Similarly, in response to Interrogatory No. 6, Whole Foods failed to identify the documents containing the purported false representations or omissions. Thus, Whole Foods' fraud claim against all Plaintiffs' fail because they failed to come forward with evidence of a false representation or omission.

*Second*, a fraud claim requires "clear and convincing" evidence of fraudulent intent. *E.g., Alford v. Providence Hosp.*, 945 F. Supp. 2d 98, 109 (D.D.C. 2013). "Intent can be inferred from reckless disregard for the truth or falsity of a statement combined with the sheer magnitude of the resultant misrepresentation." *McMullen v. Synchrony Bank*, 300 F. Supp. 3d 292, 305-306 (D.D.C. 2018). Whole Foods offers no evidence of Plaintiffs' intent, only inadmissible speculation and opinion as to Plaintiffs' motives. And contrary to Whole Foods' baseless accusations that Plaintiffs were trying to increase their bonuses, the evidence shows that Plaintiffs were simply doing exactly as they were instructed by their supervisors in the corporate regional office. *See* § II.B above; *see also* Mueller Email Instructing Miano to Transfer Labor [Ex. 6].

Further, Plaintiffs never concealed the fact that labor had been transferred in their stores. This information was inputted into the Kronos system by the stores' PBS. Global then generated Gainsharing Reports that were distributed across the company. The labor transfers were also reflected in the "weekly labor spreadsheet" and "flash recap" reports" that were provided to the Executive Coordinators in the corporate regional office. When Allshouse and May began their investigation, they looked at Gainsharing reports to identify teams that had two TLs. This information was in their possession the entire time.[23]

More damning than Whole Foods lack of evidence, is the affirmative evidence that they

---

[23] *See* Sheik Ans. Interrog. Nos. 7 and 19 (May acknowledging she knew of labor transfers [Exhibits 1(h) and 2(h)]

cannot prove intent. *See* Gearhart Dep. (Jan. 7, 2020) 195:14-20 (testifying "I don't know [why they shifted labor]. That would be speculation. I don't know their intent of why they did it).

Thus, the record here lacks any (much less "clear and convincing") evidence from which a reasonable juror could conclude that Plaintiffs acted with fraudulent intent. *See Virginia Acad. of Clinical Psychologists v. Grp. Hospitalization & Med. Servs., Inc.*, 878 A.2d 1226, 1236 (D.C. 2005) (affirming summary judgment for defendants on fraud claims because plaintiffs had failed to establish a "prima facie case" that defendants had acted with fraudulent intent); *McMullen*, 300 F. Supp. 3d at 305-306 (same); *Bennett v. Kiggins*, 377 A.2d 57, 61 (D.C. 1977) (affirming summary judgment for defendants on fraud claims when plaintiffs had "averred no admissible evidence to put this issue in disputed factual context.").

*Third*, the alleged misrepresentation and/or omissions to Whole Foods were made by the Stores' PBS, not the Plaintiffs. Thus, Whole Foods did not *rely* on any *statement of material fact* made by Plaintiffs.

*Fourth*, Whole Foods has not identified a single representation or omission made by Plaintiffs that Whole Foods relied upon. Whole Foods claims in a conclusory fashion that it paid Plaintiffs bonuses that they would not have otherwise been entitled, but Whole Foods cannot tie a single misrepresentation or omission by Plaintiffs that resulted in an increased bonus to any of the Plaintiffs.

*Finally*, Whole Foods cannot prove damages. As set forth above in § 2.E, Whole Foods Rule 30(b)(6) witness could not articulate its damages, Whole Foods could not provide this information in response to an interrogatory, and it failed to disclose its computation of damages in its Rule 26(a)(1) disclosures. Whole Foods Dep. (Dec. 9, 2021) 120:20-121:18; 134:18-136:21. WF Ans. to Interrog. No. 4; *see* WF Rule 26(a)(1) disclosures [Ex. 25]. Whole Foods has broadly

identified categories of damages (bonuses paid to Plaintiffs, gainsharing bonuses paid to team members, as gainsharing bonuses, attorney fees and costs defending the *Molock* case), but this is a far cry from what is required under Fed. R. Civ. P. 26(a)(1)(A)(iii) and does not correlate to any evidence in the case. *Am. Prop. Const. Co. v. Sprenger Lang Found.*, 274 F.R.D. 1, 11 (D.D.C. 2011) (holding defendant/counter-plaintiff "must nevertheless identify with particularity all claimed damages and correlate those damages with specific citations to any and all supporting materials"). For instance, Whole Foods benefited from labor transfers because it did not need to pay out earned Gainsharing bonuses. The fact that it had now pay back Gainsharing bonuses that had been earned does not amount to damage. It puts Whole Foods in the same position it would have been had it paid its workers what they were owed from the outset.[24]

