UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| VICTOR VASQUEZ, *et al.*, | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Case No. 17-cv-00112 (APM) |
| WHOLE FOODS MARKET, INC., *et al.*, | ) ) ) | |
| Defendants. | ) ) | |

**MEMORANDUM OPINION AND ORDER**

**I.**

Plaintiffs are nine former Store Team Leaders for various Whole Foods grocery stores in the Washington, D.C. metropolitan area.[1] Each was terminated after a corporate internal investigation revealed that they had engaged in "labor-shifting" in connection with an employee bonus program, known as Gainsharing. The labor-shifting resulted in some Whole Foods employees receiving lower bonus payments than they otherwise would have earned. Whole Foods purportedly determined the labor-shifting misconduct was localized, and it told the media as much. In response to press inquiries, a company spokesperson said that, following a nationwide internal investigation, Whole Foods had determined that the improper labor-shifting was limited to the stores managed by Plaintiffs.

Plaintiffs cry foul. They claim that Defendants Whole Foods Market Group, Inc. and Whole Foods Market Services, Inc. (collectively, "Defendants" or "Whole Foods") defamed them

---

[1] Plaintiffs are: Victor Vasquez, Nadeem Sheikh, Katia Sadoudi, Svetlana Bautista, Ibrahima Ba, Nicholas Miano, Pa M. Njie, Michael Amegnaglo, and David Berger.

in connection with their firings. In truth, Plaintiffs contend, they were directed by their superiors to shift labor, the practice was widespread, and they were "scapegoated" by Whole Foods. Defendants have not, however, backed down from their public statements. They insist that Plaintiffs knowingly violated company policy and did so to benefit themselves by increasing their own bonuses, and that the company conducted a thorough nationwide investigation and uncovered no misconduct except by Plaintiffs.

Plaintiffs bring defamation and false light claims against Defendants. Before the court are the following motions: (1) Defendants' Motion for Summary Judgment; (2) Defendants' Motion to Strike; and (3) Plaintiffs' Motion to Strike.[2] For the reasons stated below, the court denies Defendants' motion for summary judgment except with respect to the false light claims of Virginia-based Plaintiffs Sheikh, Sadoudi, Ba, Amegnaglo, and Berger, and denies the parties' motions to strike.

## II.

Summary judgment is proper when the pleadings and evidence show that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a); *accord Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). A genuine issue of material fact is one that "might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248. The movant must demonstrate the absence of a genuine issue of material fact. *See Celotex*, 477 U.S. at 323. When determining whether a genuine issue of material fact exists, the court must view all facts, and reasonable inferences drawn from those facts, in the light most favorable to the

---

[2] Defs.' Mot. for Summ. J., ECF No. 175; Defs.' Mot. to Strike, ECF No. 190; Pls.' Mot. to Strike, ECF No. 198.

nonmoving party. *See Matsushita Elec. Indus. v. Zenith Radio Corp.*, 475 U.S. 574, 587–88 (1986).

### III.

Because the court writes primarily for the parties, it has not endeavored to summarize the facts. If the court had tried to do so, it would have proven exceedingly difficult. The parties' competing statements of material facts not in dispute are collectively over two hundred pages long. Distilling those facts, as discussed below, is better left to a jury.

Plaintiffs claim that Defendants defamed them through the statements of the company's spokesperson, Brooke Buchanan. Am. Compl. and Jury Demand, ECF No. 11 [hereinafter Compl.], at 10. Plaintiffs assert that Defendants are liable for the following statements that Buchanan made directly to news organizations or that were derived from her statements:

1. Whole Foods Fires 9 Stores Managers Over Bonus Manipulation.

2. Whole Foods supermarkets says it has fired nine store managers in the mid-Atlantic region for manipulating a bonus program to their benefit.

3. Brook Buchanan, a spokeswoman for Austin, Texas-based Whole Foods Market Inc., said [the Vasquez Plaintiffs] 'were dismissed in recent weeks after a company-wide investigation.'

4. 'The [company] found that nine managers in the stores in Maryland, Virginia and the District of Columbia engaged in a policy infraction that allowed the managers to benefit from a profit-sharing program at the expense of store employees.'

5. Whole Foods Fire Managers in Md., Va. And D.C. for Manipulating Bonus System.

6. The managers, at nine separate Whole Foods stores, were fired for manipulating the chain's Gainsharing program.

7. Whole Foods . . . say[s] the incident was still under investigation and 'isolated' to a relatively small number of its 457 stores.

3

8. 'We took swift action, but, relative to the rest of the company, this manipulation only happened in nine of our locations.'

9. '9 store managers [were terminated] around what we call gain sharing. Not naming the stores and no charges filed. This is an isolated incident.'