A common law fraud claim in the District of Columbia requires that the party alleging fraud was damaged by the fraud. *See Naartex*, 722 F.2d at 793 ("neither fraud without damage nor damage without fraud is sufficient to support an action."). Whole Foods has failed or refused to provide Plaintiff with its purported economic damages both in its testimony, its interrogatory response, and its Rule 26(a)(1) disclosures.

Accordingly, Whole Foods' fraud claims must be dismissed has it has failed to provide clear and convincing evidence of the requisite elements for fraud.

## C. Plaintiffs Are Entitled to Summary Judgment on Whole Foods Claims of Negligent Misrepresentation (Count III)

Unlike fraud, negligent misrepresentation does not require that Plaintiffs had knowledge of the falsity of their representations, nor is it required that Plaintiffs possessed an intent to deceive.

---

[24] This should be obvious to Whole Foods because it has incurred a windfall by not paying back the Gainsharing bonuses in connection with the 23,859 unsupported labor transfers that occurred in the 113 stores across the country in a three-month period. If Whole Foods had clean hands, it would have paid back all of its workers across the country that are owed money. It chose not to.

*Sundberg v. TTR Realty, LLC*, 109 A.3d 1123, 1131 (D.C. 2015). The burden is also a lesser one – preponderance of the evidence. *E.M. v. Shady Grove Reprod. Sci. Ctr. P.C.*, 496 F. Supp. 3d 338, 401 (D.D.C. 2020); *White*, 221 Md. App. at 648, 110 A.3d at 751 (2015).  "More specifically, a plaintiff alleging negligent misrepresentations or omissions must show '(1) that [the defendant] made a false statement or omitted a fact that he had a duty to disclose; (2) that it involved a material issue; and (3) that [the plaintiff] reasonably relied upon the false statement or omission to his detriment.;" *Sundberg*, 109 A.3d at 1131. As discussed above, Whole Foods has not identified the false statements or omissions and failed to provide *reliance* and *damages* that resulted. For the same reasons as those discussed, Whole Foods claims of negligent misrepresentation must be dismissed.

Virginia does not have a claim called negligent misrepresentation, but "constructive fraud," which requires "a showing by clear and convincing evidence that a false representation of a material fact was made innocently or negligently, and the injured party was damaged as a result of his reliance upon the misrepresentation." *Sun Hotel, Inc. v. SummitBridge Credit Invs. III, LLC*, 86 Va. Cir. 189 (2013). Like negligent misrepresentation under D.C. law, intent or scienter is not a required element for constructive fraud, but there is a heightened burden (clear and convincing) under Virginia law for *both* actual fraud and constructive fraud. Nevertheless, because Whole Foods claims that Plaintiffs Ba, Miano, Njie[25], Sheik, Sadoudi, Amegnaglo, and Berger, made misrepresentations occurring in Virginia, the negligent misrepresentation claims against these Plaintiffs must be dismissed because no such cause of action exists in Virginia.

Unlike D.C. or Virginia, under Maryland, law, a claim for negligent misrepresentation

---

[25]     Whole Foods claims that Njie and Miano worked in Maryland and Virginia as STLs. Countercl. at ¶ 6.

requires, *inter alia*, an intent to deceive as well as the existence of a legal duty of care. *Lloyd v. Gen. Motors Corp.*, 397 Md. 108, 135, 916 A.2d 257, 273 (2007). Whole Foods cannot establish the existence of a legal duty of care with respect to Miano, Njie, and Bautista because it was the PBS's responsibility to accurately submit the labor data in Kronos, not Plaintiffs.  And although Plaintiffs had some supervisory authority over the PBS's the same is true for Dave Gearhart and the PBSs that worked for the corporate regional office. But mere oversight and supervisory authority, cannot amount to a negligent misrepresentation. Indeed, Whole Foods does not attribute, and cannot, attribute vicarious liability over Plaintiffs for the actions of the PBSs.

Thus, Whole Foods' negligent misrepresentation claims (Count III) must be dismissed.