10. '[Gainsharing is] a type of bonus/profit sharing in our stores. [The incident is] isolated to those 9 stores in our mid-atlantic region that includes MD, VA, and DC. As you know we have over 450 locations.'

11. Whole Foods Fires 9 Store Managers who were Stealing Money from Employees.

Defs.' Mot. for Summ. J., ECF No. 175 [hereinafter Defs.' Mot.], Defs.' Mem. of L. in Supp. of Defs.' Mot, ECF No. 175-1 [hereinafter Defs.' Mem.], at 24; Defs.' Mot., Ex. 1, ECF No. 175-4; Defs.' Mot., Ex. 2, ECF No. 175-5; Defs.' Mot., Ex. 53, ECF No. 175-56; Defs.' Resp. to Pls.' Counter-Designated Facts, ECF No. 214, at 68–69.

Under District of Columbia law, the elements of defamation include "(1) that the defendant made a false and defamatory statement concerning the plaintiff;" "(2) that the defendant published the statement without privilege to a third party;" "(3) that the defendant's fault in publishing the statement amounted to at least negligence;" and "(4) either that the statement is actionable as a matter of law irrespective of special harm, or that its publication caused the plaintiff special harm." *Marsh v. Hollander*, 339 F. Supp. 2d 1, 5 (D.D.C. 2004) (quoting *Crowley v. N. Am. Telecomm. Ass'n,* 691 A.2d 1169, 1172 n. 2 (D.C. 1997)).[3]

---

[3] Defendants argue that this court should use the defamation law of the respective states where each Plaintiff was employed—meaning District of Columbia law for Plaintiff Vasquez; Virginia law for Plaintiffs Sheikh, Sadoudi, Ba, Amegnaglo, and Berger; and Maryland law for Plaintiffs Bautista, Miano, and Njie. "When deciding state-law claims under diversity or supplemental jurisdiction, federal courts apply the choice-of-law rules of the jurisdiction in which they sit." *Mastro v. Potomac Elec. Power Co.*, 447 F.3d 843, 857 (D.C. Cir. 2006) (quoting *Ideal Elec. Sec. Co. v. Int'l Fidelity Ins.,* 129 F.3d 143, 148 (D.C. Cir. 1997)). This court "looks to the choice of law rules prevailing in the District of Columbia," which "employs the governmental interest analysis test of the Restatement Second of Conflict of Laws." *Weyrich v. New Republic, Inc.*, 235 F.3d 617, 626 (D.C. Cir. 2001). "Applying it to defamation actions, the weight of authority considers that the law to be applied is that of the place where the plaintiff suffered injury by reason of his loss of reputation." *Mastro*, 447 F.3d at 857–58 (holding D.C. law applied to a Maryland resident who worked in the District of Columbia) (internal quotation marks omitted). Here, Plaintiffs allege professional reputational injury, so their injuries for choice-of-law purposes arose where they were employed. The court therefore will apply the state law of Plaintiffs' respective places of employment, but only to the extent that the law differs in a

A.

Defendants make various arguments as to why summary judgment is proper for Plaintiffs' defamation claim.

*Substantially True Statements.*  Insofar as Defendants argue that the statements made by Ms. Buchanan were substantially true, that is a question for the jury as both Plaintiffs and Defendants have put forward conflicting evidence regarding whether Plaintiffs' labor-shifting was actually directed by Defendants or done by Plaintiffs' independent, improper initiative. *See Moldea v. N. Y. Times Co.*, 15 F.3d 1137, 1150 (D.C. Cir. 1994) (*Moldea I*) ("[I]n a case of this sort, in which the truth or falsity of multiple statements are presented as questions of fact for the jury, it is the jury's province to determine whether the publication was sufficiently false so as to have defamed the plaintiff.").

Such evidence includes an email from Jane Mueller, the Executive of Operations, asking Plaintiff Miano, "are you OK to spread the Grocery, Prep foods and WB deficits to the other teams that made labor?  We are doing this with a few stores so teams don't get too far behind."  Pls.' Opp'n to Defs.' Mot., ECF No. 184 [hereinafter Pls.' Opp'n], Ex. 6, ECF No. 184-35.  It also comes from Plaintiffs themselves, some of whom have testified that their supervisors had knowledge of the labor-shifting practice and that it was more widespread than Whole Foods reported.  *See* Defs.' Mot., Ex. 54, ECF No. 175-57, at 31:24–32:25 (When asked what "higher-ups" knew about the labor-shifting, Plaintiff Vasquez responded "I'm sure my store manager at the time knew.  He was there.  He would see the payrolls . . . I'm sure that HR knew.  They saw the reports every week."); Defs.' Mot., Ex. 55, ECF No. 175-58, at 56:11–57:9 (testifying that the

---

material way.  *See GEICO v. Fetisoff*, 958 F.2d 1137, 1141 (D.C. Cir. 1992) (stating that choice-of-law principles come into play only when a "true conflict" exists among the competing jurisdictions).  Except as to the false light claim, there are no material differences.

president of the Mid-Atlantic region, Scott Allshouse, stated during a meeting, "[w]e need to do whatever that we need to do to make sure we clean up the labor"); Defs.' Mot., Ex. 57, ECF No. 175-60, at 84:22–84:24 (Plaintiff Miano stating that the labor-shifting was something "we were told to do, what we were shown to do over the years").