## D.  Plaintiffs are Entitled to Summary Judgment on the Claim of Unjust Enrichment (Count II)

Under D.C. law, a claim for unjust enrichment requires three elements: "(1) the plaintiff conferred a benefit on the defendant; (2) the defendant retains the benefit; and (3) under the circumstances, the defendant's retention of the benefit is unjust." *Falconi-Sachs v. LPF Senate Square, LLC*, 142 A.3d 550, 556 (D.C. 2016). The existence of a contract precludes a claim for unjust enrichment. *Harrington v. Trotman*, 983 A.2d 342, 347 (D.C. 2009).

A claim for unjust enrichment under Maryland law requires essentially the same three elements as D.C. but with slightly different wording. *See Hill v. Cross Country Settlements, LLC*, 402 Md. 281, 295, 936 A.2d 343, 351 (2007). Unjust enrichment is only available as a claim in the absence of an "enforceable, binding agreement…defining the rights of the parties." *Cty. Comm'rs of Caroline Cty. v. J. Roland Dashiell & Sons, Inc.*, 358 Md. 83, 97, 747 A.2d 600, 608 (2000). In other words, where there is an express contract, there can be no claim for unjust enrichment. *Id*. at 94, 606.  An express contract may be oral or in writing. *Id*.

Under Virginia law, unjust enrichment is viewed as a quasi-contract "requiring one who

accepts and receives goods, services, or money from another to make reasonable compensation for those services." *James G. Davis Constr. Corp. v. FTJ, Inc.*, 298 Va. 582, 591, 841 S.E.2d 642, 647 (2020). The examples of unjust enrichment supplied by Virginia's Supreme Court include "a payment or overpayment under a mistake of fact, or the acceptance of services without a contract for those services." *Id*. Like D.C. and Maryland, a claim for unjust enrichment under Virginia law cannot survive if there is an "express contract covering the same subject matter of the parties' dispute. *Id.* at 592, 647.

While the employment relationship between Plaintiffs and Whole Foods was terminable at-will, there still existed a contract "to employ and serve" during Plaintiffs' employment. *Draim v. Virtual Geosatellite Holdings, Inc.*, 631 F. Supp. 2d 32, 39 (D.D.C. 2009) ("Under the law of the District of Columbia, the mutual promise to employ and serve creates a contract terminable at the will of either party."); *see also Molock v. Whole Foods Mkt., Inc.,* 297 F. Supp. 3d 114, 132 (D.D.C. 2018) (finding plaintiffs sufficiently pled the existence of an oral contract for their employment). The existence of that contract (Plaintiffs work and Whole Foods pays them) was the basis for Whole Foods paying Plaintiffs bonuses. So, because those payments arose out of an express contract, Wholes Foods cannot legally make a claim for unjust enrichment.

Moreover, Whole Foods was unable to provide any evidence as to the benefit Whole Foods claims that Plaintiffs unjustly received. Whole Foods Dep. (Dec. 8, 2021) 123:16-126:04. Quite the contrary, Whole Foods became unjustly enriched by the practice of labor transfers because it resulted in less labor costs for Whole Foods and a greater profit (unclean hands).

## E.    There Was No Breach of a Duty of Loyalty (Count IV)

D.C., Virginia, and Maryland all recognized that an employee owes a duty of loyalty to their employer during their employment. *Phillips v. Mabus*, 894 F. Supp. 2d 71, 92 (D.D.C. 2012); *Williams v. Dominion Tech. Partners, L.L.C.*, 265 Va. 280, 289, 576 S.E.2d 752, 757 (2003);

*Weichert Co. of Maryland v. Faust*, 419 Md. 306, 318, 19 A.3d 393, 400 (2011). In Maryland, the duty is an implied one "read into every contract of employment, and requires that an employee act solely for the benefit of his employer in all matters within the scope of employment, avoiding all conflicts between his duty to the employer and his own self-interest." *Weichert*, 419 Md. at 318, 19 A.3d at 400. So, what does this duty of loyalty require?  According to the Restatement:

> the general fiduciary principle requires that the agent subordinate the agent's interests to those of the principal and place the principal's interests first as to matters connected with the agency relationship. A principal may choose to structure the basis on which an agent will be compensated so that the agent's interests are concurrent with those of the principal.

Restatement (Third) Of Agency § 8.01 (2006). An agent must also use "reasonable efforts to provide material information to the principal." *Id.*

There was no breach of loyalty here. Indeed, if anything, Plaintiffs' loyalty to Whole Foods cost them their jobs. Plaintiffs were good foot soldiers that followed the orders of their supervisors to transfer labor. They did as they were instructed and told to do. It cost them their jobs and reputations when Whole Foods' scapegoated them and defamed them publicly in an effort to staunch the public bleeding.