On the other hand, Defendants' evidence arguably establishes that, at a minimum, Plaintiffs knew that labor-shifting was improper. *See* Defs.' Mot., Ex. 3, ECF No. 175-6, at 4 (The Gainsharing Guide states "[n]o one may manipulate Labor Surplus Payouts by charging hours worked by Team Members on one team to other teams. This is considered a major infraction and may result in disciplinary action, which may lead to termination."); Defs.' Resp. to Pls.' Counter-Designated Facts at 13 (stating that Plaintiffs had access to the Gainsharing Guide); Defs.' Mot., Ex. 14, ECF No. 175-17, at 12 (when Plaintiff Njie was asked if he had transferred labor to teams where employees did not work without approval, he answered "Yes I have I'm taking full responsibility I do it because I thought this was common practice"); Defs.' Mot., Ex. 15, ECF No. 175-18, at 6–7 (Plaintiff Sheikh admitting that he transferred labor against policy, but stating "[i]t has been a practice at every store I worked I didn't think it was taking any money from anybody . . . . Even in some of our Ops meeting they say I know [you] guys move labor around to help meet labor"); Defs.' Mot., Ex. 16, ECF No. 175-19, at 8 (Plaintiff Sadoudi admitting to transferring labor, but stating "I didn't think it was a violation of policy I thought it was us helping each other out"). The jury will have to sort out this conflicting evidence to determine whether the alleged defamatory statements were in fact substantially true or not.

*Statement of Opinion.* The court disagrees with Defendants that the statement Plaintiffs "manipulated a bonus program to their benefit" is a statement of opinion that cannot be defamatory. Defs.' Mem. at 27. "[S]tatements of opinion can be actionable if they imply a provably false fact,

6

or rely upon stated facts that are provably false." *Moldea v. N. Y. Times Co.*, 22 F.3d 310, 313 (D.C. Cir. 1994) (*Moldea II*) ("[T]here is no wholesale exemption from liability in defamation for statements of 'opinion.'"). If Plaintiffs are able to convince a jury that their superiors indeed directed them to improperly labor-shift, then this statement implies a provably false fact as Plaintiffs would not have "manipulated" anything to their "benefit." Defs.' Mem. at 27.

*Statements Identifying Plaintiffs.* Defendants argue, as they did at the motion-to-dismiss stage, that because their statements did not expressly identify Plaintiffs, they cannot be deemed defamatory. Defs.' Mem. at 37. The court again disagrees. In *Croixland Properties*, the D.C. Circuit held that a statement need not identify the plaintiff by name to qualify as defamatory. "[I]t suffices that the statements at issue lead the listener to conclude that the speaker is referring to the plaintiff by description." *Croixland Prop. Ltd. P'ship v. Corcoran*, 174 F.3d 213, 216 (D.C. Cir. 1999). "When a statement refers to a group, a member of that group may claim defamation if the group's size or other circumstances are such that a reasonable listener could conclude the statement referred to each member or 'solely or especially' to the plaintiff." *Browning v. Clinton*, 292 F.3d 235, 247 (D.C. Cir. 2002) (citing RESTATEMENT (SECOND) OF TORTS § 564A (1977)). "A plaintiff can rely upon extrinsic evidence to show that listeners understood the statements to pertain to the plaintiff." *Vasquez v. Whole Foods Market, Inc.*, 302 F. Supp. 3d 36, 64 (D.D.C. 2018). "If the applicability of the defamatory matter to the plaintiff depends upon extrinsic circumstances, it must appear that some person who saw or read it was familiar with the circumstances and reasonably believed that it referred to the plaintiff." RESTATEMENT (SECOND) OF TORTS § 564 cmt. b. Thus, to establish that the defamatory statement pertains to a plaintiff within a group, the plaintiff can prove "the circumstances of publication

7

reasonably give rise to the conclusion that there is particular reference to the [plaintiff]." *Id.* § 564A(b).