**F.  There was No Breach of Good Faith and Fair Dealing (Count V)**

First, for Plaintiffs Ba, Miano, Njie, Sheik, Sadoudi, Amegnaglo, and Berger who were employed in Virginia, this Count must be dismissed, as Virginia does not recognize an independent claim for the breach of the covenant of good faith and fair dealing. *S. Bank & Tr. Co. v. Woodhouse*, 92 Va. Cir. 402 (2016). Second, under Maryland law, the implied covenant of good faith and fair dealing is tied directly to the underlying purpose of a contract and prohibits a party from frustrating the other party's performance of the contract. *Blondell v. Littlepage*, 413 Md. 96, 114, 991 A.2d 80, 91 (2010). Whole Foods has not identified a contract, let alone the purpose or frustration of

performance of a contract. Thus, Count V must also be dismissed against the Maryland Plaintiffs—Miano, Njie, and Bautista.

Under D.C. law, "[t]o state a claim for breach of the implied covenant of good faith and fair dealing, a plaintiff must allege either 'bad faith or conduct that is arbitrary and capricious.'" *Sundberg v. TTR Realty, LLC*, 109 A.3d 1123, 1133 (D.C. 2015); *see also Allworth v. Howard Univ.*, 890 A.2d 194, 202 (D.C. 2006) ("bad faith means more than mere negligence"). Leaving aside the fact that Whole Foods has no evidence that Plaintiffs acted in bad faith, this claim under D.C. law is nothing more than a rehash of its fraud and negligent misrepresentation claims and should be dismissed for that reason. *See VMI Liquidating Trust v. FDIC*, 110 F. Supp. 3d 44, 59 (D.D.C. 2015) (dismissing claim which "does not present any legal or factual theories that are not already subsumed in … count one"); *Wultz v. Islamic Republic of Iran,* 755 F. Supp. 2d 1, 81 (D.D.C. 2010).

Moreover, it is a "well-settled principle that a claim for a breach of this duty cannot be made by the parties to an employment contract that is terminable at will." *Draim*, 631 F. Supp. 2d at 39. Because the only contract between the parties here was a contract for employment that was terminable at-will, there is no legal basis for Whole Foods' claim that Plaintiffs breached an implied duty of good faith and fair dealing under D.C. law. Thus, Count V of the Counterclaim must be dismissed as to Vasquez as well.

**G.  There is No Chattel to be Converted (Count VI)**

Conversion requires three elements: "[1] an unlawful exercise, [2] of ownership, dominion, and control, [3] over the personalty of another, [4] in denial or repudiation of his right to such property." *Poola v. Howard Univ.*, 147 A.3d 267, 285 n. 17 (D.C. 2016). Notably, conversion deals with "chattel" not money. *Blanken v. Harris, Upham & Co.*, 359 A.2d 281, 283 (D.C. 1976). This is the same in Maryland. *Darcars Motors of Silver Spring, Inc. v. Borzym*, 379 Md. 249, 259, 841

A.2d 828, 834 (2004) ("As a general rule, money, i.e., currency, is not subject to a claim of conversion unless the plaintiff seeks to recover specific segregated or identifiable funds."). Plaintiffs' bonus payments are not segregated money held in a lockbox somewhere – it is simply a sum that could be satisfied by "check or other currency." *Id*.  Virginia too limits conversion to "goods or chattels." *Economopoulos v. Kolaitis*, 259 Va. 806, 814, 528 S.E.2d 714, 719 (2000).

Thus, because Whole Foods is seeking a monetary judgment and not seeking the return of tangible objects, conversion does not apply here. Count VI must be dismissed as it lacks legal merit.

## V.    CONCLUSION

For the foregoing reasons, Plaintiffs respectfully requests that the Court grant Plaintiffs' Motion for Summary Judgment as to Defendant Whole Foods Market Group, Inc.'s  Counterclaims and dismiss the Counterclaim in its entirety.

Dated: May 3, 2022

Respectfully submitted,

Klaproth Law PLLC

*/s/* Brendan J. Klaproth
Brendan J. Klaproth (D.C. Bar No. 999360)
Jesse C. Klaproth (Bar No. PA0063)
2141 Wisconsin Ave. NW, Suite M3
Washington, DC 20007
(202) 618-2344
bklaproth@klaprothlaw.com
jklaproth@klaprothlaw.com
*Attorneys for Plaintiff*