In this case, Plaintiffs' own testimony establishes that potential employers and others in their communities asked whether the articles referred to them. *See, e.g.*, Pls.' Opp'n, Ex. 2(b), ECF No. 184-15, at 7 (Plaintiff Ba stated that during job interviews, he "was asked about the news article and whether he was one of the store managers that had been fired," and "[a]fter this was brought up, the tone of the interview changed and it appeared to Plaintiff that he was no longer considered a candidate for the position"); Defs.' Mot., Ex. 63, ECF No. 175-66, at 5–6 (Plaintiff Vasquez stating that his "close friends and family . . . read the news articles and understood they referred to [him] as one of the store managers," "prospective employers and recruiters read the news articles and understood that they referred to [him]," and "[he] was personally asked by one of his recruiters if [he] was one of the store managers referenced in the news articles"). Defendants have suggested that such statements are inadmissible hearsay, and therefore the court cannot rely on them, but that is not necessarily so. *See United States v. Long*, 905 F.2d 1572, 1580–81 (D.C. Cir. 1990) (holding that whether a question constitutes hearsay depends on whether the declarant intended to convey a fact assertion). At the summary judgment stage, the court finds that there is a genuine dispute as to whether Plaintiffs were identifiable and will leave this determination to a jury.

## B.

*Limited Purpose Public Figures.* Defendants additionally contend that Plaintiffs are limited purpose public figures to which the standard of actual malice applies, and Plaintiffs cannot prove actual malice. The court, however, finds the actual malice standard inapplicable.

A limited purpose public figure is a person who has "assumed a role of especial prominence in the affairs of society that invites attention and comment." *Jankovic v. Int'l Crisis Grp.*, 822 F.3d 576, 585 (D.C. Cir. 2016) (quoting *Lohrenz v. Donnelly*, 350 F.3d 1272, 1279 (D.C. Cir. 2003) (cleaned up)). The court conducts a three-part inquiry to determine if a person so qualifies: "First, the court must identify the relevant controversy and determine whether it is a public controversy. Second, the plaintiff must have played a significant role in that controversy. Third, the defamatory statement must be germane to the plaintiff's participation in the controversy." *Id.* (internal citations omitted).

With respect to the first inquiry, a "controversy is not a public controversy solely because the public is interested in it." *Id.*; *see also Waldbaum v. Fairchild Pub'n, Inc.*, 627 F.2d 1287, 1296 (D.C. Cir. 1980) ("Newsworthiness alone will not suffice, for the alleged defamation itself indicates that someone in the press believed the matter deserved media coverage."). Rather, courts "must examine whether persons actually were discussing some specific question"—"[a] general concern or interest will not suffice." *Waldbaum*, 627 F.2d at 1297. Courts should also consider whether "the press was covering the debate, reporting what people were saying and uncovering facts and theories to help the public formulate some judgment," and "should ask whether a reasonable person would have expected persons beyond the immediate participants in the dispute to feel the impact of its resolution." *Id.* "If the issue was being debated publicly and if it had foreseeable and substantial ramifications for nonparticipants, it was a public controversy." *Id.*

Once the controversy is defined, the court must assess the plaintiffs' role in it. *Id.* "Trivial or tangential participation is not enough." *Id.* Rather, the "plaintiffs must have 'thrust themselves to the forefront' of the controversies so as to become factors in their ultimate resolution." *Id.* (quoting *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 345 (1974)). "They must have achieved a

9

'special prominence' in the debate." *Id.* (quoting *Gertz*, 418 U.S. at 351). "The plaintiff[s] either must have been purposely trying to influence the outcome or could realistically have been expected, because of [their] position in the controversy, to have an impact on its resolution." *Id.*

As to the third and final element, "the alleged defamation must have been germane to the plaintiff[s'] participation in the controversy." *Id.*

In this case, the "controversy" centered on whether Gainsharing abuses were limited to Plaintiffs' stores and executed for their benefit or were more widespread and sanctioned by superiors. That controversy was newsworthy, but it did not rise to the level of a "public controversy." The press did not cover Plaintiffs' firings before Buchanan made the alleged defamatory statements. There was, for example, no reporting on what "people were saying," and the press was not "uncovering facts and theories to help the public formulate some judgment," either before or after Buchanan's media statements. *Id.* The press appears largely to have accepted Whole Foods' statements at face value, and the Gainsharing violations appear not to have generated any further media coverage.

Defendants point to the fact that an online message board, Layoff.com, had a thread regarding the firings, which included some commentary among anonymous Whole Foods employees as to whether the labor-shifting practice was widespread. Defs.' Mem. at 31; Defs.' Mot., Ex. 48, ECF No. 175-51 (A post from the message board stating "[r]egional has been complicit from the beginning with this nonsense"). But such self-contained discussions among a small number of individuals who are likely Whole Foods employees cannot convert the controversy into a public one. *Cf. Lohrenz*, 350 F.3d at 1280–81 (finding a female fighter pilot was a limited public figure when there was a public controversy surrounding women in combat aviation roles because she was "in a position of special prominence in that controversy"). Whole

10

Foods also notes that employees stood to recover lost bonuses to show that the controversy entailed "substantial ramifications for nonparticipants." Defs.' Mem. at 30. But resolving the actual controversy—whether or not supervisors sanctioned a more widespread labor-shifting practice—would not determine whether any particular Whole Foods employee would be made whole: either an employee was short-changed or not due to improper shifting. Plaintiffs' firings were at most newsworthy, but nothing more.

Plaintiffs also did not "thrust themselves to the forefront" of the controversy. Their former employer placed them there by responding to media inquiries. Nor is there evidence that any Plaintiff attempted to use the press to resolve the controversy in their favor. Whole Foods has suggested that one or more Plaintiffs might have caused the press inquiry, but it has offered no proof to support that theory. Pls.' Opp'n, Pls.' Mem. of P. & A. in Supp. of Pls.' Opp'n, ECF No. 184-1[hereinafter Pls.' Mem.], at 58.

Finally, although the defamatory statements were "germane" to Plaintiffs' participation in the controversy, that fact does not overcome the other two factors that weigh decidedly against treating Plaintiffs as limited purpose public figures.

It is useful to compare these Plaintiffs to those whom the D.C. Circuit has deemed to be limited purpose public figures. In *Dameron v. Washington Magazine,* for example, an air traffic controller—who had been on duty the day that a plane crashed—became a limited purpose public figure in the ensuing controversy about the accident's causes. 779 F.2d 736, 742–43 (D.C. Cir. 1985). In *Lohrenz*, a female fighter pilot became a limited purpose public figure regarding the controversy of "whether and how women should be integrated into combat aviation roles." 350 F.3d at 1281. And in *Jankovic*, an advisor and financial supporter of a Serbian prime minister became a limited purpose public figure "with respect to the public controversy surrounding

11

political and economic reform in Serbia and integration of Serbia into international institutions." 822 F.3d at 582. Plaintiffs are in an entirely different category.

*Negligence Standard.* Having concluded that Plaintiffs are private figures for purposes of their claim, a negligence standard applies.[4] Under a negligence standard, a defendant must have "fail[ed] to observe an ordinary degree of care in ascertaining the truth of an assertion before publishing it to others, i.e., a failure to make a reasonable investigation as to truth." *Nyambal v. Alliedbarton Sec. Servs.*, 344 F. Supp. 3d 183, 190 (D.D.C. 2018) (quoting *Kendrick v. Fox Television*, 659 A.2d 814, 822 (D.C. 1995)). "This determination is fact-intensive." *Id.*

Defendants argue that Plaintiffs cannot prove a negligent investigation because they have offered no expert testimony. But expert testimony is not required. Plaintiffs correctly respond that they "are not suing Whole Foods for negligently conducting an investigation. Plaintiffs are suing Whole Foods because they defamed Plaintiffs knowing the statements to be false, with a reckless disregard for the truth of the statements, and for negligently failing to ascertain whether the statements were truthful." Pls.' Mem. at 53–54. Under D.C. law, in a "typical negligence case," the "standard of care applicable to a person's conduct is simply that of a 'reasonable man under like circumstances.'" *Godfrey v. Iverson*, 559 F.3d 569, 572 (D.C. Cir. 2009) (quoting RESTATEMENT (SECOND) OF TORTS § 283 (1965)). "Ordinarily a jury can ascertain this standard without the aid of expert testimony." *Id.* However, "if the subject in question is so distinctly related to some science, profession or occupation as to be beyond the ken of the average layperson," expert testimony is required "to establish the pertinent standard of care unless it is

---

[4] Defendants argue that Plaintiffs did not allege a negligence standard in their Complaint. However, Plaintiffs stated that "Defendants' publication of defamatory statements that Defendants knew to be false is . . . grossly negligent." Compl. at 25. And, at any rate, Plaintiffs pleaded sufficient facts to have put Whole Foods on notice that they did not view themselves as limited purpose public figures.

'within the realm of common knowledge and everyday experience' of the jurors." *Id.* (quoting *District of Columbia v. Arnold & Porter,* 756 A.2d 427, 433 (D.C. 2000)).

Here, based on the testimony and documentary evidence, a lay person can determine whether Whole Foods knew about labor-shifting. They can assess whether Whole Foods in fact conducted a nationwide investigation. And they can evaluate whether Whole Foods *reasonably* investigated the truthfulness of their statements prior to publishing. *See Jones v. U-Haul Co. of D.C.*, 169 F. App'x 590, 591 (D.C. Cir. 2005) (granting summary judgment when there was "undisputed evidence that [the defendant] undertook a *reasonable* investigation of [plaintiff's] conduct" and "no reasonable juror could conclude that [the defendant] was negligent, that is, that it fail[ed] to observe an ordinary degree of care in ascertaining the truth of the allegedly defamatory statements before publishing them to others") (emphasis added) (internal quotation marks omitted); *cf. Kendrick*, 659 A.2d at 822 n.18 ("taking no position on the question whether, in this context, expert testimony would be required" to show the standard of care for a media defendant to prove negligence in a defamation claim).

Further, viewing the evidence in a light most favorable to Plaintiffs, a reasonable layperson could conclude that Defendants' investigation was "unsystematic and incomplete" outside of the ten stores that Mr. Gearhart investigated—nine of which were Plaintiffs' stores. *Parker v. Nat'l R.R. Passenger Corp.*, 214 F. Supp. 3d 19, 29 (D.D.C. 2016), *aff'd*, 696 F. App'x 522 (D.C. Cir. 2017) (stating in the context of a discrimination claim that an investigation could be "so unsystematic and incomplete that a factfinder could conclude that the employer sought[] not to discover the truth"). There remain open questions about why there are investigative files for only those ten stores, *see* Pls.' Opp'n, Exs. 4(a)–4(k), ECF Nos. 184-24–33, as well as why Whole Foods did not more closely scrutinize other stores that were flagged as likely to have had improper

labor-shifting practices. *See* Defs.' Mot., Ex. 28, ECF No. 175-31 (Gainsharing Investigation Color Coded List of Stores), at 7–8; Defs.' Mot., Ex. 29, ECF No. 175-32, at 1–2 (explaining the color-coded list of stores and stating that "[t]he issue seems to be **spread across regions** . . . . We have flagged a **total of 119 stores** based on the analysis of data.  62 stores are 'red' - these are stores that almost certainly moved labor across product teams to increase gainsharing") (emphasis in original); Pls.' Opp'n, Ex. 14, ECF No. 184-43, at 2 (email from a Whole Foods senior analyst regarding the methodology of subsequent investigations, stating "concern[] that SP may have gotten the results of their [Store Team Leader ('STL')] investigation directly from the STLs"); Defs.' Resp. to Pls.' Counter-Designated Facts at 65–66 (Defendants disputing Plaintiff's characterization that Defendants "cannot identify a single person interviewed or a single document reflecting that any such interview even took place").  Ultimately, resolving whether Defendants were negligent in making the alleged defamatory statements lies with a jury.

## C.

*Qualified Self-Defense Privilege.*  Next, Defendants maintain that they cannot be held liable for the alleged defamatory statements because they are protected by the qualified self-defense privilege. Defs.' Mem. at 39; *Washburn v. Lavoie*, 437 F.3d 84, 90 (D.C. Cir. 2006) ("The District of Columbia recognizes the common-law qualified privilege of self-defense as a complete defense to a claim of libel or slander."); *see Mosrie v. Trussell*, 467 A.2d 475, 477 (D.C. 1983). "When the author of a libel writes . . . for the protection of his own rights or interests, that which he writes is a privileged communication unless the writer be actuated by malice." *Dickins v. Int'l Bhd. of Teamsters*, 171 F.2d 21, 24 (D.C. Cir. 1948).  The qualified self-defense privilege applies "if the circumstances induce a correct or reasonable belief that (a) there is information that affects a sufficiently important interest of the publisher, and (b) the recipient's knowledge of the

14

defamatory matter will be of service in the lawful protection of the interest." *Washburn*, 437 F.3d at 90 (quoting RESTATEMENT (SECOND) OF TORTS § 594 (1977)).  The person receiving the information must have a "corresponding interest." *Novecon Ltd. v. Bulgarian-Am. Enter. Fund*, 190 F.3d 556, 566 n.5 (D.C. Cir. 1999).  Further, as the privilege is qualified, the person invoking the privilege must not have acted primarily motivated by common-law malice, meaning with "bad faith and evil motive."  *Id.* at 567 (quoting *Moss v. Stockard*, 580 A.2d 1011, 1027 n.29 (D.C. 1990)).  "[T]he existence of the privilege is a question of law for the court[;] whether it was abused by the defendant[] is a question of fact for the jury." *Mosrie*, 467 A.2d at 477.

The court finds that Defendants fail on the basic elements of the privilege, without reaching whether they acted out of common-law malice.  The facts at hand are markedly different from those of *Mosrie* and *Washburn*.  In *Mosrie*, a Deputy Chief of Police prepared a report, which the Chief of Police *requested*, to respond to complaints *against* the Deputy that were reported to a newspaper by someone in the department.  *Id.* at 476.  In *Washburn*, university students sent a letter to their landlord and a university representative regarding their neighbor *in response* to letters sent by the neighbor to the landlord and university representative complaining about the students' noisy behavior.  *Washburn*, 437 F.3d at 87.  In both cases, the defendants were responding to accusations of wrongdoing made about them by the plaintiffs to someone who had the power to determine their credibility.  Such is not the case here.  Plaintiffs did not accuse Defendants of any misconduct prior to the published statements—in the press or elsewhere—and the reporters to whom Defendants made the statements had no corresponding interest in the matter.[5]  The self-defense privilege does not apply.

---

[5] The court does not mean to suggest that the press can never be a party with a "corresponding interest."  Say, for example, Plaintiffs in this case went to the press first to accuse Whole Foods of improperly terminating them.  In that instance, Whole Foods' responsive media statements, even if defamatory, arguably would qualify for the self-defense privilege.  But those are not the facts presented here.

15

Lastly, Defendants argue that Plaintiffs have not produced admissible evidence of actual injury. However, no such proof is required in this case. "Where a plaintiff is neither a public official nor a public figure, and where the defamatory statements involve no issue of general public importance, proof of defamation *per se* entitles the injured party to presumed general damages"—meaning "general damages may be presumed and do not have to be proved." *LaRue v. Johnson*, No. 16-cv-504 (EGS/RMM), 2018 WL 1967128, at *9 (D.D.C. Feb. 22, 2018). A statement is defamatory per se if "it is so likely to cause degrading injury to the subject's reputation that proof of that harm is not required to recover compensation." *Franklin v. Pepco Holdings, Inc.*, 875 F. Supp. 2d 66, 75 (D.D.C. 2012). Defamation per se includes, among other things, "a matter adversely affecting the person's ability to work in a profession." *LaRue*, 2018 WL 1967128, at *6. Defendants' statements in this matter qualify as defamation per se because they accuse Plaintiffs of having, in essence, violated company policy for their own pecuniary gain—allegations that plainly would adversely impact their ability to work in their profession. General damages therefore may be "presumed." *Id.* at *9.[6]

### D.

*False Light.* The related false light claims may proceed as to some Plaintiffs but not others. Maryland and District of Columbia law provide that false light claims are treated the same as defamation claims, so Defendants' motion for summary judgment as to the false light claims of Maryland and D.C. Plaintiffs is also denied. *See Blodgett v. Univ. Club*, 930 A.2d 210, 223 (D.C.

---

[6] Plaintiffs also have produced some evidence of lost wages resulting from the alleged defamatory statements. *See e.g.*, Pls.' Opp'n, Ex. 2(a), ECF No. 184-14, at 13; Defs.' Mot., Ex. 63, ECF No. 175-66, at 11 (Plaintiff Vasquez providing a table of his lost wages over time and stating that he "lost income as a result of the defamatory articles" and after his "terminat[ion] from Whole Foods, he immediately attempted to find new employment" but "the defamatory news articles impaired his ability to gain employment and/or to find a position making the same or similar income that he earned at Whole Foods"); Pls.' Opp'n, Ex. 29, ECF No. 184-58, at 4 (recruiter email to Plaintiff Miano stating "[t]he Whole Foods store manager firing and now lawsuit has spooked" a potential employer). Whether that evidence can support an award of more than general damages shall be determined at trial.

2007) ("[W]here the plaintiff rests both his defamation and false light claims on the same allegations . . . the claims will be analyzed in the same manner."); *Piscatelli v. Van Smith*, 424 Md. 294, 305–06 (Md. App. Ct. 2012) (stating the court "need not address the false light claim separately" as an "allegation of false light must meet the same legal standards as an allegation of defamation."). Virginia, on the other hand, has abrogated false light as a cause of action and thus judgment is entered in favor of Defendants on the Virginia Plaintiffs' false light claims. *See WJLA-TV v. Levin*, 564 S.E.2d 383, 394 n.5 (Va. 2002); *Zandford v. Nat'l Ass'n of Sec. Dealers, Inc.*, 19 F. Supp. 2d 1, 3 (D.D.C. 1998).

### IV.

*Motions to Strike.* Under Federal Rule of Civil Procedure 12(f), a court may strike from a pleading any "redundant, immaterial, impertinent, or scandalous matter." FED. R. CIV. P. 12(f); *see also Naegele v. Albers*, 355 F. Supp. 2d 129, 142–43 (D.D.C. 2005) (stating that motions to strike solely apply to pleadings, not responsive documents). An allegation is "immaterial" or "impertinent" "when it is not relevant to the resolution of the issue at hand." *Jud. Watch, Inc. v. U.S. Dep't of Com.*, 224 F.R.D. 261, 263 (D.D.C. 2004). A "decision to grant or deny a motion to strike is vested in the trial judge's sound discretion." *Ascom Hasler Mailing Sys., v. U.S. Postal Serv.*, 815 F. Supp. 2d 148, 162 (D.D.C. 2011) (quoting *Canady v. Erbe Elektromedizin GmbH*, 384 F.Supp.2d 176, 180 (D.D.C. 2005)). Courts disfavor motions to strike. *See Stabilisierungsfonds Fur Wein v. Kaiser Stuhl Wine Distribs. Pty. Ltd.*, 647 F.2d 200, 201 (D.C. Cir. 1981).

Federal Rule of Civil Procedure 56(c) states that a "party asserting that a fact cannot be or is genuinely disputed must support the assertion" through a variety of methods, including "citing to particular parts of materials in the record, including depositions, documents, electronically

stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." FED. R. CIV. P. 56(c)(1). "While a nonmovant is not required to produce evidence in a *form* that would be admissible at trial, the evidence still must be capable of being converted into admissible evidence." *Gleklen v. Democratic Cong. Campaign Comm., Inc.*, 199 F.3d 1365, 1369 (D.C. Cir. 2000).

Defendants move to strike various portions of Plaintiffs' papers. First, Defendants ask the court to "strike all of Plaintiffs' Response evidence that is not included in cross-statements of fact, as required by the Local Rules and this Court's Order." Defs.' Mot. to Strike and Mem. of L. in Supp. of Mot., ECF No. 190 [hereinafter Defs.' Mot. to Strike], at 2. This request is moot as the court has granted Plaintiffs' Motion for Leave to File a Corrected Statement of Facts. *See* Minute Order, Feb. 3, 2023. Defendants next ask the court to strike Plaintiffs' evidence in the form of their own interrogatory responses as they are "replete with hearsay, hearsay within hearsay, speculation unsupported by personal knowledge, and conclusory allegations." Defs.' Mot. to Strike at 4. But not all out-of-court statements are inadmissible hearsay. Some are not hearsay because they may be capable of being converted into admissible evidence at trial. Arguments regarding this evidence's suitability will be better addressed in motions in limine or at trial. Defendants' motion to strike is denied.

Plaintiffs also filed a motion to strike. Plaintiffs seek to strike (1) Defendants' Supplemental Statement of Facts, which was attached to Defendants' Reply (ECF No. 188-1); (2) 31 Exhibits attached to the Reply (ECF No. 188-2 to 188-29, 189); (3) "all arguments based on that new evidence attached to" the Reply; (4) Defendants' response to Plaintiffs' objections to Defendants' Counterstatement of Facts (ECF No. 194); and (5) two exhibits attached to this response (ECF No. 194-1 to 194-2). Plaintiffs argue that Defendants "improperly presented new

argument and evidence in its Reply . . . [and] filed what amounts to a sur-reply." Pls.' Mot. to Strike, ECF No. 198, at 1.

"[A]s a motion to strike a reply for raising new arguments addresses concerns identical with those in a motion for leave to file a sur-reply, courts will apply the standard of the latter when construing such a motion." *Baloch v. Norton*, 517 F. Supp. 2d 345, 348 n.2 (D.D.C. 2007), *aff'd sub nom. Baloch v. Kempthorne*, 550 F.3d 1191 (D.C. Cir. 2008). The decision to grant or deny leave to file a sur-reply is within a court's discretion. *Id.* "If the movant raises arguments for the first time in his reply to the non-movant's opposition, the court will either ignore those arguments in resolving the motion or provide the non-movant an opportunity to respond to those arguments by granting leave to file a sur-reply." *Id.*

To begin, Plaintiffs' request to strike anything in the moving papers related to the counterclaims is moot. Defendants dropped their counterclaims after briefing concluded. *See* Whole Foods' Unopposed Motion to Dismiss Counterclaims with Prejudice, ECF No. 216. Further, much of what Plaintiffs want stricken is not new *argument*, but instead new evidence in response to Plaintiffs' evidence. In its Order filed on January 28, 2022, the court instructed the parties that "[i]f additional fact allegations are made by the non-movant, the moving party shall file a responsive statement of its own with its reply brief." Order, ECF No. 171 at 2. Insofar as the Defendants are responding to new facts put forward by Plaintiffs, this is proper. Where Defendants have raised new legal arguments in its responses, the court ignored those arguments in resolving the motion. Plaintiffs' motion to strike is denied.

**V.**

For the foregoing reasons, Defendants' Motion for Summary Judgment, ECF No. 175, is denied except as to the false light claims of Virginia-based Plaintiffs Sheikh, Sadoudi, Ba, Amegnaglo, and Berger. Additionally, Defendants' Motion to Strike, ECF No. 190, and Plaintiffs' Motion to Strike, ECF No. 198, are denied.

Dated: March 28, 2023

_____
Amit P. Mehta
United States District Court Judge